1   SARAH H. BURT (CA Bar No. 250378)
    J. MARTIN WAGNER (CA Bar No. 190049)
2   Earthjustice
    426 17th Street, 6th Floor
3   Oakland, CA 94612
    Tel.: (510) 550-6700
4   Fax: (510) 550-6740
    mwagner@earthjustice.org
5   sburt@earthjustice.org

6   KEVIN REUTHER (MN Bar No. 266255) (Application for Admission *Pro Hac Vice* Pending)
    Minnesota Center for Environmental Advocacy
7   26 E. Exchange St., Suite 206
    St. Paul, MN 55101
8   Tel.: (651) 223-5969
    Fax: (651) 223-5967
9   kreuther@mncenter.org

10  ERIC E. HUBER (CO Bar No. 40664) (Application for Admission *Pro Hac Vice* Pending)
    DOUGLAS P. HAYES (CO Bar No. 39216) (Application for Admission *Pro Hac Vice* Pending)
11  Sierra Club Environmental Law Program
    1650 38th Street, Suite 102W
12  Boulder, Colorado 80301
    Tel.: (303) 449-5595
13  Fax: (303) 449-6520
    eric.huber@sierraclub.org
14  doug.hayes@sierraclub.org

15  *Counsel for Plaintiffs*

16              UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF CALIFORNIA
17              SAN FRANCISCO DIVISION

18  
19  SIERRA CLUB, MINNESOTA          )  CV  09      4086
    CENTER FOR ENVIRONMENTAL        )                              JCS
20  ADVOCACY, INDIGENOUS            )
    ENVIRONMENTAL NETWORK, and      )  Civ. No._____
21  NATIONAL WILDLIFE               )
    FEDERATION,                     )
22                                  )
            Plaintiffs,             )  COMPLAINT FOR DECLARATORY
                                    )  AND INJUNCTIVE RELIEF
23                                  )
        v.                          )  (National Environmental Policy Act, 42
24                                  )  U.S.C. §§ 4321 et seq.)
    HILLARY CLINTON, in her official capacity
25
26  COMPLAINT                                                    1

1  as Secretary of State, JAMES STEINBERG, in )
   his official capacity as Deputy Secretary of )
2  State, UNITED STATES DEPARTMENT OF )
   STATE, and the UNITED STATES ARMY )
3  CORPS OF ENGINEERS, )
                                                 )
4          Defendants.

5

6                    **INTRODUCTION**

7      1.     Plaintiffs bring this action to challenge the United States Department of State's

8  ("State Department") issuance of a Presidential permit to Enbridge Energy LP and its affiliates

9  (collectively, "Enbridge"), to construct and operate a pipeline known as the Alberta Clipper, the

10 purpose of which is to import tar sands crude oil into the United States from Canada.  The U.S.

11 portion of the Alberta Clipper project involves the building of 384 miles of pipeline, from the

12 Canadian border at Neche, North Dakota, across Minnesota, to a terminal in Superior Wisconsin.

13     2.     The Alberta Clipper project is part of Enbridge's larger pipeline expansion

14 project, which includes the Southern Lights project.  The Southern Lights project is designed to

15 transport diluent (a blending agent necessary for transporting tar sands crude oil via the Alberta

16 Clipper pipeline) from U.S. refineries to tar sands production sites in Canada.  It is integral to

17 and connected with the Alberta Clipper project.  There are two components to the Southern

18 Lights project: a) the Line 13 Reversal/New Diluent Pipeline project ("diluent pipeline"), which

19 requires construction of 678 miles of new pipeline from Manhattan Illinois to Clearbrook,

20 Minnesota, as well as the reversal of flow in Enbridge's existing Line 13 pipeline (currently a

21 light sour crude pipeline between Edmonton, Alberta and Clearbrook, Minnesota), to create a

22 dedicated diluent delivery system to tar sands production centers in Alberta, Canada; and b) the

23 LSr Capacity Replacement pipeline ("LSr pipeline"), which would provide 313 miles of new

24 pipeline to replace the capacity to import light sour crude oil from Canada into the United States

25

26 COMPLAINT                                                                    2

1   that would be lost due to diversion of Line 13 for the diluent pipeline. *See* Alberta Clipper and

2   Southern Lights Map, attached hereto as Appendix A.

3         3.      The Alberta Clipper project and Southern Lights diluent project would greatly

4   increase the availability of heavy tar sands crude in the United States and, possibly, worldwide.

5   The projects would spur refinery expansions and modifications in the United States, leading to

6   increased air and water pollution for residents of the Midwest and other states.  Additionally,

7   because extraction of tar sands crude is energy intensive, life-cycle greenhouse gas emissions

8   from burning tar sands-derived fuels are significantly higher than from fuels derived from

9   conventional crude.  As a result, the production and refining of more tar sands crude will cause

10  increased emissions of greenhouse gases that contribute to global warming and related harmful

11  effects on the environment.

12        4.      In granting the Presidential permit for the Alberta Clipper, the State Department

13  violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, and NEPA's

14  implementing regulations, 40 C.F.R. §§ 1500-1508, by: i) failing to analyze the impacts of

15  connected, cumulative, and/or similar actions, including the Southern Lights project; ii) failing to

16  assess all reasonably foreseeable environmental impacts of the project, including indirect, and

17  cumulative effects; and iii) failing to take a hard look at the Alberta Clipper project's stated

18  purpose and need or to adequately consider a reasonable range of alternatives before granting the

19  Presidential permit.

20        5.      Plaintiffs allege that because they are connected, cumulative and/or similar

21  actions, a single Environmental Impact Statement (EIS) should be prepared for the Alberta

22  Clipper and Southern Lights projects.  If, however, this Court determines that the State

23  Department did not err in separating the environmental review of the Alberta Clipper project

24

25

26  COMPLAINT                                        3

1  from the Southern Lights project, then Plaintiffs challenge the adequacy of the NEPA review for

2  the Southern Lights project, which only assessed the effects of the LSr capacity replacement

3  pipeline and failed to evaluate any impacts from the diluent pipeline.

4        6.     Plaintiffs also challenge the authority of the State Department to issue the

5  Presidential permit for the Alberta Clipper project.  The regulation of international tar sands

6  crude oil pipelines falls within Congress's exclusive and plenary authority over matters of

7  foreign commerce pursuant to Article I, Section 8, clause 3 of the United States Constitution.

8  Congress has not delegated that authority to the Executive Branch.  Because the President has no

9  constitutional or statutory authority to permit the construction of new pipelines to import tar

10  sands crude oil from Canada, the State Department's issuance of the Presidential permit to

11  Enbridge was unconstitutional or contrary to constitutional right, power, privilege or immunity.

12        7.     Plaintiffs request that this Court: a) enter a declaratory judgment that the Alberta

13  Clipper permit was issued in violation of NEPA and the APA; b) issue an order vacating the

14  Alberta Clipper permit; and c) issue preliminary and permanent injunctions enjoining the

15  construction of the Alberta Clipper and Southern Lights diluent pipelines unless and until the

16  State Department complies fully with NEPA.

17        8.     In the event that the Court determines that the State Department did not err in

18  separating the environmental review of the Alberta Clipper project from the Southern Lights

19  project, Plaintiffs request that this Court a) enter a declaratory judgment that the LSr permit was

20  issued in violation of NEPA; b) issue an order vacating the LSr permit; and c) issue preliminary

21  and permanent injunctions enjoining the construction of the Southern Lights diluent pipeline

22  unless and until the State Department complies fully with NEPA.

23        9.     In addition, Plaintiffs request that this Court enter a declaratory judgment that the

24

25

26  COMPLAINT                                                          4

1  State Department's issuance of the Presidential permit for the Alberta Clipper Project was

2  unconstitutional, and vacate the Alberta Clipper permit.

3  **JURISDICTION**

4       10.    This Court has jurisdiction over this action by virtue of the Administrative

5  Procedure Act, 5 U.S.C. § 551 *et seq.*, and 28 U.S.C. § 1331 (federal question jurisdiction).

6       11.    An actual controversy exists between the parties within the meaning of 28 U.S.C.

7  § 2201(a). This Court may grant declaratory relief and additional relief, including an injunction,

8  pursuant to 28 U.S.C. §§ 2201, 2202 and 5 U.S.C. §§ 701-706.

9  **VENUE AND INTRADISTRICT ASSIGNMENT**

10       12.    Venue lies in this judicial district under 28 U.S.C. § 1391(e) because Plaintiff

11  Sierra Club resides in this district.

12       13.    Assignment to the San Francisco Division of this judicial district is proper under

13  Civil Local Rule 3-2 (c)-(d) because Plaintiff Sierra Club is incorporated and headquartered in

14  San Francisco County.

15  **PARTIES**

16       14.    Plaintiff SIERRA CLUB:

17           a.    Plaintiff Sierra Club is a national nonprofit organization of over one

18  million members and supporters dedicated to exploring, enjoying, and protecting the wild places

19  of the earth; practicing and promoting the responsible use of the earth's ecosystems and

20  resources; educating and enlisting humanity to protect and restore the quality of the natural and

21  human environment; and using all lawful means to carry out these objectives. The Sierra Club

22  has chapters and members in each of the states through which the Alberta Clipper pipeline would

23  pass, and in the state(s) where the refining of the tar sands crude would take place. The Sierra

24

25

26  COMPLAINT                                                     5

1   Club's concerns encompass the protection of wildlands, wildlife habitat, water resources, air,

2   climate change, public health and the health of its members, all of which stand to be affected by

3   these pipelines. The Sierra Club's headquarters are located at 85 2nd Street, 4th Floor, San

4   Francisco, CA 94109-3441.

5          b.      Sierra Club brings this action on behalf of its members who live, work,

6   and recreate in areas that will be affected by air and/or water pollution from the pipeline, pipeline

7   facilities, and refineries processing oil from the pipeline, and by the deleterious impacts of

8   increased emissions of greenhouse gases resulting from the refining and end-use of tar sands

9   crude oil. These members face increased risk of harm to their health, recreational, economic,

10  and aesthetic interests as a result of the Department's permitting of the pipeline. The State

11  Department's failure to provide required information and analyze and/or mitigate reasonably

12  foreseeable direct, indirect, and cumulative impacts of the proposed pipeline expansion project

13  has also deprived Sierra Club's members of their right to participate fully in the process leading

14  to the issuance of the Presidential permit.

15         c.      The declaratory and injunctive relief Sierra Club seeks will redress the

16  injuries to its members by vacating the Alberta Clipper permit and preventing construction of the

17  diluent pipeline. Sierra Club's injuries will also be redressed by requiring Defendant to remedy

18  the procedural and informational defects in the State Department's NEPA review.

19         15.    Plaintiff MINNESOTA CENTER FOR ENVIRONMENTAL ADVOCACY:

20         a.      Plaintiff Minnesota Center for Environmental Advocacy ("MCEA") is a

21  Minnesota-based non-profit environmental organization whose mission is to use law, science,

22  and research to preserve and protect Minnesota's wildlife, natural resources, and the health of its

23  people. MCEA works on a wide range of environmental policy issues, including the

24

25

26  COMPLAINT                                                                6

1  environmental impacts from large construction projects, energy consumption, and climate

2  change. MCEA is located at 26 E. Exchange Street, Suite 206, St. Paul, Minnesota 55101.

3         b.     MCEA brings this action on behalf of itself and its members. MCEA

4  members live and recreate in the areas affected by the proposed pipelines and will be affected by

5  the construction and operation of these pipelines. The recreational, aesthetic, economic and/or

6  environmental interests of MCEA and its members are threatened by air and/or water pollution

7  from the pipeline, pipeline facilities, and refineries processing oil from the pipeline, and by the

8  deleterious impacts of increased emissions of greenhouse gases resulting from the refining and

9  end-use of tar sands crude oil. These members face increased risk of harm to their health,

10  recreational, economic, and aesthetic interests as a result of the Department's permitting of the

11  pipeline. The State Department's failure to provide required information and analyze and/or

12  mitigate reasonably foreseeable direct, indirect, and cumulative impacts of the proposed pipeline

13  expansion project has also deprived MCEA's members of their right to participate fully in the

14  process leading to the issuance of the Presidential permit.

15         c.     The declaratory and injunctive relief MCEA seeks will redress the

16  injuries to its members by vacating the Alberta Clipper permit and preventing construction of the

17  Southern Lights diluent pipeline. MCEA's injuries will also be redressed by requiring

18  Defendants to remedy the procedural and informational defects in the State Department's NEPA

19  review.

20       16.    Plaintiff INDIGENOUS ENVIRONMENTAL NETWORK:

21         a.     Plaintiff Indigenous Environmental Network ("IEN") is a non-profit

22  organization that works with indigenous individuals and grassroots community groups to protect

23  their sacred sites, land, water, air, natural resources, and the health of their people and all living

24

25

26  COMPLAINT                           7

1   things, and to building economically sustainable communities.  IEN's work encompasses a range

2   of environmental and economic justice issues that impact the lands and cultures of indigenous

3   peoples and individuals, including mining and oil development on and near indigenous lands;

4   soil and water contamination from energy exploration and development; climate change; water

5   conservation; and the transboundary movement of hazardous materials along the U.S. borders

6   with Canada and Mexico.  IEN's headquaters is located at 219 Bemidji Avenue, Bemidji, MN

7   56601.

8          b.      IEN brings this action on its own behalf.  The environmental impacts of

9   the pipelines, associated facilities, and refineries processing crude oil from the pipeline,

10   including increased air and water pollution and the deleterious impacts of increased emissions of

11   greenhouse gases resulting from the refining and end-use of tar sands crude oil, frustrate IEN's

12   mission of reducing the harmful and disproportionate impacts of tar sands extraction, refining

13   and end-use on indigenous lands and on the health of indigenous communities.  Redoubled

14   efforts to educate communities in the vicinity of tar sands development and refineries of the

15   health impacts of increased air and water pollution and new programs to compel Enbridge and

16   the Pipeline and Hazardous Materials Safety Administration within the Department of

17   Transportation to implement adequate safety measures to minimize the risk of leaks and spills,

18   will divert resources from IEN's other program areas.

19          c.      IEN advocates for environmental protection to benefit members of Native

20   American Indian tribes and native lands.  The interests of the communities and lands that IEN

21   was founded to protect are directly impacted by the Department of State's permitting of the

22   Alberta Clipper pipeline.  These communities face increased risk of harm to their health,

23   recreational, economic, aesthetic and cultural interests as a result of the Department's permitting

24

25

26   COMPLAINT                                                                                8

1   of the pipeline. Community members' lives, work, and spiritual and cultural practices will be

2   affected by the construction and operation of the pipelines, pipeline facilities, and refineries that

3   process oil from the pipeline, and by the deleterious impacts of increased emissions of

4   greenhouse gases resulting from the refining and end-use of tar sands crude oil. The State

5   Department's failure to provide required information and analyze and/or mitigate reasonably

6   foreseeable direct, indirect, and cumulative impacts of the proposed pipeline expansion project

7   has also deprived IEN of its right to participate fully in the process leading to the issuance of the

8   Presidential permit.

9          d.    The declaratory and injunctive relief IEN seeks will redress the injuries to

10  IEN and the communities and resources it seeks to protect by vacating the Alberta Clipper permit

11  and preventing construction of the Southern Lights diluent pipeline. IEN's injuries will also be

12  redressed by requiring Defendants to remedy the procedural and informational defects of the

13  State Department's NEPA review.

14         17.    Plaintiff NATIONAL WILDLIFE FEDERATION:

15         a.    Plaintiff National Wildlife Federation ("NWF") is the nation's largest non-

16  profit conservation advocacy and education organization. NWF has over one million individual

17  members, including 26,310 and 33,736 members in Minnesota and Wisconsin respectively, and

18  affiliate organizations in 47 states and territories, including North Dakota, Minnesota and

19  Wisconsin. NWF's mission is to educate, mobilize, and advocate to preserve and strengthen

20  protection for wildlife and wild places. NWF also works to protect of wildlife, wild places, and

21  natural resources from the impacts of climate change and the health of its members, which will

22  be affected by the actions described herein. NWF's headquarters is located at 11100 Wildlife

23  Center Drive, Reston, VA 20190.

24

25

26  COMPLAINT                               9

1          b.      NWF brings this action on behalf of its members who live, work, and

2    recreate in areas that will be affected by air and/or water pollution from the pipeline, pipeline

3    facilities, and refineries processing oil from the pipeline, and by the deleterious impacts of

4    increased emissions of greenhouse gases resulting from the refining and end-use of tar sands

5    crude oil.  These members face increased risk of harm to their health, recreational, economic,

6    and aesthetic interests as a result of the Department's permitting of the pipeline.  The State

7    Department's failure to provide required information and analyze and/or mitigate reasonably

8    foreseeable direct, indirect, and cumulative impacts of the proposed pipeline expansion project

9    has also deprived NWF's members of their right to participate fully in the process leading to the

10   issuance of the Presidential permit.

11         c.      The declaratory and injunctive relief NWF seeks will redress the injuries

12   to its members by vacating the Alberta Clipper permit and preventing construction of the diluent

13   pipeline.  NWF's injuries will also be redressed by requiring Defendants to remedy the

14   procedural and informational defects in the State Department's NEPA review.

15         18.     Defendant UNITED STATES DEPARTMENT OF STATE is a federal agency

16   whose chief administrator is the Secretary of State.  The State Department processes applications

17   for Presidential permits for the construction, operation and maintenance of facilities on the U.S.-

18   Canada border.  In carrying out its responsibilities, the State Department must comply with

19   applicable requirements of NEPA and the APA.

20         19.     Defendant HILLARY CLINTON is the Secretary of State and is sued in her

21   official capacity.  Pursuant to Executive Order 13337, 69 Fed. Reg. 25299 (April 30, 2004),

22   Secretary Clinton is responsible for determining whether to issue permits for the construction,

23   operation or maintenance at the borders of the United States of facilities for the exportation or

24

25

26   COMPLAINT                                                                                    10

1   importation of petroleum products or other fuels to or from a foreign country.  In carrying out

2   these duties, Secretary Clinton must ensure compliance with the requirements of NEPA.

3          20.     Defendant JAMES STEINBERG is the Deputy Secretary of State and is sued in

4   his official capacity.  On February 13, 2009, Secretary Clinton delegated to the Deputy Secretary

5   of State, to the extent authorized by law, all authorities and functions vested in the Secretary of

6   State or the head of agency by any act, order, determination, delegation of authority, regulation,

7   or executive order, now or hereafter issued.  Department of State Delegation of Authority No.

8   245-1.

9          21.     Defendant UNITED STATES ARMY CORPS OF ENGINEERS.  The Army

10  Corps of Engineers ("ACE") has regulatory authority over the Alberta Clipper and Southern

11  Lights projects pursuant to section 404 of the Clean Water Act of 1977, 33 U.S.C. § 1344, and

12  section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 401.  ACE is a cooperating

13  agency in the preparation of the State Department's EA for the LSr pipeline and EIS for the

14  Alberta Clipper pipeline.

**FACTS**

15

16  **Enbridge's Pipeline Expansion Proposal**

17         22.     Enbridge proposes to expand significantly the existing pipeline system it owns

18  and operates between Alberta, Canada and United States.  The expansion includes the Alberta

19  Clipper project and the Southern Lights project.

20         23.     The Alberta Clipper pipeline is a 992-mile long, 36-inch diameter pipeline

21  running from Hardisty, Alberta, Canada, crossing the border near Neche, North Dakota, and

22  continuing through northern Minnesota to a terminal in Superior, Wisconsin.  The Alberta

23  Clipper pipeline will carry approximately 450,000 barrels per day (bpd), with an ultimate

24

25

26  COMPLAINT                                                                              11

capacity of 800,000 bpd, of heavy crude oil, also referred to as "bitumen," from the Canadian tar sands to refineries throughout the Midwest. The pipeline will be integrated with and form part of the Enbridge's mainline oil pipeline system. At Superior, the Alberta Clipper pipeline will connect to a mainline to Chicago, Illinois.

24.     The Southern Lights project is comprised of two components: the Line 13 Reversal/New Diluent pipeline and the LSr Capacity Replacement pipeline.

25.     The diluent pipeline would transport light hydrocarbons known as "diluent" from Midwest refineries to the Alberta tar sands. Because bitumen crude from the Canadian tar sands is too viscous to be pumped through a pipeline, it must be diluted with lighter liquid hydrocarbons in order to be transported by pipeline. For the diluent pipeline, Enbridge proposes to construct a new 678-mile, 20-inch pipeline from Manhattan, Illinois, to Clearbrook, Minnesota, where it would connect with Enbridge's existing Line 13. Enbridge proposes to reverse the flow of Line 13, which currently transports light sour crude from Canada to Clearbrook, to create a dedicated diluent delivery system from refineries in Illinois to the tar sands production centers in Alberta. The diluent pipeline would have an initial capacity of 180,000 bpd with expansion capability up to 330,000 bpd. The 188-mile segment of diluent pipeline from Clearbrook, Minnesota to Superior, Wisconsin would be constructed at the same time and in the same right-of-way as the Alberta Clipper pipeline.

26.     The LSr Capacity Replacement pipeline is a new 313-mile 20-inch pipeline being constructed between Cromer, Manitoba, Canada, and Clearbrook, Minnesota to transport light sour crude. According to Enbridge, diversion of the capacity of Line 13 to the diluent pipeline necessitates the construction of an additional pipeline to replace that capacity. The LSr pipeline was proposed and permitted for that purpose. The LSr pipeline would deliver 186,000 bpd of

COMPLAINT                                                                                          12

crude oil from a supply hub near Cromer, Manitoba to the existing Enbridge terminal in Clearbrook. The "ultimate capacity" of the LSr pipeline is 300,000 bpd.

27.     The TransCanada Keystone pipeline project through North and South Dakota will also carry tar sands crude. The State Department's final EIS for TransCanada's Keystone crude oil pipeline was issued in January 2008, and construction began in May 2008. The Keystone pipeline will have a capacity of 450,000 bpd and will extend approximately 1,384 miles within the United States, from the U.S.-Canadian border in western Pembina County, North Dakota to terminals at Cushing in Oklahoma, Wood River in Illinois, and Patoka in Illinois. The Keystone pipeline intersects the proposed Alberta Clipper Project route in eastern Pembina County, North Dakota.

28.     TransCanada is also proposing to build the Keystone XL pipeline, which is designed to transport tar sands crude oil from the Western Canadian Sedimentary Basin to the Texas Gulf Coast area. The U.S. portion of the proposed XL pipeline would be 1,375 miles long with a transport capacity of 900,000 bpd and would pass through Montana, South Dakota, Nebraska, Kansas, Oklahoma, and Texas.

**Regulatory Background**

29.     Because Enbridge's proposed expansion would involve construction on the U.S.-Canada border and the import and export of crude oil and refined petroleum products, Enbridge applied to the State Department for Presidential permits. Enbridge submitted permit applications for the import of heavy crude and construction of the Alberta Clipper pipeline, for the import of light sour crude and construction of the LSr pipeline, and for the export of diluent in Line 13.

30.     Enbridge also applied for permits for the Alberta Clipper and Southern Lights projects from: i) the U.S. Army Corps of Engineers for permits to dredge and fill wetlands and

COMPLAINT                                                                 13

1   place structures in or under water-bodies pursuant to section 404 of the Clean Water Act and

2   section 10 of the Rivers and Harbors Act; ii) the U.S. Forest Service for a special use permit to

3   site and construct the pipelines through the Chippewa National Forest; iii) the U.S.

4   Environmental Protection Agency for wastewater discharge permits pursuant to section 402 of

5   the Clean Water Act; and iv) the Bureau of Indian Affairs for approval to cross certain Indian

6   lands. Each agency decision on these permit requests is major federal action triggering NEPA.

7       31.    The State Department claimed to be the lead federal agency on the project for

8   purposes of NEPA and assumed responsibility for conducting the environmental review for the

9   expansion. Instead of preparing one EIS for the entire expansion, as NEPA requires, the State

10   Department segregated the component parts of Enbridge's proposal and conducted its

11   environmental review in separate pieces.

12       32.    On July 27, 2007, the State Department issued two separate Notices of Intent to

13   prepare separate Environmental Assessments (EAs) for the LSr pipeline and the Alberta Clipper

14   pipeline. Although Enbridge had applied for a Presidential permit allowing it to reverse the flow

15   in Line 13 and export diluent, the State Department, in a letter dated November 28, 2007, told

16   Enbridge that a new or amended permit was not necessary. The State Department, therefore, did

17   not issue a Notice of Intent to prepare an EA for the diluent pipeline. No other federal agency

18   issued a separate notice or undertook separate or supplemental environmental review for the

19   diluent pipeline

20       33.    The State Department then determined it would proceed with an EA for the LSr

21   pipeline, but prepare an EIS for the Alberta Clipper pipeline. Plaintiff MCEA, in comment

22   letters sent to the State Department in December 2007, pointed out that all three pipelines were

23   part of one project and that NEPA required the State Department to evaluate all three in one

24

25

26   COMPLAINT                                   14

1   environmental impact statement. Over MCEA's objections, the State Department proceeded

2   with separate environmental reviews.

3       34.    The State Department's EA for the LSr pipeline did not evaluate environmental

4   impacts from the Alberta Clipper pipeline or the diluent pipeline. In its final EA and Finding of

5   No Significant Impact ("FONSI") for the LSr pipeline, the State Department represented that the

6   diluent pipeline would be evaluated in the NEPA analysis for the Alberta Clipper project.

7       35.    The State Department issued its draft EIS for the Alberta Clipper project on

8   December 5, 2008, and its final EIS on June 8, 2009. The Department excluded both the LSr and

9   diluent pipelines from its definition of the project under review and asserted that they were not

10   connected actions for NEPA purposes.

11       36.    The draft EIS stated that the purpose and need for the project is to transport

12   additional crude oil into the United States from existing Enbridge facilities in western Canada to

13   meet the growing U.S. demand. The draft did not fully analyze all reasonably foreseeable

14   cumulative impacts of the proposal such as the impacts of refining and burning the additional

15   heavy crude oil, or the impacts of increased greenhouse gas emissions. The draft EIS also did

16   not adequately evaluate the risks, environmental impacts, and available mitigation measures

17   associated with spills and operational leaks from the pipeline.

18       37.    Plaintiffs and others submitted comments on the draft EIS noting these failures.

19   In these comments Plaintiffs notified the State Department that NEPA requires evaluation of all

20   the component parts of the Alberta Clipper project, including the connected diluent and LSr

21   pipelines, and assessment (and, as warranted, mitigation) of the reasonably foreseeable

22   environmental impacts of the project, including tar sands extraction, expanded U.S. refining of

23   heavy crude from the Canadian tar sands, and increased greenhouse gas emissions from

24

25

26   COMPLAINT    15

1   extraction, refining, and end-use of tar sands crude oil. In addition, Plaintiffs challenged the

2   accuracy of the crude oil demand forecasts underpinning the project's stated purpose and need,

3   and commented on the State Department's failure to adequately consider reasonable alternatives.

4       38.    On June 8, 2009, the State Department released a final EIS for the project. The

5   final EIS did not include the diluent or the LSr pipelines as connected actions. The final EIS did

6   not adequately respond to Plaintiffs' comments that the EIS does not consider the reasonably

7   foreseeable environmental impacts of tar sands extraction, of expanded U.S. refining of heavy

8   crude from the Canadian tar sands, or of increased greenhouse gas emissions from extraction,

9   refining, and end-use of tar sands crude oil. The final EIS also did not adequately address the

10   impacts that spills and operational leaks would have on the environment, especially soil and

11   water resources, or on human health, and does not discuss measures to mitigate these impacts,

12   but instead defers to a future review process by the Department of Transportation.

13       39.    The State Department, in its Response to Comments in the final EIS, changed the

14   purpose and need for the project, stating that the purpose of the project is to "increase the import

15   of a safe and reliable supply of Canadian crude oil to replace portions of the imported crude

16   coming from foreign sources that are substantially less reliable and stable." However, this new

17   statement of purpose and need is not reflected in Enbridge's Presidential permit application, nor

18   is it supported by laws or facts that indicate reduced importation of crude oil from other countries

19   that may be perceived as suffering from instability.

20       40.    Because the State Department failed to consider the diluent pipeline in the Alberta

21   Clipper EIS, and because it failed to consider the diluent pipeline in its NEPA review for the LSr

22   pipeline, no study has been conducted to date evaluating the environmental impacts from the

23   diluent pipeline. Defendant ACE and other federal agencies with regulatory authority over the

24

25

26   COMPLAINT                                                       16

1    diluent pipeline are unable to rely on the State Department's environmental review in their

2    permitting decisions because of this failure.

3        41.    On August 20, 2009, the State Department issued a Record of Decision (ROD) to

4    issue a Presidential permit for the Alberta Clipper pipeline, along with a determination that

5    issuance of the permit would serve the national interest. The ROD did not supply any

6    meaningful additional environmental information or analysis, but rather relied on the State

7    Department's deficient final EIS.

8        42.    On August 20, 2009, the State Department issued the Alberta Clipper Presidential

9    permit. The permit allows the transport of tar sands crude oil from Canada into the United States

10   across the U.S.-Canada border; authorizes the construction, connection, operation and

11   maintenance of pipeline facilities at the border; and contains other terms and conditions on the

12   pipeline and related facilities as set forth in the permit.

13       43.    On August 24, 2009, the Army Corps issued Enbridge permits to dredge and fill

14   wetlands and place structures in or under water-bodies in connection with construction of the

15   Alberta Clipper and diluent pipelines. In a telephone conversation with Ralph Augustin, on

16   August 25, 2009, Plaintiffs confirmed the issuance of the permit, and confirmed that the Army

17   Corps did not conduct independent NEPA review but relied on its participation in the State

18   Department's preparation of the Alberta Clipper EIS. The Army Corps refused to provide

19   Plaintiffs with a copy of the permits or the Corps' ROD.

20   **Environmental Impacts of the Project**

21       A.    **Impacts of Pipeline Construction and Operation**

22       44.    In the United States, construction of the Alberta Clipper pipeline would require

23   the installation of approximately 326.9 miles of new 36-inch-diameter pipeline starting at the

24

25

26   COMPLAINT                                                                    17

1    Canadian border in Neche, North Dakota, crossing Minnesota and bisecting the Chippewa

2    National Forest, and ending in a terminal in Superior, Wisconsin. The pipeline would involve a

3    total of three perennial and 24 intermittent water-body crossings in North Dakota; 76 perennial

4    and 86 intermittent crossings in Minnesota, and one perennial and 13 intermittent water-body

5    crossings in Wisconsin. Construction of the pipeline could result in increased sedimentation,

6    degradation and alteration of aquatic habitat, increased runoff and erosion, changes in channel

7    morphology and stability, temporary reductions in flow, and temporary to short-term surface

8    water degradation during or after construction.

9       45.    During construction, this pipeline would impact 1,255 acres of upland forested

10    lands, 655 acres of open lands, and 1,346 acres of wetlands. The primary impacts to vegetation

11    would be cutting, clearing and the potential introduction of noxious weeds. It would result in

12    both short-term disturbance and long-term modification to wildlife habitats, including impacts

13    from habitat fragmentation and widening of existing rights-of-way. It could affect fisheries

14    resources by loss or alteration of habitat, reduced spawning success, direct and indirect mortality,

15    adverse health effects, and loss of individuals and habitats due to hydrostatic testing and

16    exposure to toxic materials.

17       46.    In addition, the pipeline would cut through a rare wetland area known as a

18    calcareous fen. This is the rarest wetland plant community in Minnesota and Wisconsin and one

19    of the rarest in North America. Minnesota law protects it from all disturbance. On July 7, 2009,

20    after the State Department issued the final EIS for public comment, the Minnesota Department of

21    Natural Resources (MDNR) discovered on a site visit that the proposed pipeline route would cut

22    through a calcareous fen. On July 22, 2009, Plaintiffs sent a letter to the State Department

23    requesting consideration of an alternate route for the pipeline to avoid this calcareous fen, but

24

25

26    COMPLAINT           18

1    received no response.

2        47.    Finally, operation of the pipelines presents significant risks to the environment

3    and human health due to operational leaks and spills.  Enbridge reports over 30 incidents of leaks

4    and spills on its existing pipeline running through northern Minnesota over the last decade.

5    Nationwide, during the last 20 years, there have been nearly 3,000 reported "significant

6    incidents," resulting in 43 fatalities and over $1 billion in property damage.

7        **B.    Impacts of Extracting and Refining Tar Sands Crude Oil**

8        48.    Tar sands are composed of clay, sand, water, and bitumen – a heavy black viscous

9    oil that can be mined and processed.  Extracted bitumen is then refined into synthetic oil and

10   other petroleum products.

11       49.    Unlike conventional oil, bitumen cannot be pumped from the ground in its natural

12   state.  Instead, deposits are mined using energy-intensive extraction and separation techniques to

13   separate the bitumen from the sand, clay and water.  Surface tar sand deposits can be recovered

14   by open pit mining techniques, using large hydraulic and electrically powered shovels to dig up

15   tar sands and transport them for extraction using a hot water separation process.  Compressed air

16   and steam injection methods are used to extract deep tar sand deposits, and those methods

17   require large quantities of water and energy for heating and pumping.  About two tons of tar

18   sands are required to produce one barrel of oil.

19       50.    Both mining and processing of tar sands cause significant environmental impacts,

20   including emissions of global warming gases, destruction of wildlife habitat, and impacts to air

21   and water quality.

22       51.    Tar sands development is significantly more energy intensive than conventional

23   oil and gas development.  It takes three to five times the amount of energy to extract and upgrade

24

25

26   COMPLAINT                                                                      19

1   a barrel of crude from tar sands compared to conventional sources.  The lifecycle emissions of

2   greenhouse gases from tar sands oil production is 25% greater than emissions of low-sulfur, light

3   crude oils.

4        52.      In addition, tar sands extraction operations require large quantities of water and

5   would draw down surface water flow, adversely impacting stream habitat for migratory fish and

6   other species dependant on local water resources.  Drilling one well consumes 5.5 acre-feet of

7   water each year, and the production of one gallon of oil requires 35 gallons of water.  Water used

8   in tar sands processing is discharged into toxic tailings ponds so large that they are visible from

9   space.  In May 2008 over 500 migratory birds died in a single incident after landing on a tailings

10  pond.

11       53.      The Enbridge expansion project will supply U.S. refineries with heavy tar sands

12  crude.  According to a 2007 U.S. Geological Survey report, the type of oil extracted from

13  Canadian tar sands contains eleven times more sulfur, six times more nitrogen, eleven times

14  more nickel, and five times more lead than conventional oil.

15       54.      Refining tar sands crude transported through the Alberta Clipper pipeline will

16  likely result in higher air emissions of harmful pollutants such as sulfur dioxide, hydrogen

17  sulfide, sulfuric acid mist, and nitrogen oxides, as well as toxic metals such as lead and nickel

18  compounds.

19       55.      According to the U.S. Environmental Protection Agency, the human health effects

20  of these pollutants may include premature death; cancer; permanent lung damage; reproductive,

21  neurological, developmental, respiratory, and immunological problems; cardiovascular and

22  central nervous system disorders; bio-mutations; respiratory illness, including bronchitis and

23  pneumonia; and aggravation of heart conditions and asthma.

24

25

26  COMPLAINT                                                                              20

56.     Also according to EPA, the environmental damage caused by these pollutants includes acid rain; concentration of toxic chemicals up the food chain; creation of ground-level ozone and smog; visible impairments that migrate to sensitive areas such as national parks; and depletion of soil nutrients.

57.     Refining oil transported by the expansion project can be expected to produce more greenhouse gases, such as carbon dioxide, than refining conventional crude oil, because the tar sands crude requires more energy to refine.  The requisite additional energy is most likely to come from sources, such as coal-fired power plants, that emit large quantities of greenhouse gases.  This will add to harmful emissions emanating from the refineries themselves.

58.     Greenhouse gases, such as carbon dioxide, contribute to global warming and a wide range of related adverse ecological and human health effects, including both water shortages and coastal flooding, increased risk of wildfires and stronger hurricanes, new pests and insect-borne diseases, and disruption of habitats.

59.     Refineries processing tar sands crude from the expansion project are likely to increase discharges of water pollutants, including ammonia and total suspended solids, which may damage surrounding waterways.  Refinery construction and expansion may also compromise or destroy wild or agricultural lands.

**LEGAL BACKGROUND**

**National Environmental Policy Act**

60.     The National Environmental Policy Act is our "basic national charter for the protection of the environment."  40 C.F.R. § 1500.1.  Congress enacted NEPA "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and

COMPLAINT                                                                                          21

1   biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the

2   ecological systems and natural resources important to the Nation."  42 U.S.C. § 4321.

3       61.    To accomplish these purposes, NEPA requires all agencies of the federal

4   government to prepare a "detailed statement" that discusses the environmental impacts of, and

5   reasonable alternatives to, all "major Federal actions significantly affecting the quality of the

6   human environment."  42 U.S.C. § 4332(2)(C).  This statement is commonly known as an

7   environmental impact statement.  To determine whether a federal action will result in significant

8   environmental impacts and requires an EIS, the federal agency may first conduct an

9   environmental assessment.  40 C.F.R. § 1501.4.  If a federal agency makes a finding of no

10   significant impact, it may avoid conducting an EIS.  *Id.*

11      62.    The Council on Environmental Quality (CEQ), established under NEPA within

12   the Executive Office of the President to be responsible for coordinating federal environmental

13   efforts, has promulgated regulations implementing NEPA.  40 C.F.R. §§ 1500-1508.  The State

14   Department's own NEPA regulations, which incorporate and supplement the CEQ regulations,

15   are set forth at 22 C.F.R. §§ 161.1-161.12.

16      63.    The EIS process is intended "to help public officials make decisions that are

17   based on understanding of environmental consequences, and to take actions that protect, restore,

18   and enhance the environment" and to "insure that environmental information is available to

19   public officials and citizens before decisions are made and before actions are taken."  40 C.F.R. §

20   1500.1(b)-(c).  Where the government has acted prior to fulfilling its NEPA obligations, projects

21   authorized by government action must be suspended until NEPA's requirements are met.

22      64.    The EIS must "provide full and fair discussion of significant environmental

23   impacts and shall inform decision-makers and the public of the reasonable alternatives which

24

25

26   COMPLAINT                                                              22

1   would avoid or minimize adverse impacts or enhance the quality of the human environment." *Id.*

2   at § 1502.1.  The alternatives analysis is considered to be the "heart" of an EIS.  40 C.F.R. §

3   1502.14.  An EIS "should present the environmental impacts of the proposal and the alternatives

4   in comparative form, thus sharply defining the issues and providing a clear choice among options

5   by the decisionmaker and the public." *Id.*  NEPA requires the State Department to "rigorously

6   explore and objectively evaluate all reasonable alternatives," including the "alternative of no

7   action," and to "devote substantial treatment to each alternative ... so that reviewers may evaluate

8   their comparative merits." *Id.*

9       65.     An EIS must "specify the underlying purpose and need to which the agency is

10  responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13.

11  An agency must not define its project purpose and need so narrowly as to preclude consideration

12  of reasonable alternatives.

13      66.     Pursuant to the CEQ regulations, decision-makers must address in a single EIS all

14  "connected," "cumulative," and "similar" actions. *Id.* § 1508.25(a).  Actions are connected if

15  they: "(i) [a]utomatically trigger other actions which may require environmental impact

16  statements; (ii) [c]annot or will not proceed unless other actions are taken previously or

17  simultaneously; [or] (iii) [a]re interdependent parts of a larger action and depend on the larger

18  action for their justification." *Id.*  Cumulative actions are those which have "cumulatively

19  significant impacts and should therefore be discussed in the same impact statement." *Id.*  Similar

20  actions are those which have "similarities ... such as common timing or geography." *Id.*

21      67.     CEQ regulations also require that an EIS include, among other things: (i) a "full

22  and fair discussion" of the significance of all "direct," "indirect," and "cumulative" effects of the

23  action, 40 C.F.R. §§ 1502.1, 1502.16(a)-(b), 1508.25(c); and (ii) a discussion of "means to

24

25

26  COMPLAINT                                                                           23

1  mitigate adverse environmental impact." *Id.* § 1502.16(h). "Direct effects" are caused by the

2  action and occur at the same time and place. 40 C.F.R. § 1508.8(a). "Indirect effects" are

3  reasonably foreseeable effects caused by the action, but later in time or farther removed in

4  distance. *Id.* § 1508.8(b). These may include "growth inducing effects and other effects related

5  to induced changes in the pattern of land use, population density or growth rate, and related

6  effects on air and water and other natural systems, including ecosystems." *Id.* A "cumulative

7  impact" is defined as the "impact on the environment which results from the incremental impact

8  of the action when added to other past, present, and reasonably foreseeable future actions,

9  regardless of what agency ... or person undertakes such other actions." *Id.* § 1508.7. Cumulative

10  impacts "can result from individually minor but collectively significant actions taking place over

11  a period of time." *Id.*

12      68.     NEPA directs federal decision-makers to "recognize the worldwide and long-

13  range character of environmental problems." 42 U.S.C. § 4332(2)(F).

14      69.     An agency must first prepare a draft EIS that satisfies to the fullest extent possible

15  the final EIS requirements of 42 U.S.C. § 4332(2)(C). 40 C.F.R. § 1502.9(a). After preparing

16  the draft EIS and before preparing a final EIS, the agency must solicit comments from the public,

17  "affirmatively soliciting comments from those persons or organizations who may be interested or

18  affected." *Id.* § 1503.1(a).

19      70.     After the public comment period, an agency must prepare a final EIS based on its

20  assessment and consideration of the comments received from the public, as well as other relevant

21  Federal, State and local agencies, on the draft EIS. *Id.* § 1503.4(a). An agency must respond to

22  comments by such means as modifying alternatives; developing and evaluating new alternatives;

23  supplementing, improving, or modifying its analyses; making factual corrections; and/or

24

25

26  COMPLAINT                                                                    24

1  explaining in detail why the comments do not require further response.  *Id.* §§ 1503.4(a),
2  1502.9(b).

3        71.    If there are significant new circumstances or information relevant to
4  environmental concerns and bearing on the proposed action or its impacts, the agency must
5  prepare supplements to the draft or final EIS.  *Id.* § 1502.9(c).

6  **Regulation of International Tar Sands Crude Oil Pipelines**

7        72.    The "foreign commerce clause" of the United States Constitution endows
8  Congress with exclusive and plenary authority to "regulate commerce with foreign nations."
9  U.S. Const. art. I, § 8, cl. 3.  The importation of tar sands crude oil from Canada falls within
10  Congress's foreign commerce clause powers.  Congress has not delegated its power to regulate
11  the importation of Canadian tar sands crude oil to the President, the Executive Branch, or any
12  agency of the Executive Branch.  The President has no independent constitutional authority to
13  regulate the importation of Canadian tar sands crude by pipeline.

14        73.    To the extent that Congress has made any delegation of its power to regulate
15  international tar sands crude oil pipelines, it is limited to specific grants of regulatory authority,
16  e.g.:  i) delegation of authority to the Federal Energy Regulatory Commission to control the rates
17  and valuation of oil pipelines, *see* 42 U.S.C.A. § 7111 *et seq.*; ii) delegation of authority to the
18  Department of Transportation to establish federal pipeline safety regulations, *see* 49 U.S.C. §
19  60134 *et seq.*; and (iii) delegation of authority to the Pipeline and Hazardous Materials Safety
20  Administration in the Pipeline Inspection, Protection, Enforcement, and Safety Act, 49 U.S.C. §
21  60134 *et seq*.  These grants of authority do not extend to the State Department and do not
22  delegate the Congress's power to permit a pipeline for the importation of tar sands crude oil from
23  Canada.

24

25

26  COMPLAINT                                                      25

1    74.    The State Department claims authority to issue permits allowing the importation

2  of tar sands crude oil from Canada pursuant to Executive Order 13337, 69 Fed. Reg. 25299

3  (2004) as amended.  Under Executive Order 13337, the Secretary of State is "designated and

4  empowered to receive all applications for Presidential permits ... for the construction,

5  connection, operation, or maintenance, at the borders of the United States, of facilities for the

6  exportation or importation of petroleum, petroleum products, coal, or other fuels to or from a

7  foreign country."  69 Fed. Reg. 25299.  In the Executive Order, President George W. Bush cites

8  "the authority vested in me as President by the Constitution," *id.*, without reference to a statutory

9  grant of authority for the issuance of Presidential permits for pipelines that import tar sands

10  crude oil from Canada.  Indeed, there is no statutory authority for the Executive Branch's

11  issuance of the Presidential permit for the Alberta Clipper pipeline.

12  **Administrative Procedure Act**

13    75.    The APA provides a right of action against agency actions or decisions that are

14  "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B)

15  contrary to constitutional right, power, privilege or immunity [or] (C) in excess of statutory

16  jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A)(B)(C).

17                              **CLAIMS FOR RELIEF**

18                          **FIRST CLAIM FOR RELIEF**
                          **Violation of NEPA and the APA:**
19                      **Failure to Evaluate Full Range of Actions**

20    76.    Plaintiffs incorporate and re-allege, as if fully set forth herein, all allegations

21  contained in the preceding paragraphs.

22    77.    The Alberta Clipper pipeline, the Southern Lights diluent pipeline and the LSr

23  pipeline are connected and cumulative, and/or similar actions that the State Department must

24

25

26  COMPLAINT                                                          26

1   evaluate in a single EIS.  The Alberta Clipper and diluent pipelines will be constructed

2   simultaneously and in the same corridor and are thus similar actions pursuant to 40 C.F.R. §

3   1508.25(a)(3).  Without an increased supply of diluent to facilitate transportation of viscous tar

4   sands crude, the Alberta Clipper pipeline would not be able to transport the 450,000 bpd of crude

5   for which it is designed.  Because the Alberta Clipper and diluent pipelines are interdependent

6   parts of a larger action and when viewed together have cumulatively significant impacts, they

7   meet the definition of connected and cumulated actions set forth in 40 C.F.R. § 1508.25(a)(1)

8   and (2).

9       78.     Similarly, Enbridge refers to the LSr pipeline as the "capacity replacement

10  project" because its primary purpose is to replace the transport capacity of Line 13 which will be

11  reversed and diverted to transport diluent as part of the diluent pipeline.  Because the new LSr

12  pipeline is an interdependent part of the larger expansion project and depends on the diluent

13  pipeline and the Alberta Clipper Project for its justification it meets the definition of a connected

14  action under 40 C.F.R. § 1508.25(a)(1).

15      79.     The State Department's failure to assess the full range of connected, cumulative

16  and similar actions in the Alberta Clipper EIS violated and continues to violate section 102(2)(C)

17  of NEPA, 42 U.S.C. § 4332(2)(C), and NEPA's implementing regulations including 40 C.F.R. §

18  1508.25(a).

19      80.     Accordingly, i) the State Department's issuance of a Presidential permit for the

20  Alberta Clipper project; and ii) the Army Corps' issuance of permits for the Alberta Clipper and

21  Southern Lights projects pursuant to section 404 of the Clean Water Act and section 10 of the

22  Rivers and Harbors Act, were arbitrary, capricious, an abuse of discretion, not in accordance

23  with law, and without observance of procedure required by law within the meaning of the APA,

24

25

26  COMPLAINT                                                                                    27

1  5 U.S.C. § 706(2).

2
## SECOND CLAIM FOR RELIEF
### Violation of NEPA and the APA:
3  ### Failure to Adequately Analyze Indirect and Cumulative Impacts

4      81.    Plaintiffs incorporate and re-allege, as if fully set forth herein, all allegations

5  contained in the preceding paragraphs.

6      82.    Defendants failed to include in the EIS for the Alberta Clipper pipeline, a full and

7  fair discussion of the significant indirect environmental effects of the action it approved, in

8  violation of NEPA.

9      83.    The environmental review fails to analyze the reasonably foreseeable impacts in

10  the United States of increased exploitation and development of Canadian tar sands due to the

11  pipeline infrastructure expansion.  These impacts include the climate impacts resulting from

12  increased emissions of greenhouse gases during tar sands extraction and upgrading and from vast

13  deforestation in the Canadian boreal forest as well as impacts on migratory species.

14      84.    The EIS does not adequately address global warming impacts or the mitigation

15  thereof.  The final EIS for the Alberta Clipper pipeline does not account for: a) the upstream

16  emissions generated by the increased tar sands development induced by increased U.S. transport

17  and refining capacity; b) refinery upgrades and expansions necessary to accommodate the

18  increased volumes and weight of crude oil delivered by the pipelines; c) the reasonably

19  foreseeable future expansion of the Alberta Clipper pipeline capacity from 450,000 to 800,000

20  bpd; d) the downstream use of the oil; or e) the global warming impacts resulting from the

21  connected diluent pipeline.  Because it omits these significant indirect sources of greenhouse

22  emissions, the State Department's treatment of global warming impacts is inadequate.

23      85.    Defendants failed to include in the EIS for the Alberta Clipper pipeline, a full and

24

25

26  COMPLAINT                                                      28

1   fair discussion of the significant cumulative environmental effects of the action it approved, in

2   violation of NEPA.

3       86.     The EIS does not assess the cumulatively significant impacts of a) construction

4   and operation of the 188-mile segment of the Southern Lights diluent pipeline that will be

5   constructed between Clearbrook Minnesota and Superior Wisconsin at the same time and in the

6   same right of way as the Alberta Clipper pipeline; b) construction and operation of the remaining

7   490 miles of the Southern Lights diluent pipeline from Superior to Manhattan, Illinois; c) the

8   impacts, including increased greenhouse gas emissions, of making a large source of diluent

9   available for increased exploitation of the tar sands; or d) construction and operation of the LSr

10  pipeline.

11      87.     The EIS also does not consider the cumulatively significant impacts of the Alberta

12  Clipper pipeline when added to the Keystone and Keystone XL pipelines which will together

13  transport approximately two million bpd of tar sands crude oil from Canada for refining in the

14  United States.  This large increase in the capacity to import heavy bitumen crude for processing

15  in the United States will boost exploitation and development of Canadian tar sands which have

16  cumulative impacts on the climate and migratory species in the United States.  The EIS also did

17  not consider the cumulative impacts on regional air  and water quality, and the increase in

18  greenhouse gas emissions resulting from refining and using tar sands crude oil delivered by the

19  Alberta Clipper pipeline in addition to the crude delivered by the Keystone and Keystone XL

20  pipelines.

21      88.     The State Department's failure to consider and evaluate the indirect and

22  cumulative impacts of increased exploitation and development of the Canadian tar sands, and

23  failure to evaluate the project's cumulative climate impacts violated and continues to violate

24

25

26  COMPLAINT                                                                              29

section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), and NEPA's implementing regulations,

including the requirements that agencies take a "hard look" at the impacts of their actions, and

that they consider all direct, indirect and cumulative impacts. 40 C.F.R. § 1508.7.

89.     Accordingly, i) the State Department's issuance of a Presidential permit for the

Alberta Clipper project; and ii) the Army Corps' issuance of permits for the Alberta Clipper and

Southern Lights projects pursuant to section 404 of the Clean Water Act and section 10 of the

Rivers and Harbors Act, prior to fulfilling NEPA's requirements are arbitrary, capricious, an

abuse of discretion, not in accordance with law, and without observance of procedure required by

law within the meaning of the APA, 5 U.S.C. § 706(2).

### THIRD CLAIM FOR RELIEF
### Violation of NEPA and the APA:
### Failure to Adequately Evaluate Risks, Impacts, and Mitigation Measures
### Associated with Spills and Operational Leaks

90.     Plaintiffs incorporate and re-allege, as if fully set forth herein, all allegations

contained in the preceding paragraphs.

91.     The State Department's environmental review has not adequately addressed the

impact that spills and operational leaks would have on the environment, especially soil and water

resources or on human health. The State Department states that it relies on a future review

process by the Pipeline and Hazardous Materials Safety Administration (PHMSA) within the

Department of Transportation. However PHMSA has not and does not intent to conduct any

separate environmental review for these pipelines.

92.     In particular, because the State Department failed to consider the connected

Southern Lights diluent pipeline, it has not provided information about or evaluated the risks,

impacts, or available measures to mitigate leaks and spills from the diluent pipeline. Diluent has

not previously been transported through Minnesota's water-rich environment. The State

COMPLAINT                                                                              30

1   Department's environmental review fails to identify the specific refined petroleum product that

2   will be used as diluent and offers the public and public officials no understanding of the

3   environmental consequences from leaks and spills of diluent along the Southern Lights diluent

4   pipeline.

5       93.     The State Department's failure to adequately evaluate the risks and impacts of

6   spills and operational pipeline leaks, and failure to consider measures to mitigate such risks and

7   impacts violated and continues to violate section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C),

8   and NEPA's implementing regulations, including the requirements that agencies take a "hard

9   look" at the impacts of their actions, and that they consider the direct, indirect and cumulative

10  impacts of their actions.  40 C.F.R. § 1508.7.

11      94.     Accordingly, i) the State Department's issuance of a Presidential permit for the

12  Alberta Clipper pipeline; and ii) the Army Corps' issuance of permits for the Alberta Clipper and

13  Southern Lights projects pursuant to section 404 of the Clean Water Act and section 10 of the

14  Rivers and Harbors Act, prior to fulfilling NEPA's requirements are arbitrary, capricious, an

15  abuse of discretion, not in accordance with law, and without observance of procedure required by

16  law within the meaning of the APA, 5 U.S.C. § 706(2).

17                          **FOURTH CLAIM FOR RELIEF**
                            **Violation of NEPA and the APA:**
18              **Failure to Adequately Evaluate the No Action Alternative**

19      95.     Plaintiffs incorporate and re-allege, as if fully set forth herein, all allegations

20  contained in the preceding paragraphs.

21      96.     The State Department failed to take a hard look at the no action alternative and

22  instead rejected it based on conclusory assertions that that alternative does not satisfy the

23  project's purpose and need.

24

25

26  COMPLAINT                                                                              31

97.     The purpose for the proposal as stated by Enbridge – meeting growing demand for petroleum products – is based on inaccurate assumptions about future demand for heavy tar sands crude.  Current forecasts from the U.S. Energy Information Administration (EIA) show that the demand for crude oil in the U.S. is flat and that the need for net imports will decline dramatically over the next two decades.  Adding to that the likelihood of state and federal laws to confront climate change and reduce U.S. dependence on fossil fuels, it is clear that there is no objective or reliable demand forecast that would support the statement of purpose and need in the EIS.

98.     Without an adequate assessment of the purpose and need for the project, the entire EIS is deficient – the State Department cannot take a "hard look" at alternatives and balance costs and benefits of the project as it considers the national interest unless it has first established that the need for the project as proposed is accurate.  The failure to adequately assess purpose and need has led to the State Department's erroneous summary dismissal of the "no action" alternative without adequate justification.

99.     Even if the perceived future energy shortfall in the United States were based on reliable forecasts, the construction of these new pipelines is not the only alternative for filling this perceived need.  Other alternatives include energy efficiency, renewable energy, clean technologies, and demand-side management.  NEPA regulations specifically require consideration of energy requirements and conservation in environmental review documents.  40 C.F.R § 1502.16(e).  The EIS does not adequately address alternatives to expanding U.S. capacity to import tar sands oil in considering the no action alternative.

100.    The State Department's EIS for the Alberta Clipper also fails to adequately consider the enormous expansion in transport capacity that has already been added to the

COMPLAINT                                                                                      32

1  pipeline systems that serve U.S. refineries, and fails to address this additional capacity

2  availability in evaluating the no action alternative.

3      101.   Defendants' failure to take a hard look at the stated purpose and need for the

4  proposed expansion and to adequately evaluate all reasonable alternatives including the no action

5  alternative violated and continues to violate section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C),

6  and NEPA's implementing regulations, including the requirement to "rigorously explore and

7  objectively evaluate all reasonable alternatives," including the "alternative of no action."  40

8  C.F.R. § 1502.14.

9      102.   Accordingly, i) the State Department's issuance of a Presidential permit for the

10  Alberta Clipper project; and ii) the Army Corps' issuance of permits for the Alberta Clipper and

11  Southern Lights projects pursuant to section 404 of the Clean Water Act and section 10 of the

12  Rivers and Harbors Act, prior to fulfilling NEPA's requirements are arbitrary, capricious, an

13  abuse of discretion, not in accordance with law, and without observance of procedure required by

14  law within the meaning of the APA, 5 U.S.C. § 706(2).

15              **FIFTH CLAIM FOR RELIEF**
                **Violation of NEPA and the APA:**
16              **Failure to Adequately Evaluate the Diluent**
                **Project in the LSr Environmental Assessment**
17

18      103.   Plaintiffs incorporate and re-allege, as if fully set forth herein, all allegations

19  contained in the preceding paragraphs.

20      104.   The State Department prepared a separate EA for the LSr pipeline.  This resulted

21  in the State Department's Finding of No Significant Impact.

22      105.   The State Department's EA for the LSr pipeline did not analyze the diluent

23  pipeline or the Alberta Clipper pipeline, even though they are connected, cumulative and/or

24  similar actions.

25

26  COMPLAINT                                                                33

106.    When the State Department issued its FONSI for the LSr pipeline, it justified its omission of the diluent pipeline from the LSr EA by pledging to address it in the Alberta Clipper EIS. It stated: "the construction by Enbridge of another pipeline that would bring diluent north to the oil sands project, will be addressed in a separate Environmental Impact Statement that is being prepared for the Alberta Clipper project by the [State Department] working with other agencies." Thus, the State Department acknowledged the necessity of performing NEPA review of the diluent pipeline in connection with the Alberta Clipper project.

107.    However, the State Department failed to fulfill this commitment in the Alberta Clipper EIS. As a result, the impacts of the diluent pipeline were not assessed in either the LSr EA or the Alberta Clipper EIS.

108.    The State Department's failure to consider the impacts of the diluent pipeline in the LSr EA violated and continues to violate section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), and NEPA's implementing regulations, including the requirements that agencies take a "hard look" at the impacts of their actions; that they consider all connected, cumulative and similar actions; and that they consider the direct, indirect and cumulative impacts of their actions. 40 C.F.R. §§ 1508.7, 1508.25(a).

109.    Accordingly, the State Department's EA, FONSI and its issuance of a Presidential permit for the LSr pipeline were arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

### SIXTH CLAIM FOR RELIEF
### Violation of the United States Constitution and the APA

110.    Plaintiffs incorporate and re-allege, as if fully set forth herein, all allegations contained in the preceding paragraphs.

COMPLAINT                                                                                       34

111.    The State Department lacks statutory or constitutional authority to issue a Presidential permit for the Alberta Clipper pipeline.  Regulation of pipelines that import tar sands crude oil into the United States from Canada falls within Congress's exclusive and plenary authority over matters of foreign commerce pursuant to Article I, Section 8, clause 3 of the United States Constitution.  Congress has not delegated this authority to the Executive Branch. The President lacks independent constitutional authority to issue permits allowing the importation of tar sands crude oil from Canada.

112.    To the extent that Congress has delegated authority to the Executive Branch regarding international tar sands crude oil pipelines, it has done so in a limited fashion as identified in paragraph 74 above.  The Department's issuance of the Presidential permit for the Alberta Clipper pipeline exceeds this limited statutory authority.

113.    For the reasons set forth above, the State Department's issuance of the Presidential permit for the Alberta Clipper pipeline was contrary to the United States Constitution.  Issuance of the permit was also arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege or immunity; and/or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.  5 U.S.C. § 706(2)(A)(B)(C).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Declare that the State Department's issuance of the Presidential permit for the Alberta Clipper pipeline was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege or immunity; and/or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.  5 U.S.C. §

COMPLAINT                                                                                              35

706(2)(A)(B)(C);

B. Declare that the State Department's approval of the Alberta Clipper pipeline and the associated Record of Decision and final Environmental Impact Statement failed to comply with the National Environmental Policy Act and its implementing regulations.  42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500-1508;

C. Declare that the Army Corps's issuance of permits for the Alberta Clipper and Southern Lights project pursuant to section 404 of the Clean Water Act and section 10 of the Rivers and Harbors Act, and the associated Record of Decision failed to comply with the National Environmental Policy Act and its implementing regulations.  42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500-1508;

D. Declare that the State Department's approval of the LSr pipeline and the associated final Environmental Assessment and Finding of No Significant Impact failed to comply with the National Environmental Policy Act and its implementing regulations.  42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500-1508;

E. Vacate the Presidential permit for the Alberta Clipper;

F. Vacate the Army Corps's permits issued for the Alberta Clipper and Southern Lights projects pursuant to section 404 of the Clean Water Act and section 10 of the Rivers and Harbors Act;

G. Enjoin any activity in furtherance of construction or operation of the Alberta Clipper and Southern Lights projects;

H. Award Plaintiffs their costs of litigation, including reasonable attorney and expert witness fees;

I. Grant Plaintiffs such further and additional relief as the Court may deem just and

COMPLAINT                                                                                                    36

1  proper.

2                               Respectfully submitted,

3

4  Dated:  September 2, 2009

                             SARAH H. BURT

5                               J. MARTIN WAGNER
                             Earthjustice

6                               426 17th Street, 6th Floor
                             Oakland, CA  94612

7                               Tel.: (510) 550-6700
                             Fax: (510) 550-6740

8                               mwagner@earthjustice.org
                             sburt@earthjustice.org

9                               KEVIN REUTHER (*Pro Hac Vice* Applicant)
                             Minnesota Center for Environmental Advocacy

10                               26 E. Exchange St., Suite 206
                             St. Paul, MN  55101

11                               Tel.: (651) 223-5969
                             Fax: (651) 223-5967

12                               kreuther@mncenter.org

13                               ERIC E. HUBER (*Pro Hac Vice* Applicant)
                             DOUGLAS P. HAYES (*Pro Hac Vice* Applicant)

14                               Sierra Club Environmental Law Program
                             1650 38th Street, Suite 102W

15                               Boulder, Colorado 80301
                             Tel.: (303) 449-5595

16                               Fax: (303) 449-6520
                             eric.huber@sierraclub.org

17                               doug.hayes@sierraclub.org

18

19

20

21

22

23

24

25

26  COMPLAINT                                                                    37

# APPENDIX A

