**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| SIERRA CLUB, MINNESOTA CENTER FOR ENVIRONMENTAL ADVOCACY, INDIGENOUS ENVIRONMENTAL NETWORK, and NATIONAL WILDLIFE FEDERATION, | Civ. No. 0:09-cv-02622-RHK-RLE |
| Plaintiffs, | FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| v. | (National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq.) |
| HILLARY CLINTON, in her official capacity as Secretary of State, JAMES STEINBERG, in his official capacity as Deputy Secretary of State, UNITED STATES DEPARTMENT OF STATE,, Lieutenant General ROBERT L. VAN ANTWERP, in his official capacity as U.S. Army Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers; Colonel JON L. CHRISTENSEN, in his official capacity as District Engineer and Commander of the U.S. Army Corps of Engineers; the UNITED STATES ARMY CORPS OF ENGINEERS, TOM TIDWELL, in his official capacity as Chief of the United States Forest Service; ROB HARPER, in his official capacity as Forest Supervisor for the Chippewa National Forest; and the UNITED STATES FOREST SERVICE, | |
| Defendants. | |

## INTRODUCTION

1.     Plaintiffs bring this action to challenge the United States Department of State's

("State Department") issuance of a Presidential permit to Enbridge Energy LP and its affiliates

(collectively, "Enbridge"), to construct and operate a pipeline known as the Alberta Clipper, the

purpose of which is to import tar sands crude oil into the United States from Canada.  The U.S.

portion of the Alberta Clipper project involves the building of 384 miles of pipeline, from the

Canadian border at Neche, North Dakota, across Minnesota, to a terminal in Superior Wisconsin.

2.      The Alberta Clipper project is part of Enbridge's larger pipeline expansion

project, which includes the Southern Lights project.  The Southern Lights project is designed to

transport diluent (a blending agent necessary for transporting tar sands crude oil via the Alberta

Clipper pipeline) from U.S. refineries to tar sands production sites in Canada.  It is integral to

and connected with the Alberta Clipper project.  There are two components to the Southern

Lights project: a) the Line 13 Reversal/New Diluent Pipeline project ("diluent pipeline"), which

requires construction of 678 miles of new pipeline from Manhattan Illinois to Clearbrook,

Minnesota, as well as the reversal of flow in Enbridge's existing Line 13 pipeline (currently a

light sour crude pipeline between Edmonton, Alberta and Clearbrook, Minnesota), to create a

dedicated diluent delivery system to tar sands production centers in Alberta, Canada; and b) the

LSr Capacity Replacement pipeline ("LSr pipeline"), which would provide 313 miles of new

pipeline to replace the capacity to import light sour crude oil from Canada into the United States

that would be lost due to diversion of Line 13 for the diluent pipeline.  *See* Alberta Clipper and

Southern Lights Map, attached hereto as Appendix A.

3.      The Alberta Clipper project and Southern Lights diluent project would greatly

increase the availability of heavy tar sands crude in the United States and, possibly, worldwide.

The projects would spur refinery expansions and modifications in the United States, leading to

increased air and water pollution for residents of the Midwest and other states.  Additionally,

because extraction of tar sands crude is energy intensive, life-cycle greenhouse gas emissions

from burning tar sands-derived fuels are significantly higher than from fuels derived from

conventional crude.  As a result, the production and refining of more tar sands crude will cause

increased emissions of greenhouse gases that contribute to global warming and related harmful effects on the environment.

4.      In granting the Presidential permit for the Alberta Clipper, the State Department violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, and NEPA's implementing regulations, 40 C.F.R. §§ 1500-1508, by: i) failing to analyze the impacts of connected, cumulative, and/or similar actions, including the Southern Lights project; ii) failing to assess all reasonably foreseeable environmental impacts of the project, including indirect, and cumulative effects; and iii) failing to take a hard look at the Alberta Clipper project's stated purpose and need or to adequately consider a reasonable range of alternatives before granting the Presidential permit.

5.      Plaintiffs allege that because they are connected, cumulative and/or similar actions, a single Environmental Impact Statement (EIS) should be prepared for the Alberta Clipper and Southern Lights projects.  If, however, this Court determines that the State Department did not err in separating the environmental review of the Alberta Clipper project from the Southern Lights project, then Plaintiffs challenge the adequacy of the NEPA review for the Southern Lights project, which only assessed the effects of the LSr capacity replacement pipeline and failed to evaluate any impacts from the diluent pipeline.

6.      Plaintiffs also challenge the authority of the State Department to issue the Presidential permit for the Alberta Clipper project.  The regulation of international tar sands crude oil pipelines falls within Congress's exclusive and plenary authority over matters of foreign commerce pursuant to Article I, Section 8, clause 3 of the United States Constitution. Congress has not delegated that authority to the Executive Branch.  Because the President has no constitutional or statutory authority to permit the construction of new pipelines to import tar

sands crude oil from Canada, the State Department's issuance of the Presidential permit to Enbridge was unconstitutional or contrary to constitutional right, power, privilege or immunity.

7.      Plaintiffs request that this Court: a) enter a declaratory judgment that the Alberta Clipper permit was issued in violation of NEPA and the APA; b) issue an order vacating the Alberta Clipper permit; and c) issue preliminary and permanent injunctions enjoining the construction and operation of the Alberta Clipper and Southern Lights diluent pipelines unless and until the State Department complies fully with NEPA.

8.      In the event that the Court determines that the State Department did not err in separating the environmental review of the Alberta Clipper project from the Southern Lights project, Plaintiffs request that this Court a) enter a declaratory judgment that the LSr permit was issued in violation of NEPA; b) issue an order vacating the LSr permit; and c) issue preliminary and permanent injunctions enjoining the construction and operation of the Southern Lights diluent pipeline unless and until the State Department complies fully with NEPA.

9.      In addition, Plaintiffs request that this Court enter a declaratory judgment that the State Department's issuance of the Presidential permit for the Alberta Clipper Project was unconstitutional, and vacate the Alberta Clipper permit.

## JURISDICTION

10.      This Court has jurisdiction over this action by virtue of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*., and 28 U.S.C. § 1331 (federal question jurisdiction).

11.      An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a).  This Court may grant declaratory relief and additional relief, including an injunction, pursuant to 28 U.S.C. §§ 2201, 2202 and 5 U.S.C. §§ 701-706.

**VENUE**

12.     Pursuant to a September 23, 2009 Order of the United States District Court for the

Northern District of California, this matter has been transferred to the District of Minnesota.

Venue lies in this judicial district under 28 U.S.C. § 1391(e) because Plaintiffs Minnesota Center

for Environmental Advocacy and Indigenous Environmental Network reside in this district.

**PARTIES**

13.     Plaintiff SIERRA CLUB:

        a.      Plaintiff Sierra Club is a national nonprofit organization of over one

million members and supporters dedicated to exploring, enjoying, and protecting the wild places

of the earth; practicing and promoting the responsible use of the earth's ecosystems and

resources; educating and enlisting humanity to protect and restore the quality of the natural and

human environment; and using all lawful means to carry out these objectives.  The Sierra Club

has chapters and members in each of the states through which the Alberta Clipper pipeline would

pass, and in the state(s) where the refining of the tar sands crude would take place.  The Sierra

Club's concerns encompass the protection of wildlands, wildlife habitat, water resources, air,

climate change, public health and the health of its members, all of which stand to be affected by

these pipelines.  The Sierra Club's headquarters are located at 85 2nd Street, 4th Floor, San

Francisco, CA 94109-3441.

        b.      Sierra Club brings this action on behalf of its members who live, work,

and recreate in areas that will be affected by air and/or water pollution from the pipeline, pipeline

facilities, and refineries processing oil from the pipeline, and by the deleterious impacts of

increased emissions of greenhouse gases resulting from the refining and end-use of tar sands

crude oil.  These members face increased risk of harm to their health, recreational, economic,

and aesthetic interests as a result of the Department's permitting of the pipeline.  The State

Department's failure to provide required information and analyze and/or mitigate reasonably

foreseeable direct, indirect, and cumulative impacts of the proposed pipeline expansion project

has also deprived Sierra Club's members of their right to participate fully in the process leading

to the issuance of the Presidential permit.

   c. The declaratory and injunctive relief Sierra Club seeks will redress the

injuries to its members by vacating the Alberta Clipper permit and preventing construction of the

diluent pipeline.  Sierra Club's injuries will also be redressed by requiring Defendant to remedy

the procedural and informational defects in the State Department's NEPA review.

  14. Plaintiff MINNESOTA CENTER FOR ENVIRONMENTAL ADVOCACY:

   a. Plaintiff Minnesota Center for Environmental Advocacy ("MCEA") is a

Minnesota-based non-profit environmental organization whose mission is to use law, science,

and research to preserve and protect Minnesota's wildlife, natural resources, and the health of its

people.  MCEA works on a wide range of environmental policy issues, including the

environmental impacts from large construction projects, energy consumption, and climate

change.  MCEA is located at 26 E. Exchange Street, Suite 206, St. Paul, Minnesota 55101.

   b. MCEA brings this action on behalf of itself and its members.  MCEA

members live and recreate in the areas affected by the proposed pipelines and will be affected by

the construction and operation of these pipelines.  The recreational, aesthetic, economic and/or

environmental interests of MCEA and its members are threatened by air and/or water pollution

from the pipeline, pipeline facilities, and refineries processing oil from the pipeline, and by the

deleterious impacts of increased emissions of greenhouse gases resulting from the refining and

end-use of tar sands crude oil.  These members face increased risk of harm to their health,

recreational, economic, and aesthetic interests as a result of the Department's permitting of the pipeline.  The State Department's failure to provide required information and analyze and/or mitigate reasonably foreseeable direct, indirect, and cumulative impacts of the proposed pipeline expansion project has also deprived MCEA's members of their right to participate fully in the process leading to the issuance of the Presidential permit.

c.      The declaratory and injunctive relief MCEA seeks will redress the injuries to its members by vacating the Alberta Clipper permit and preventing construction of the Southern Lights diluent pipeline.  MCEA's injuries will also be redressed by requiring Defendants to remedy the procedural and informational defects in the State Department's NEPA review.

15.    Plaintiff INDIGENOUS ENVIRONMENTAL NETWORK:

a.      Plaintiff Indigenous Environmental Network ("IEN") is a non-profit organization that works with indigenous individuals and grassroots community groups to protect their sacred sites, land, water, air, natural resources, and the health of their people and all living things, and to building economically sustainable communities.  IEN's work encompasses a range of environmental and economic justice issues that impact the lands and cultures of indigenous peoples and individuals, including mining and oil development on and near indigenous lands; soil and water contamination from energy exploration and development; climate change; water conservation; and the transboundary movement of hazardous materials along the U.S. borders with Canada and Mexico.  IEN's headquaters is located at 219 Bemidji Avenue, Bemidji, MN 56601.

b.      IEN brings this action on its own behalf.  The environmental impacts of the pipelines, associated facilities, and refineries processing crude oil from the pipeline,

including increased air and water pollution and the deleterious impacts of increased emissions of greenhouse gases resulting from the refining and end-use of tar sands crude oil, frustrate IEN's mission of reducing the harmful and disproportionate impacts of tar sands extraction, refining and end-use on indigenous lands and on the health of indigenous communities.  Redoubled efforts to educate communities in the vicinity of tar sands development and refineries of the health impacts of increased air and water pollution and new programs to compel Enbridge and the Pipeline and Hazardous Materials Safety Administration within the Department of Transportation to implement adequate safety measures to minimize the risk of leaks and spills, will divert resources from IEN's other program areas.

    c.  IEN advocates for environmental protection to benefit members of Native American Indian tribes and native lands.  The interests of the communities and lands that IEN was founded to protect are directly impacted by the Department of State's permitting of the Alberta Clipper pipeline.  These communities face increased risk of harm to their health, recreational, economic, aesthetic and cultural interests as a result of the Department's permitting of the pipeline.  Community members' lives, work, and spiritual and cultural practices will be affected by the construction and operation of the pipelines, pipeline facilities, and refineries that process oil from the pipeline, and by the deleterious impacts of increased emissions of greenhouse gases resulting from the refining and end-use of tar sands crude oil.  The State Department's failure to provide required information and analyze and/or mitigate reasonably foreseeable direct, indirect, and cumulative impacts of the proposed pipeline expansion project has also deprived IEN of its right to participate fully in the process leading to the issuance of the Presidential permit.

    d.  The declaratory and injunctive relief IEN seeks will redress the injuries to

IEN and the communities and resources it seeks to protect by vacating the Alberta Clipper permit and preventing construction of the Southern Lights diluent pipeline.  IEN's injuries will also be redressed by requiring Defendants to remedy the procedural and informational defects of the State Department's NEPA review.

16.     Plaintiff NATIONAL WILDLIFE FEDERATION:

a.     Plaintiff National Wildlife Federation ("NWF") is the nation's largest non-profit conservation advocacy and education organization.  NWF has over one million individual members, including 26,310 and 33,736 members in Minnesota and Wisconsin respectively, and affiliate organizations in 47 states and territories, including North Dakota, Minnesota and Wisconsin.  NWF's mission is to educate, mobilize, and advocate to preserve and strengthen protection for wildlife and wild places.  NWF also works to protect of wildlife, wild places, and natural resources from the impacts of climate change and the health of its members, which will be affected by the actions described herein.  NWF's headquarters is located at 11100 Wildlife Center Drive, Reston, VA 20190.

b.     NWF brings this action on behalf of its members who live, work, and recreate in areas that will be affected by air and/or water pollution from the pipeline, pipeline facilities, and refineries processing oil from the pipeline, and by the deleterious impacts of increased emissions of greenhouse gases resulting from the refining and end-use of tar sands crude oil.  These members face increased risk of harm to their health, recreational, economic, and aesthetic interests as a result of the Department's permitting of the pipeline.  The State Department's failure to provide required information and analyze and/or mitigate reasonably foreseeable direct, indirect, and cumulative impacts of the proposed pipeline expansion project has also deprived NWF's members of their right to participate fully in the process leading to the

issuance of the Presidential permit.

        c.     The declaratory and injunctive relief NWF seeks will redress the injuries to its members by vacating the Alberta Clipper permit and preventing construction of the diluent pipeline.  NWF's injuries will also be redressed by requiring Defendants to remedy the procedural and informational defects in the State Department's NEPA review.

17.     Defendant UNITED STATES DEPARTMENT OF STATE is a federal agency whose chief administrator is the Secretary of State.  The State Department processes applications for Presidential permits for the construction, operation and maintenance of facilities on the U.S.-Canada border.  In carrying out its responsibilities, the State Department must comply with applicable requirements of NEPA and the APA.

18.     Defendant HILLARY CLINTON is the Secretary of State and is sued in her official capacity.  Pursuant to Executive Order 13337, 69 Fed. Reg. 25299 (April 30, 2004), Secretary Clinton is responsible for determining whether to issue permits for the construction, operation or maintenance at the borders of the United States of facilities for the exportation or importation of petroleum products or other fuels to or from a foreign country.  In carrying out these duties, Secretary Clinton must ensure compliance with the requirements of NEPA.

19.     Defendant JAMES STEINBERG is the Deputy Secretary of State and is sued in his official capacity.  On February 13, 2009, Secretary Clinton delegated to the Deputy Secretary of State, to the extent authorized by law, all authorities and functions vested in the Secretary of State or the head of agency by any act, order, determination, delegation of authority, regulation, or executive order, now or hereafter issued.  Department of State Delegation of Authority No. 245-1.

20.     Defendant UNITED STATES ARMY CORPS OF ENGINEERS.  The Army

Corps of Engineers ("ACE") has regulatory authority over the Alberta Clipper and Southern

Lights projects pursuant to section 404 of the Clean Water Act of 1977, 33 U.S.C. § 1344, and

section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 401.  ACE is a cooperating

agency in the preparation of the State Department's EA for the LSr pipeline and EIS for the

Alberta Clipper pipeline.  Defendants Lieutenant General ROBERT L. VAN ANTWERP and

Colonel JON L. CHRISTENSEN are sued in their official capacity as U.S. Army Chief of

Engineers and Commanding General and District Engineer and Commander, respectively, of the

U.S. Army Corps of Engineers

21.     Defendant UNITED STATES FOREST SERVICE is an agency of the

Department of Agriculture, with responsibility for the management and protection of the

Chippewa National Forest, and the wildlife and resources therein.  The Forest Service issued

special use permits to Enbridge for the construction and operation of the Alberta Clipper and

Southern Lights diluent pipelines and was a cooperating agency for the preparation of the State

Department's EIS for the Alberta Clipper pipeline.  Defendants TOM TIDWELL and ROB

HARPER are sued in their official capacity as Chief of the United States Forest Service and

Forest Supervisor for the Chippewa National Forest, respectively.

**FACTS**

**Enbridge's Pipeline Expansion Proposal**

22.     Enbridge proposes to expand significantly the existing pipeline system it owns

and operates between Alberta, Canada and United States.  The expansion includes the Alberta

Clipper project and the Southern Lights project.

23.     The Alberta Clipper pipeline is a 992-mile long, 36-inch diameter pipeline

running from Hardisty, Alberta, Canada, crossing the border near Neche, North Dakota, and

continuing through northern Minnesota to a terminal in Superior, Wisconsin.  The Alberta
Clipper pipeline will carry approximately 450,000 barrels per day (bpd), with an ultimate
capacity of 800,000 bpd, of heavy crude oil, also referred to as "bitumen," from the Canadian tar
sands to refineries throughout the Midwest.  The pipeline will be integrated with and form part of
the Enbridge's mainline oil pipeline system.  At Superior, the Alberta Clipper pipeline will
connect to a mainline to Chicago, Illinois.

24.     The Southern Lights project is comprised of two components:  the Line 13
Reversal/New Diluent pipeline and the LSr Capacity Replacement pipeline.

25.     The diluent pipeline would transport light hydrocarbons known as "diluent" from
Midwest refineries to the Alberta tar sands.  Because bitumen crude from the Canadian tar sands
is too viscous to be pumped through a pipeline, it must be diluted with lighter liquid
hydrocarbons in order to be transported by pipeline.  For the diluent pipeline, Enbridge proposes
to construct a new 678-mile, 20-inch pipeline from Manhattan, Illinois, to Clearbrook,
Minnesota, where it would connect with Enbridge's existing Line 13.  Enbridge proposes to
reverse the flow of Line 13, which currently transports light sour crude from Canada to
Clearbrook, to create a dedicated diluent delivery system from refineries in Illinois to the tar
sands production centers in Alberta.  The diluent pipeline would have an initial capacity of
180,000 bpd with expansion capability up to 330,000 bpd.  The 188-mile segment of diluent
pipeline from Clearbrook, Minnesota to Superior, Wisconsin would be constructed at the same
time and in the same right-of-way as the Alberta Clipper pipeline.

26.     The LSr Capacity Replacement pipeline is a new 313-mile 20-inch pipeline being
constructed between Cromer, Manitoba, Canada, and Clearbrook, Minnesota to transport light
sour crude.  According to Enbridge, diversion of the capacity of Line 13 to the diluent pipeline

necessitates the construction of an additional pipeline to replace that capacity.  The LSr pipeline was proposed and permitted for that purpose.  The LSr pipeline would deliver 186,000 bpd of crude oil from a supply hub near Cromer, Manitoba to the existing Enbridge terminal in Clearbrook.  The "ultimate capacity" of the LSr pipeline is 300,000 bpd.

27.     The TransCanada Keystone pipeline project through North and South Dakota will also carry tar sands crude.  The State Department's final EIS for TransCanada's Keystone crude oil pipeline was issued in January 2008, and construction began in May 2008.  The Keystone pipeline will have a capacity of 450,000 bpd and will extend approximately 1,384 miles within the United States, from the U.S.-Canadian border in western Pembina County, North Dakota to terminals at Cushing in Oklahoma, Wood River in Illinois, and Patoka in Illinois.  The Keystone pipeline intersects the proposed Alberta Clipper Project route in eastern Pembina County, North Dakota.

28.     TransCanada is also proposing to build the Keystone XL pipeline, which is designed to transport tar sands crude oil from the Western Canadian Sedimentary Basin to the Texas Gulf Coast area.  The U.S. portion of the proposed XL pipeline would be 1,375 miles long with a transport capacity of 900,000 bpd and would pass through Montana, South Dakota, Nebraska, Kansas, Oklahoma, and Texas.

**Regulatory Background**

29.     Because Enbridge's proposed expansion would involve construction on the U.S.-Canada border and the import and export of crude oil and refined petroleum products, Enbridge applied to the State Department for Presidential permits.  Enbridge submitted permit applications for the import of heavy crude and construction of the Alberta Clipper pipeline, for the import of light sour crude and construction of the LSr pipeline, and for the export of diluent in Line 13.

30.     Enbridge also applied for permits for the Alberta Clipper and Southern Lights projects from: i) the U.S. Army Corps of Engineers for permits to dredge and fill wetlands and place structures in or under water-bodies pursuant to section 404 of the Clean Water Act and section 10 of the Rivers and Harbors Act; ii) the U.S. Forest Service for a special use permit to site and construct the pipelines through the Chippewa National Forest; iii) the U.S. Environmental Protection Agency for wastewater discharge permits pursuant to section 402 of the Clean Water Act; and iv) the Bureau of Indian Affairs for approval to cross certain Indian lands.  Each agency decision on these permit requests is major federal action triggering NEPA.

31.     The State Department claimed to be the lead federal agency on the project for purposes of NEPA and assumed responsibility for conducting the environmental review for the expansion.  Instead of preparing one EIS for the entire expansion, as NEPA requires, the State Department segregated the component parts of Enbridge's proposal and conducted its environmental review in separate pieces.

32.     On July 27, 2007, the State Department issued two separate Notices of Intent to prepare separate Environmental Assessments (EAs) for the LSr pipeline and the Alberta Clipper pipeline.  Although Enbridge had applied for a Presidential permit allowing it to reverse the flow in Line 13 and export diluent, the State Department, in a letter dated November 28, 2007, told Enbridge that a new or amended permit was not necessary.  The State Department, therefore, did not issue a Notice of Intent to prepare an EA for the diluent pipeline.  No other federal agency issued a separate notice or undertook separate or supplemental environmental review for the diluent pipeline

33.     The State Department then determined it would proceed with an EA for the LSr pipeline, but prepare an EIS for the Alberta Clipper pipeline.  Plaintiff MCEA, in comment

letters sent to the State Department in December 2007, pointed out that all three pipelines were part of one project and that NEPA required the State Department to evaluate all three in one environmental impact statement.  Over MCEA's objections, the State Department proceeded with separate environmental reviews.

34.     The State Department's EA for the LSr pipeline did not evaluate environmental impacts from the Alberta Clipper pipeline or the diluent pipeline.  In its final EA and Finding of No Significant Impact ("FONSI") for the LSr pipeline, the State Department represented that the diluent pipeline would be evaluated in the NEPA analysis for the Alberta Clipper project.

35.     The State Department issued its draft EIS for the Alberta Clipper project on December 5, 2008, and its final EIS on June 8, 2009.  The Department excluded both the LSr and diluent pipelines from its definition of the project under review and asserted that they were not connected actions for NEPA purposes.

36.     The draft EIS stated that the purpose and need for the project is to transport additional crude oil into the United States from existing Enbridge facilities in western Canada to meet the growing U.S. demand.  The draft did not fully analyze all reasonably foreseeable cumulative impacts of the proposal such as the impacts of refining and burning the additional heavy crude oil, or the impacts of increased greenhouse gas emissions.  The draft EIS also did not adequately evaluate the risks, environmental impacts, and available mitigation measures associated with spills and operational leaks from the pipeline.

37.     Plaintiffs and others submitted comments on the draft EIS noting these failures. In these comments Plaintiffs notified the State Department that NEPA requires evaluation of all the component parts of the Alberta Clipper project, including the connected diluent and LSr pipelines, and assessment (and, as warranted, mitigation) of the reasonably foreseeable

environmental impacts of the project, including tar sands extraction, expanded U.S. refining of heavy crude from the Canadian tar sands, and increased greenhouse gas emissions from extraction, refining, and end-use of tar sands crude oil.  In addition, Plaintiffs challenged the accuracy of the crude oil demand forecasts underpinning the project's stated purpose and need, and commented on the State Department's failure to adequately consider reasonable alternatives.

38.     On June 8, 2009, the State Department released a final EIS for the project.  The final EIS did not include the diluent or the LSr pipelines as connected actions.  The final EIS did not adequately respond to Plaintiffs' comments that the EIS does not consider the reasonably foreseeable environmental impacts of tar sands extraction, of expanded U.S. refining of heavy crude from the Canadian tar sands, or of increased greenhouse gas emissions from extraction, refining, and end-use of tar sands crude oil.  The final EIS also did not adequately address the impacts that spills and operational leaks would have on the environment, especially soil and water resources, or on human health, and does not discuss measures to mitigate these impacts, but instead defers to a future review process by the Department of Transportation.

39.     The State Department, in its Response to Comments in the final EIS, changed the purpose and need for the project, stating that the purpose of the project is to "increase the import of a safe and reliable supply of Canadian crude oil to replace portions of the imported crude coming from foreign sources that are substantially less reliable and stable."  However, this new statement of purpose and need is not reflected in Enbridge's Presidential permit application, nor is it supported by laws or facts that indicate reduced importation of crude oil from other countries that may be perceived as suffering from instability.

40.     Because the State Department failed to consider the diluent pipeline in the Alberta Clipper EIS, and because it failed to consider the diluent pipeline in its NEPA review for the LSr

pipeline, no study has been conducted to date evaluating the environmental impacts from the diluent pipeline. Defendant ACE and other federal agencies with regulatory authority over the diluent pipeline are unable to rely on the State Department's environmental review in their permitting decisions because of this failure.

41.     On August 20, 2009, the State Department issued a Record of Decision (ROD) to issue a Presidential permit for the Alberta Clipper pipeline, along with a determination that issuance of the permit would serve the national interest. The ROD did not supply any meaningful additional environmental information or analysis, but rather relied on the State Department's deficient final EIS.

42.     On August 20, 2009, the State Department issued the Alberta Clipper Presidential permit. The permit allows the transport of tar sands crude oil from Canada into the United States across the U.S.-Canada border; authorizes the construction, connection, operation and maintenance of pipeline facilities at the border; and contains other terms and conditions on the pipeline and related facilities as set forth in the permit.

43.     On August 24, 2009, the Army Corps issued Enbridge permits to dredge and fill wetlands and place structures in or under water-bodies in connection with construction of the Alberta Clipper and diluent pipelines. In a telephone conversation with Ralph Augustin, on August 25, 2009, Plaintiffs confirmed the issuance of the permit, and confirmed that the Army Corps did not conduct independent NEPA review but relied on its participation in the State Department's preparation of the Alberta Clipper EIS. The Army Corps refused to provide Plaintiffs with a copy of the permits or the Corps' ROD.

44.     On June 29, 2009, the Chippewa National Forest Supervisor issued special use permits and a Record of Decision for the construction and maintenance of the Alberta Clipper

and Southern Lights diluent pipelines in the Chippewa National Forest. Plaintiffs filed a timely administrative appeal on August 17, 2009, challenging the Forest Service's failure to conduct an independent NEPA analysis and its reliance on the State Department's inadequate FEIS. On September 24, 2009, the Appeal Reviewing Officer recommended that the appeal be denied and the ROD affirmed. On September 28, 2009, the Forest Service's Appeal Deciding Officer adopted the recommendation of the Reviewing Officer. The Appeal Deciding Officer's decision is the Forest Service's final agency action. 36 C.F.R. § 215.18(c).

**Environmental Impacts of the Project**

**A.     Impacts of Pipeline Construction and Operation**

45.     In the United States, construction of the Alberta Clipper pipeline would require the installation of approximately 326.9 miles of new 36-inch-diameter pipeline starting at the Canadian border in Neche, North Dakota, crossing Minnesota and bisecting the Chippewa National Forest, and ending in a terminal in Superior, Wisconsin. The pipeline would involve a total of three perennial and 24 intermittent water-body crossings in North Dakota; 76 perennial and 86 intermittent crossings in Minnesota, and one perennial and 13 intermittent water-body crossings in Wisconsin. Construction of the pipeline could result in increased sedimentation, degradation and alteration of aquatic habitat, increased runoff and erosion, changes in channel morphology and stability, temporary reductions in flow, and temporary to short-term surface water degradation during or after construction.

46.     During construction, this pipeline would impact 1,255 acres of upland forested lands, 655 acres of open lands, and 1,346 acres of wetlands. The primary impacts to vegetation would be cutting, clearing and the potential introduction of noxious weeds. It would result in both short-term disturbance and long-term modification to wildlife habitats, including impacts

from habitat fragmentation and widening of existing rights-of-way. It could affect fisheries resources by loss or alteration of habitat, reduced spawning success, direct and indirect mortality, adverse health effects, and loss of individuals and habitats due to hydrostatic testing and exposure to toxic materials.

47.     In addition, the pipeline would cut through a rare wetland area known as a calcareous fen. This is the rarest wetland plant community in Minnesota and Wisconsin and one of the rarest in North America. Minnesota law protects it from all disturbance. On July 7, 2009, after the State Department issued the final EIS for public comment, the Minnesota Department of Natural Resources (MDNR) discovered on a site visit that the proposed pipeline route would cut through a calcareous fen. On July 22, 2009, Plaintiffs sent a letter to the State Department requesting consideration of an alternate route for the pipeline to avoid this calcareous fen, but received no response.

48.     Finally, operation of the pipelines presents significant risks to the environment and human health due to operational leaks and spills. Enbridge reports over 30 incidents of leaks and spills on its existing pipeline running through northern Minnesota over the last decade. Nationwide, during the last 20 years, there have been nearly 3,000 reported "significant incidents," resulting in 43 fatalities and over $1 billion in property damage.

### B.     Impacts of Extracting and Refining Tar Sands Crude Oil

49.     Tar sands are composed of clay, sand, water, and bitumen – a heavy black viscous oil that can be mined and processed. Extracted bitumen is then refined into synthetic oil and other petroleum products.

50.     Unlike conventional oil, bitumen cannot be pumped from the ground in its natural state. Instead, deposits are mined using energy-intensive extraction and separation techniques to

separate the bitumen from the sand, clay and water.  Surface tar sand deposits can be recovered by open pit mining techniques, using large hydraulic and electrically powered shovels to dig up tar sands and transport them for extraction using a hot water separation process.  Compressed air and steam injection methods are used to extract deep tar sand deposits, and those methods require large quantities of water and energy for heating and pumping.  About two tons of tar sands are required to produce one barrel of oil.

51.     Both mining and processing of tar sands cause significant environmental impacts, including emissions of global warming gases, destruction of wildlife habitat, and impacts to air and water quality.

52.     Tar sands development is significantly more energy intensive than conventional oil and gas development.  It takes three to five times the amount of energy to extract and upgrade a barrel of crude from tar sands compared to conventional sources.  The lifecycle emissions of greenhouse gases from tar sands oil production is 25% greater than emissions of low-sulfur, light crude oils.

53.     In addition, tar sands extraction operations require large quantities of water and would draw down surface water flow, adversely impacting stream habitat for migratory fish and other species dependant on local water resources.  Drilling one well consumes 5.5 acre-feet of water each year, and the production of one gallon of oil requires 35 gallons of water.  Water used in tar sands processing is discharged into toxic tailings ponds so large that they are visible from space.  In May 2008 over 500 migratory birds died in a single incident after landing on a tailings pond.

54.     The Enbridge expansion project will supply U.S. refineries with heavy tar sands crude.  According to a 2007 U.S. Geological Survey report, the type of oil extracted from

Canadian tar sands contains eleven times more sulfur, six times more nitrogen, eleven times more nickel, and five times more lead than conventional oil.

55.     Refining tar sands crude transported through the Alberta Clipper pipeline will likely result in higher air emissions of harmful pollutants such as sulfur dioxide, hydrogen sulfide, sulfuric acid mist, and nitrogen oxides, as well as toxic metals such as lead and nickel compounds.

56.     According to the U.S. Environmental Protection Agency, the human health effects of these pollutants may include premature death; cancer; permanent lung damage; reproductive, neurological, developmental, respiratory, and immunological problems; cardiovascular and central nervous system disorders; bio-mutations; respiratory illness, including bronchitis and pneumonia; and aggravation of heart conditions and asthma.

57.     Also according to EPA, the environmental damage caused by these pollutants includes acid rain; concentration of toxic chemicals up the food chain; creation of ground-level ozone and smog; visible impairments that migrate to sensitive areas such as national parks; and depletion of soil nutrients.

58.     Refining oil transported by the expansion project can be expected to produce more greenhouse gases, such as carbon dioxide, than refining conventional crude oil, because the tar sands crude requires more energy to refine.  The requisite additional energy is most likely to come from sources, such as coal-fired power plants, that emit large quantities of greenhouse gases.  This will add to harmful emissions emanating from the refineries themselves.

59.     Greenhouse gases, such as carbon dioxide, contribute to global warming and a wide range of related adverse ecological and human health effects, including both water shortages and coastal flooding, increased risk of wildfires and stronger hurricanes, new pests and

insect-borne diseases, and disruption of habitats.

60.     Refineries processing tar sands crude from the expansion project are likely to increase discharges of water pollutants, including ammonia and total suspended solids, which may damage surrounding waterways.  Refinery construction and expansion may also compromise or destroy wild or agricultural lands.

## LEGAL BACKGROUND

### National Environmental Policy Act

61.     The National Environmental Policy Act is our "basic national charter for the protection of the environment."  40 C.F.R. § 1500.1.  Congress enacted NEPA "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation."  42 U.S.C. § 4321.

62.     To accomplish these purposes, NEPA requires all agencies of the federal government to prepare a "detailed statement" that discusses the environmental impacts of, and reasonable alternatives to, all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  This statement is commonly known as an environmental impact statement.  To determine whether a federal action will result in significant environmental impacts and requires an EIS, the federal agency may first conduct an environmental assessment.  40 C.F.R. § 1501.4.  If a federal agency makes a finding of no significant impact, it may avoid conducting an EIS.  *Id.*

63.     The Council on Environmental Quality (CEQ), established under NEPA within the Executive Office of the President to be responsible for coordinating federal environmental

efforts, has promulgated regulations implementing NEPA.  40 C.F.R. §§ 1500-1508.  The State Department's own NEPA regulations, which incorporate and supplement the CEQ regulations, are set forth at 22 C.F.R. §§ 161.1-161.12.

64.     The EIS process is intended "to help public officials make decisions that are based on understanding of environmental consequences, and to take actions that protect, restore, and enhance the environment" and to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken."  40 C.F.R. § 1500.1(b)-(c).  Where the government has acted prior to fulfilling its NEPA obligations, projects authorized by government action must be suspended until NEPA's requirements are met.

65.     The EIS must "provide full and fair discussion of significant environmental impacts and shall inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  *Id.* at § 1502.1.  The alternatives analysis is considered to be the "heart" of an EIS.  40 C.F.R. § 1502.14.  An EIS "should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear choice among options by the decisionmaker and the public."  *Id.*  NEPA requires the State Department to "rigorously explore and objectively evaluate all reasonable alternatives," including the "alternative of no action," and to "devote substantial treatment to each alternative ... so that reviewers may evaluate their comparative merits."  *Id.*

66.     An EIS must "specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action."  40 C.F.R. § 1502.13.  An agency must not define its project purpose and need so narrowly as to preclude consideration of reasonable alternatives.

67.     Pursuant to the CEQ regulations, decision-makers must address in a single EIS all "connected," "cumulative," and "similar" actions.  *Id.* § 1508.25(a).  Actions are connected if they: "(i) [a]utomatically trigger other actions which may require environmental impact statements; (ii) [c]annot or will not proceed unless other actions are taken previously or simultaneously; [or] (iii) [a]re interdependent parts of a larger action and depend on the larger action for their justification."  *Id.*  Cumulative actions are those which have "cumulatively significant impacts and should therefore be discussed in the same impact statement."  *Id.*  Similar actions are those which have "similarities ... such as common timing or geography."  *Id.*

68.     CEQ regulations also require that an EIS include, among other things: (i) a "full and fair discussion" of the significance of all "direct," "indirect," and "cumulative" effects of the action, 40 C.F.R. §§ 1502.1, 1502.16(a)-(b), 1508.25(c); and (ii) a discussion of "means to mitigate adverse environmental impact."  *Id.* § 1502.16(h).  "Direct effects" are caused by the action and occur at the same time and place.  40 C.F.R. § 1508.8(a).  "Indirect effects" are reasonably foreseeable effects caused by the action, but later in time or farther removed in distance.  *Id.* § 1508.8(b).  These may include "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems."  *Id.*  A "cumulative impact" is defined as the "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions, regardless of what agency ... or person undertakes such other actions."  *Id.* § 1508.7.  Cumulative impacts "can result from individually minor but collectively significant actions taking place over a period of time."  *Id.*

69.     NEPA directs federal decision-makers to "recognize the worldwide and long-

range character of environmental problems."  42 U.S.C. § 4332(2)(F).

70.    An agency must first prepare a draft EIS that satisfies to the fullest extent possible the final EIS requirements of 42 U.S.C. § 4332(2)(C).  40 C.F.R. § 1502.9(a).  After preparing the draft EIS and before preparing a final EIS, the agency must solicit comments from the public, "affirmatively soliciting comments from those persons or organizations who may be interested or affected."  *Id.* § 1503.1(a).

71.    After the public comment period, an agency must prepare a final EIS based on its assessment and consideration of the comments received from the public, as well as other relevant Federal, State and local agencies, on the draft EIS.  *Id.* § 1503.4(a).  An agency must respond to comments by such means as modifying alternatives; developing and evaluating new alternatives; supplementing, improving, or modifying its analyses; making factual corrections; and/or explaining in detail why the comments do not require further response.  *Id.* §§ 1503.4(a), 1502.9(b).

72.    If there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts, the agency must prepare supplements to the draft or final EIS.  *Id.* § 1502.9(c).

**Regulation of International Tar Sands Crude Oil Pipelines**

73.    The "foreign commerce clause" of the United States Constitution endows Congress with exclusive and plenary authority to "regulate commerce with foreign nations." U.S. Const. art. I, § 8, cl. 3.  The importation of tar sands crude oil from Canada falls within Congress's foreign commerce clause powers.  Congress has not delegated its power to regulate the importation of Canadian tar sands crude oil to the President, the Executive Branch, or any agency of the Executive Branch.  The President has no independent constitutional authority to

regulate the importation of Canadian tar sands crude by pipeline.

74.     To the extent that Congress has made any delegation of its power to regulate international tar sands crude oil pipelines, it is limited to specific grants of regulatory authority, e.g.:  i) delegation of authority to the Federal Energy Regulatory Commission to control the rates and valuation of oil pipelines, *see* 42 U.S.C.A. § 7111 *et seq*.; ii) delegation of authority to the Department of Transportation to establish federal pipeline safety regulations, *see* 49 U.S.C. § 60134 *et seq*.; and (iii) delegation of authority to the Pipeline and Hazardous Materials Safety Administration in the Pipeline Inspection, Protection, Enforcement, and Safety Act, 49 U.S.C. § 60134 *et seq*.  These grants of authority do not extend to the State Department and do not delegate the Congress's power to permit a pipeline for the importation of tar sands crude oil from Canada.

75.     The State Department claims authority to issue permits allowing the importation of tar sands crude oil from Canada pursuant to Executive Order 13337, 69 Fed. Reg. 25299 (2004) as amended.  Under Executive Order 13337, the Secretary of State is "designated and empowered to receive all applications for Presidential permits … for the construction, connection, operation, or maintenance, at the borders of the United States, of facilities for the exportation or importation of petroleum, petroleum products, coal, or other fuels to or from a foreign country."  69 Fed. Reg. 25299.  In the Executive Order, President George W. Bush cites "the authority vested in me as President by the Constitution," *id.*, without reference to a statutory grant of authority for the issuance of Presidential permits for pipelines that import tar sands crude oil from Canada.  Indeed, there is no statutory authority for the Executive Branch's issuance of the Presidential permit for the Alberta Clipper pipeline.

**<u>Administrative Procedure Act</u>**

76.     The APA provides a right of action against agency actions or decisions that are "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege or immunity [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A)(B)(C).

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of NEPA and the APA:
### Failure to Evaluate Full Range of Actions

77.     Plaintiffs incorporate and re-allege, as if fully set forth herein, all allegations contained in the preceding paragraphs.

78.     The Alberta Clipper pipeline, the Southern Lights diluent pipeline and the LSr pipeline are connected and cumulative, and/or similar actions that the State Department must evaluate in a single EIS.  The Alberta Clipper and diluent pipelines will be constructed simultaneously and in the same corridor and are thus similar actions pursuant to 40 C.F.R. § 1508.25(a)(3).  Without an increased supply of diluent to facilitate transportation of viscous tar sands crude, the Alberta Clipper pipeline would not be able to transport the 450,000 bpd of crude for which it is designed.  Because the Alberta Clipper and diluent pipelines are interdependent parts of a larger action and when viewed together have cumulatively significant impacts, they meet the definition of connected and cumulated actions set forth in 40 C.F.R. § 1508.25(a)(1) and (2).

79.     Similarly, Enbridge refers to the LSr pipeline as the "capacity replacement project" because its primary purpose is to replace the transport capacity of Line 13 which will be reversed and diverted to transport diluent as part of the diluent pipeline.  Because the new LSr pipeline is an interdependent part of the larger expansion project and depends on the diluent

pipeline and the Alberta Clipper Project for its justification it meets the definition of a connected action under 40 C.F.R. § 1508.25(a)(1).

80.     The State Department's failure to assess the full range of connected, cumulative and similar actions in the Alberta Clipper EIS violated and continues to violate section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), and NEPA's implementing regulations including 40 C.F.R. § 1508.25(a). The ACE and Forest Service's granting of permits for construction and operation of the Southern Lights Diluent pipeline in reliance on the State Department's inadequate assessment and without conducting an independent environmental review of the diluent pipeline violates NEPA, 42 U.S.C. § 4332(2)(C).

81.     Accordingly, i) the State Department's issuance of a Presidential permit for the Alberta Clipper project;  ii) the Army Corps' issuance of permits for the Alberta Clipper and Southern Lights projects pursuant to section 404 of the Clean Water Act and section 10 of the Rivers and Harbors Act, and iii) the Forest Service's granting of a special use permit for construction and operation of the Alberta Clipper and Southern Lights diluent pipelines in the Chippewa National Forest were arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

## SECOND CLAIM FOR RELIEF
### Violation of NEPA and the APA:
### Failure to Adequately Analyze Indirect and Cumulative Impacts

82.     Plaintiffs incorporate and re-allege, as if fully set forth herein, all allegations contained in the preceding paragraphs.

83.     Defendants failed to include in the EIS for the Alberta Clipper pipeline, a full and fair discussion of the significant indirect environmental effects of the action it approved, in

violation of NEPA.

84.     The environmental review fails to analyze the reasonably foreseeable impacts in the United States of increased exploitation and development of Canadian tar sands due to the pipeline infrastructure expansion.  These impacts include the climate impacts resulting from increased emissions of greenhouse gases during tar sands extraction and upgrading and from vast deforestation in the Canadian boreal forest as well as impacts on migratory species.

85.     The EIS does not adequately address global warming impacts or the mitigation thereof.  The final EIS for the Alberta Clipper pipeline does not account for: a) the upstream emissions generated by the increased tar sands development induced by increased U.S. transport and refining capacity; b) refinery upgrades and expansions necessary to accommodate the increased volumes and weight of crude oil delivered by the pipelines; c) the reasonably foreseeable future expansion of the Alberta Clipper pipeline capacity from 450,000 to 800,000 bpd; d) the downstream use of the oil; or e) the global warming impacts resulting from the connected diluent pipeline.  There is no analysis in the FEIS, or the appendix provided by the Forest Service, Appendix U, of the impacts climate change will have on the Chippewa National Forest.  Because it omits these significant indirect sources of greenhouse emissions, the State Department's treatment of global warming impacts is inadequate.

86.     Defendants failed to include in the EIS for the Alberta Clipper pipeline, a full and fair discussion of the significant cumulative environmental effects of the action it approved, in violation of NEPA.

87.     The EIS does not assess the cumulatively significant impacts of a) construction and operation of the 188-mile segment of the Southern Lights diluent pipeline that will be constructed between Clearbrook Minnesota and Superior Wisconsin at the same time and in the

same right of way as the Alberta Clipper pipeline; b) construction and operation of the remaining 490 miles of the Southern Lights diluent pipeline from Superior to Manhattan, Illinois; c) the impacts, including increased greenhouse gas emissions, of making a large source of diluent available for increased exploitation of the tar sands; or d) construction and operation of the LSr pipeline.

88.     The EIS also does not consider the cumulatively significant impacts of the Alberta Clipper pipeline when added to the Keystone and Keystone XL pipelines which will together transport approximately two million bpd of tar sands crude oil from Canada for refining in the United States.  This large increase in the capacity to import heavy bitumen crude for processing in the United States will boost exploitation and development of Canadian tar sands which have cumulative impacts on the climate and migratory species in the United States.  The EIS also did not consider the cumulative impacts on regional air  and water quality, and the increase in greenhouse gas emissions resulting from refining and using tar sands crude oil delivered by the Alberta Clipper pipeline in addition to the crude delivered by the Keystone and Keystone XL pipelines.

89.     The State Department's failure to consider and evaluate the indirect and cumulative impacts of increased exploitation and development of the Canadian tar sands, and failure to evaluate the project's cumulative climate impacts violated and continues to violate section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), and NEPA's implementing regulations, including the requirements that agencies take a "hard look" at the impacts of their actions, and that they consider all direct, indirect and cumulative impacts.  40 C.F.R. § 1508.7.

90.     Accordingly, i) the State Department's issuance of a Presidential permit for the Alberta Clipper project; ii) the Army Corps' issuance of permits for the Alberta Clipper and

Southern Lights projects pursuant to section 404 of the Clean Water Act and section 10 of the

Rivers and Harbors Act, and iii) the Forest Service's granting of a special use permit for

construction and operation of the Alberta Clipper and Southern Lights diluent pipelines in the

Chippewa National Forest prior to fulfilling NEPA's requirements are arbitrary, capricious, an

abuse of discretion, not in accordance with law, and without observance of procedure required by

law within the meaning of the APA, 5 U.S.C. § 706(2).

**THIRD CLAIM FOR RELIEF**
**Violation of NEPA and the APA:**
**Failure to Adequately Evaluate Risks, Impacts, and Mitigation Measures**
**Associated with Spills and Operational Leaks**

91.     Plaintiffs incorporate and re-allege, as if fully set forth herein, all allegations

contained in the preceding paragraphs.

92.     The State Department's environmental review has not adequately addressed the

impact that spills and operational leaks would have on the environment, especially soil and water

resources or on human health.  The State Department states that it relies on a future review

process by the Pipeline and Hazardous Materials Safety Administration (PHMSA) within the

Department of Transportation.  However PHMSA has not and does not intent to conduct any

separate environmental review for these pipelines.

93.     In particular, because the State Department failed to consider the connected

Southern Lights diluent pipeline, it has not provided information about or evaluated the risks,

impacts, or available measures to mitigate leaks and spills from the diluent pipeline.  Diluent has

not previously been transported through Minnesota's water-rich environment.  The State

Department's environmental review fails to identify the specific refined petroleum product that

will be used as diluent and offers the public and public officials no understanding of the

environmental consequences from leaks and spills of diluent along the Southern Lights diluent

pipeline.  In response to Plaintiffs' Forest Service appeal, the Reviewing Officer acknowledged

that the FEIS did not address the chemical make-up of diluent or how it differed from crude oil,

and "did not analyze those impacts as distinct from impacts of the heavier crude oil to be

pumped in the Alberta Clipper project."  The Reviewing Officer alleged that Plaintiffs had failed

to raise the issue in their comments on the draft EIS.  In fact, Plaintiffs' comments pointed to the

absence of such analysis as a "glaring inadequacy" of the DEIS and an issue of particular

concern.

94.     The State Department's failure to adequately evaluate the risks and impacts of

spills and operational pipeline leaks, and failure to consider measures to mitigate such risks and

impacts violated and continues to violate section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C),

and NEPA's implementing regulations, including the requirements that agencies take a "hard

look" at the impacts of their actions, and that they consider the direct, indirect and cumulative

impacts of their actions.  40 C.F.R. § 1508.7.

95.     Accordingly, i) the State Department's issuance of a Presidential permit for the

Alberta Clipper pipeline;  ii) the Army Corps' issuance of permits for the Alberta Clipper and

Southern Lights projects pursuant to section 404 of the Clean Water Act and section 10 of the

Rivers and Harbors Act, and iii) the Forest Service's granting of a special use permit for

construction and operation of the Alberta Clipper and Southern Lights diluent pipelines in the

Chippewa National Forest prior to fulfilling NEPA's requirements are arbitrary, capricious, an

abuse of discretion, not in accordance with law, and without observance of procedure required by

law within the meaning of the APA, 5 U.S.C. § 706(2).

**FOURTH CLAIM FOR RELIEF**
**Violation of NEPA and the APA:**
**Failure to Adequately Evaluate the No Action Alternative**

96.     Plaintiffs incorporate and re-allege, as if fully set forth herein, all allegations contained in the preceding paragraphs.

97.     The State Department failed to take a hard look at the no action alternative and instead rejected it based on conclusory assertions that that alternative does not satisfy the project's purpose and need.

98.     The purpose for the proposal as stated by Enbridge – meeting growing demand for petroleum products – is based on inaccurate assumptions about future demand for heavy tar sands crude.  Current forecasts from the U.S. Energy Information Administration (EIA) show that the demand for crude oil in the U.S. is flat and that the need for net imports will decline dramatically over the next two decades.  Adding to that the likelihood of state and federal laws to confront climate change and reduce U.S. dependence on fossil fuels, it is clear that there is no objective or reliable demand forecast that would support the statement of purpose and need in the EIS.

99.     The State Department misunderstood or misinterpreted forecasts from the United State Energy Information Administration (EIA) related to the projected need for Canadian imports to meet U.S. demand.  In the FEIS and Record of Decision, the State Department alleges that U.S. demand for unconventional fuels from Canada will "grow from approximately 1.5 million bpd in 2008 to over 4.3 million bpd by 2030."  The State Department, however, misapprehends the EIA source it cites for this allegation.  EIA, in fact, projects that imports from Canada will *decline*.  The growth from 1.5 million to 4.3 million bpd that EIA forecasts is in Canadian (and Mexican) unconventional crude *production*.  Plaintiffs pointed this error out in their comments on the final EIS but the State Department repeated the error in its Record of Decision.

100.    Without an adequate assessment of the purpose and need for the project, the entire EIS is deficient – the State Department cannot take a "hard look" at alternatives and balance

costs and benefits of the project as it considers the national interest unless it has first established that the need for the project as proposed is accurate.  The failure to adequately assess purpose and need has led to the State Department's erroneous summary dismissal of the "no action" alternative without adequate justification.

101.    Even if the perceived future energy shortfall in the United States were based on reliable forecasts, the construction of these new pipelines is not the only alternative for filling this perceived need.  Other alternatives include energy efficiency, renewable energy, clean technologies, and demand-side management.  NEPA regulations specifically require consideration of energy requirements and conservation in environmental review documents.  40 C.F.R § 1502.16(e).  The EIS does not adequately address alternatives to expanding U.S. capacity to import tar sands oil in considering the no action alternative.

102.    The State Department's EIS for the Alberta Clipper also fails to adequately consider the enormous expansion in transport capacity that has already been added to the pipeline systems that serve U.S. refineries, and fails to address this additional capacity availability in evaluating the no action alternative.

103.    Defendants' failure to take a hard look at the stated purpose and need for the proposed expansion and to adequately evaluate all reasonable alternatives including the no action alternative violated and continues to violate section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), and NEPA's implementing regulations, including the requirement to "rigorously explore and objectively evaluate all reasonable alternatives," including the "alternative of no action."  40 C.F.R. § 1502.14.

104.    Accordingly, i) the State Department's issuance of a Presidential permit for the Alberta Clipper project;  ii) the Army Corps' issuance of permits for the Alberta Clipper and

Southern Lights projects pursuant to section 404 of the Clean Water Act and section 10 of the

Rivers and Harbors Act, and iii) the Forest Service's granting of a special use permit for

construction and operation of the Alberta Clipper and Southern Lights diluent pipelines in the

Chippewa National Forest prior to fulfilling NEPA's requirements are arbitrary, capricious, an

abuse of discretion, not in accordance with law, and without observance of procedure required by

law within the meaning of the APA, 5 U.S.C. § 706(2).

**FIFTH CLAIM FOR RELIEF**
**Violation of NEPA and the APA:**
**Failure to Adequately Evaluate the Diluent**
**Project in the LSr Environmental Assessment**

105.     Plaintiffs incorporate and re-allege, as if fully set forth herein, all allegations

contained in the preceding paragraphs.

106.     The State Department prepared a separate EA for the LSr pipeline.  This resulted

in the State Department's Finding of No Significant Impact.

107.     The State Department's EA for the LSr pipeline did not analyze the diluent

pipeline or the Alberta Clipper pipeline, even though they are connected, cumulative and/or

similar actions.

108.     When the State Department issued its FONSI for the LSr pipeline, it justified its

omission of the diluent pipeline from the LSr EA by pledging to address it in the Alberta Clipper

EIS.  It stated: "the construction by Enbridge of another pipeline that would bring diluent north

to the oil sands project, will be addressed in a separate Environmental Impact Statement that is

being prepared for the Alberta Clipper project by the [State Department] working with other

agencies."  Thus, the State Department acknowledged the necessity of performing NEPA review

of the diluent pipeline in connection with the Alberta Clipper project.

109.     However, the State Department failed to fulfill this commitment in the Alberta

Clipper EIS.  As a result, the impacts of the diluent pipeline were not assessed in either the LSr EA or the Alberta Clipper EIS.

110.    The State Department's failure to consider the impacts of the diluent pipeline in the LSr EA violated and continues to violate section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), and NEPA's implementing regulations, including the requirements that agencies take a "hard look" at the impacts of their actions; that they consider all connected, cumulative and similar actions; and that they consider the direct, indirect and cumulative impacts of their actions.  40 C.F.R. §§ 1508.7, 1508.25(a).

111.    Accordingly, the State Department's EA, FONSI and its issuance of a Presidential permit for the LSr pipeline were arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

## SIXTH CLAIM FOR RELIEF
### Violation of the United States Constitution and the APA

112.    Plaintiffs incorporate and re-allege, as if fully set forth herein, all allegations contained in the preceding paragraphs.

113.    The State Department lacks statutory or constitutional authority to issue a Presidential permit for the Alberta Clipper pipeline.  Regulation of pipelines that import tar sands crude oil into the United States from Canada falls within Congress's exclusive and plenary authority over matters of foreign commerce pursuant to Article I, Section 8, clause 3 of the United States Constitution.  Congress has not delegated this authority to the Executive Branch. The President lacks independent constitutional authority to issue permits allowing the importation of tar sands crude oil from Canada.

114.    To the extent that Congress has delegated authority to the Executive Branch

FIRST AMENDED COMPLAINT                                                                                      36

regarding international tar sands crude oil pipelines, it has done so in a limited fashion as identified in paragraph 74 above.  The Department's issuance of the Presidential permit for the Alberta Clipper pipeline exceeds this limited statutory authority.

115.    For the reasons set forth above, the State Department's issuance of the Presidential permit for the Alberta Clipper pipeline was contrary to the United States Constitution.  Issuance of the permit was also arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege or immunity; and/or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.  5 U.S.C. § 706(2)(A)(B)(C).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Declare that the State Department's issuance of the Presidential permit for the Alberta Clipper pipeline was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege or immunity; and/or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.  5 U.S.C. § 706(2)(A)(B)(C);

B.    Declare that the State Department's approval of the Alberta Clipper pipeline and the associated Record of Decision and final Environmental Impact Statement failed to comply with the National Environmental Policy Act and its implementing regulations.  42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500-1508;

C.    Declare that the Army Corps's issuance of permits for the Alberta Clipper and Southern Lights project pursuant to section 404 of the Clean Water Act and section 10 of the Rivers and Harbors Act, and the associated Record of Decision failed to comply with the

National Environmental Policy Act and its implementing regulations.  42 U.S.C. § 4332(2)(C);

40 C.F.R. §§ 1500-1508;

      D.     Declare that the State Department's approval of the LSr pipeline and the

associated final Environmental Assessment and Finding of No Significant Impact failed to

comply with the National Environmental Policy Act and its implementing regulations.  42 U.S.C.

§ 4332(2)(C); 40 C.F.R. §§ 1500-1508;

      E.     Vacate the Presidential permit for the Alberta Clipper;

      F.     Vacate the Army Corps's permits issued for the Alberta Clipper and Southern

Lights projects pursuant to section 404 of the Clean Water Act and section 10 of the Rivers and

Harbors Act;

      G.     Vacate the Forest Service's special use permits authorizing construction and

operation of the Alberta Clipper and Southern Lights diluent pipelines in the Chippewa National

Forest;

      H.     Enjoin any activity in furtherance of construction or operation of the Alberta

Clipper and Southern Lights projects;

      I.     Award Plaintiffs their costs of litigation, including reasonable attorney and expert

witness fees;

      J.     Grant Plaintiffs such further and additional relief as the Court may deem just and

proper.

                      Respectfully submitted,

Dated:  October 1, 2009        /s/ Kevin Reuther
                             KEVIN REUTHER (MN Bar No. 266255)
                             Minnesota Center for Environmental Advocacy
                             26 E. Exchange St., Suite 206
                             St. Paul, MN  55101

Tel.: (651) 223-5969
Fax: (651) 223-5967
kreuther@mncenter.org

SARAH H. BURT (*Pro Hac Vice* Applicant)
J. MARTIN WAGNER (*Pro Hac Vice* Applicant)
Earthjustice
426 17th Street, 6th Floor
Oakland, CA 94612
Tel.: (510) 550-6700
Fax: (510) 550-6740
mwagner@earthjustice.org
sburt@earthjustice.org

ERIC E. HUBER (*Pro Hac Vice* Applicant)
DOUGLAS P. HAYES (*Pro Hac Vice* Applicant)
Sierra Club Environmental Law Program
1650 38th Street, Suite 102W
Boulder, Colorado 80301
Tel.: (303) 449-5595
Fax: (303) 449-6520
eric.huber@sierraclub.org
doug.hayes@sierraclub.org

ATTORNEYS FOR PLAINTIFFS