## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Sierra Club; Minnesota Center for
Environmental Advocacy; Indigenous
Environmental Network; and National
Wildlife Federation,

           Plaintiffs,

v.

Hillary Clinton, in her official capacity as
Secretary of State; James Steinberg, in his official
capacity as Deputy Secretary of State; United States
Department of State; Lieutenant General Robert L.
Van Antwerp, in his official capacity as U.S. Army
Chief of Engineers and Commanding General of
U.S. Army Corps of Engineers; Colonel Jon L.
Christensen, in his official capacity as District
Engineer and Commander of the U.S. Army Corps
of Engineers; the United States Army Corps of
Engineers; Tom Tidwell, in his official capacity as
Chief of the United States Forest Service; Rob Harper,
in his Official capacity as Forest Supervisor for the
Chippewa National Forest; and the United States
Forest Service,

           Defendants,

and

Enbridge Energy, Limited Partnership,

           Defendant-Intervenor.

Civil No. 09-2622 (DWF/RLE)

**MEMORANDUM
OPINION AND ORDER**

_____

Douglas P. Hayes, Esq. and Eric E. Huber, Esq., Sierra Club Environmental Law
Program; J. Martin Wagner, Esq. and Sarah H. Burt, Esq., Earthjustice; and Kevin
Reuther, Esq., Minnesota Center for Environmental Advocacy, counsel for Plaintiffs.

Luther L. Hajek, Esq., U.S. Department of Justice, Chad A. Blumenfield, Assistant
United States Attorney, United States Attorney's Office, counsel for Defendants.

Daniel J. Herber, Esq., and John F. Beukema, Esq., Faegre & Benson LLP; David H.
Coburn, Esq., and Sara Beth Watson, Esq., Steptoe & Johnson LLP, counsel for
Defendant-Intervenor.

---

## INTRODUCTION

Plaintiffs Sierra Club, Minnesota Center for Environmental Advocacy ("MCEA"),

Indigenous Environmental Network, and National Wildlife Federation (together,

"Plaintiffs") bring this action against United States Department of State ("State

Department"); Hillary Clinton, in her official capacity as Secretary of State; James

Steinberg, in his official capacity as Deputy Secretary of State; the United States Army

Corps of Engineers (the "Corps"); Lieutenant General Robert L. Van Antwerp, in his

official capacity as U.S. Army Chief of the Corps; Colonel Jon L. Christensen, in his

official capacity as District Engineer and Commander of the U.S. Army Corps of

Engineers; the United States Forest Service ("Forest Service"); Tom Tidwell, in his

official capacity as Chief of the Forest Service; Rob Harper, in his official capacity as

Forest Supervisor for the Chippewa National Forest (together, "Federal Defendants");

and Intervenor-Defendant Enbridge Energy ("Enbridge") (collectively, "Defendants").

Plaintiffs seek a preliminary injunction prohibiting Defendants from permitting the

construction and operation of the Alberta Clipper Pipeline ("AC Pipeline").  Plaintiffs

claim that Defendants violated the National Environmental Policy Act (NEPA),

42 U.S.C. § 4321, *et seq.*, and the Administrative Procedure Act (APA), 5 U.S.C. § 706.

Plaintiffs also claim that the State Department's permitting of the AC Pipeline is unconstitutional.  For the reasons set forth below, the Court denies Plaintiffs' motion.

## BACKGROUND

This case involves the construction and operation of the AC Pipeline.  The AC Pipeline is an underground pipeline that will extend from Hardisty, Alberta, Canada, to Superior, Wisconsin.  In the United States, the AC Pipeline will consist of approximately 326 miles of new 36-inch diameter pipeline.  The AC Pipeline will extend in the United States from Neches, North Dakota, across Minnesota, to Superior, Wisconsin.  At Superior, the AC Pipeline will connect with an existing mainline to Chicago, Illinois. The AC Pipeline will transport heavy crude oil extracted from tar sands in Canada.

The AC Pipeline project is being constructed by Enbridge and will have the capacity to transport approximately 450,000 barrels-per-day of crude oil from a supply hub in Alberta, Canada, to Superior, Wisconsin.  (Final Envtl. Impact Statement for the Alberta Clipper Pipeline Project ("FEIS") at 1-1.); Decl. of Denise M. Hamsher in Supp. of Enbridge's Opp. to Plts.' Mot. For Prelim. Inj. ("Hamsher Decl.") ¶ 6.)  The AC Pipeline will be installed primarily within or adjacent to an existing pipeline corridor. (FEIS at 1-1; Decl. of James G. Crawford in Supp. of Enbridge's Opp. to Plfs.' Mot. for Prelim. Inj. ("Crawford Decl." ¶ 6).)

In May 2007, Enbridge submitted an application for a Presidential permit to construct and operate the AC Pipeline.  (Decl. of Luther L. Hajek in Supp. of Defs.' Opp. to Plfs.' Mot. for a Prelim. Inj. ("Hajek Decl.") ¶ 2, Ex. 1 (Department of State's Record of Decision and Nat'l Interest Determination ("State Department ROD")) at 5.)  After

3

receiving the application, the State Department conducted an environmental review and prepared a Final Environmental Impact Statement ("FEIS") under NEPA.  During the environmental review, the State Department published a Notice of Intent to Prepare an Environmental Impact Statement ("EIS") and to Conduct Supplemental Scoping in the Federal Register; conducted public meetings in North Dakota, Minnesota, and Wisconsin; accepted and reviewed public comments on its draft environmental impact statement ("DEIS"); and consulted with Indian tribes and several federal and state agencies, including the Corps, the U.S. Environmental Protection Agency, and the U.S. Fish and Wildlife Service.  (State Department ROD at 23.)  The State Department published its Notice of Availability of the Final EIS and request for public comments in the Federal Register on June 8, 2009, seeking comments by July 3, 2009.  (*Id.*)

On August 3, 2009, Deputy Secretary of State James Steinberg signed a Record of Decision and National Interest Determination and Presidential Permit, indicating the State Department's intent to issue a Presidential Permit to Enbridge (the "Permit").  The Permit grants Enbridge permission "to construct, connect, operate, and maintain pipeline facilities at the border of the United States and Canada at Neches, North Dakota, for the transport of crude oil and other hydrocarbons between the United States and Canada." (Hajek Decl. ¶ 3, Ex. 2 at 1.)  The Permit notes that the United States facilities consist of "[a] 36-inch-diamter pipeline extending from the United States—Canada border near Neches, North Dakota, up to an including the first mainline shut-off valve or pumping station in the United States."  (*Id.*)

The Summary of the State Department ROD states in part:

> DOS has determined, through review of the Alberta Clipper Project
> application, that the Alberta Clipper Project would serve the national
> interest, in a time of considerable political tension in other major oil
> producing regions and countries, by providing additional access to a
> proximate, stable, secure supply of crude oil with minimum transportation
> requirements from a reliable ally and trading partner of the United States
> with which we have free trade agreements that further augments the
> security of this energy supply.

(State Department ROD at 2-3.)  The State Department ROD goes on to explain that the

construction and operation of the AC Pipeline serves the national and strategic interests

of the United States by "increas[ing] the diversity of available supplies among the

United States' worldwide crude oil sources in a time of considerable political tension in

other major oil producing countries and regions," shortening the transportation pathway

for crude oil imports, "increas[ing] crude supplies from a major non-Organization of

Petroleum Exporting Countries producer which is a stable and reliable ally and trading

partner with the United States," and providing additional supplies of crude oil to make up

for declines in imports from other suppliers.  (State Department ROD at 25.)  On

August 20, 2009, pursuant to Executive Order 13337[1], the State Department issued the

Permit.  Enbridge began constructing the AC Pipeline on August 20, 2009.

Enbridge is also constructing the Southern Lights Diluent Pipeline ("SLD

Pipeline").  The SLD Pipeline will be a 20-inch diameter pipeline extending from

---

[1]      Executive Order No. 13337 empowers the Secretary of State to "receive all
applications for Presidential permits . . . for the construction, connection, operation, or
maintenance, at the borders of the United States, of facilities for the . . . exportation or
importation of petroleum [or] petroleum products .  .  . to or from a foreign country."  69
Fed. Reg. 25,299 (April 30, 2004).

Manhattan, Illinois, to Clearbrook, Minnesota.  At Clearbrook, it will connect with an existing Enbridge pipeline (Enbridge Line 13).  (FEIS at 1-28 to 1-29.)  Enbridge intends to reverse the flow of Line 13 to create a diluent delivery line ("Reversal Pipeline") to transport diluent from Illinois to Canadian oil sands producers.  Diluent is a light petroleum liquid, used to facilitate the flow of heavy crude oil, which must be diluted in order to be transported through a pipeline.  (*Id*. at 1-28.)  The new segment of the SLD Pipeline that will run from Superior, Wisconsin, to Clearbrook, Minnesota, will, along with the AC Pipeline, be "installed primarily within or adjacent to the existing Enbridge pipeline corridor" and will be constructed at the same time as the AC Pipeline.  (*Id*. at 1-28 to 1-29.)

Enbridge also obtained permits from the Corps under the Clean Water Act and River and Harbors Act because both the AC Pipeline and the SLD Pipeline cross wetlands and waters of the United States.  (Hamsher Decl. ¶ 18.)  On June 11, 2009, the Corps issued Enbridge a permit for the North Dakota portion of the AC Pipeline, and on August 24, 2009, the Corps issued Enbridge permits allowing the AC Pipeline and the SLD Pipeline to be constructed in Minnesota and Wisconsin.  (*Id*.)  The Corps issued a Record of Decision ("Corps ROD"), relying on the DEIS, FEIS, and additional information addressing potential impacts on wetlands and waterbodies.  (Hajek Decl. ¶ 4, Ex. 3.)

The AC Pipeline and SLD Pipeline also cross the Chippewa National Forest ("CNF") in Minnesota for a distance of about thirty-four miles.  Enbridge applied for an amendment to an existing Special Use Authorization permit and for a Temporary

Construction Special Use Permit from the Forest Service, seeking allowance to construct the two pipelines in the CNF.  (Record of Decision on AC and SLD Pipelines Across the CNF ("Forest Service ROD")), Plf. Ex. 9 at 1.)  The CNF and the Leech Lake Band jointly completed an Environmental Assessment ("EA") of the impacts of the expansion of the right-of-way through the CNF.  The Final EA was issued and published as an appendix to the State Department FEIS.  The Forest Service subsequently issued the permits to Enbridge.[2]

Enbridge also recently constructed and completed the now operational LSr Pipeline to transport light and medium sour crude originating in Saskatchewan to the United States.  Prior to construction of the LSr Pipeline, the State Department issued a draft and final EA addressing the impacts.  The State Department made a finding of No Significant Impact ("FONSI").  (Hamsher Decl. ¶ 9.)  Because the LSr Pipeline crosses the international border, the LSr Pipeline project required a Presidential permit.

In their First Amended Complaint[3], Plaintiffs challenge the issuance of three sets of permits:  (1) the State Department's issuance of the Permit for the construction and

[2]     Enbridge also applied for and received permits from state agencies in North Dakota, Minnesota, and Wisconsin and the Fond du Lac Band of Lake Superior Chippewa and the Leech Lake Band of Ojibwe.  Plaintiff MCEA is challenging a Minnesota Public Utilities Commission permit in state court.

[3]     The procedural history of this case and the briefing of the pending motion before the Court have been unusually disjointed.  On September 3, 2009, Plaintiffs filed this lawsuit and a motion for a temporary restraining order in the United States District Court for the Northern District of California.  The court in the Northern District of California denied the motion for a temporary restraining order and later granted a motion by

(Footnote Continued on Next Page)

operation of the AC Pipeline; (2) the Corps' permits allowing Enbridge to dredge and fill wetlands and place structures underwater in the construction of the AC Pipeline and the SLD Pipeline; and (3) the Forest Service's special use permits allowing Enbridge to construct and operate the AC Pipeline and SLD Pipeline in the CNF.

## DISCUSSION

**I.     Scope of Review under NEPA and Preliminary Injunction Standard**

Under Eighth Circuit precedent, the Court considers four factors when determining whether a preliminary injunction should issue:  (1) the probability of success on the merits; (2) the threat that the movant will suffer irreparable harm absent the restraining order; (3) the balance of harms; and (4) the public interest.  *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).  The first *Dataphase* factor requires that the movant establish a substantial probability of success on the merits of its

---

(Footnote Continued From Previous Page)

Defendants to transfer the action here.  On October 1, 2009, Plaintiffs filed the First Amended Complaint. The case was assigned to the undersigned on October 13, 2009. The motion for preliminary injunction was heard on November 18, 2009.  On December 11, 2009, the Court heard separate motions to dismiss brought by Enbridge and Federal Defendants.  The issues raised in the motions to dismiss overlap significantly with the issues presented in the current motion.  On December 15, 2009, Enbridge submitted a supplement to its opposition to Plaintiff's motion for preliminary injunction, notifying the Court of recent developments in the permitting and construction of the AC Pipeline.  The developments involve a November 2009 management plan and amendment regarding construction of the AC Pipeline through a calcareous fen that addresses, among other things, mitigation to the calcareous fen during construction.  Further, on January 11, 2009, Plaintiffs submitted additional briefing in support of their opposition to Defendants' motions to dismiss addressing issues also raised in their motion for preliminary injunction.

claim. *See Dataphase,* 640 F.2d at 114. None of the factors by itself is determinative; rather, in each case the factors must be balanced to determine whether they tilt toward or away from granting injunctive relief. *See West Pub. Co. v. Mead Data Cent., Inc.,* 799 F.2d 1219, 1222 (8th Cir. 1986). The party requesting the injunctive relief bears the "complete burden" of proving that an injunction should be granted. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

Under the APA, the reviewing court must affirm an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A). *See also Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 375 (1989); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). The Court considers whether Defendants considered the relevant factors and whether they made a "clear error of judgment." *Motor Vehicles*, 463 U.S. at 43. This standard of review is narrow and gives agency decisions a high degree of deference. *Sierra Club v. Envtl. Prot. Agency*, 252 F.3d 943, 947 (8th Cir. 2001). An agency's rule is arbitrary and capricious if it (1) relied on factors Congress did not intend it to consider; (2) "entirely failed to consider an important aspect of the problem"; (3) offered an explanation that runs counter to the evidence before the agency; or (4) "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles*, 463 U.S. at 43.

NEPA imposes procedural requirements, not substantive results, on agencies. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989) (NEPA prohibits uninformed, not unwise, agency action). NEPA requires federal agencies to prepare an

EIS for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  An EIS must contain a "detailed statement" on the environmental impact of the proposed action, any unavoidable adverse environmental effects of the proposed action, and the alternatives to the proposed action.  *Id.  See also Kleppe v. Sierra Club*, 427 U.S. 390, 401-02 (1976).  NEPA does not allow a court to substitute its judgment for that of an agency as to the environmental consequences of the agency's actions.  A court's review is to "insure that the agency has taken a 'hard look' at the environmental consequences."  *Kleppe*, 427 U.S. at 410 n.21.

## II.    Likelihood of Success on the Merits[4]

### A.    Unconstitutionality of the Presidential Permit

Plaintiffs assert that the State Department's issuance of the Permit is unconstitutional because the President has no constitutional or statutory authority to issue presidential permits for international tar sands crude oil pipelines.  Plaintiffs assert that

---

[4]    Both Federal Defendants and Enbridge argue that Plaintiffs are not likely to succeed on the merits of their claims against the State Department because the Permit is unreviewable by this Court.  In particular, Defendants assert that the State Department's decision to issue the Permit was made pursuant to Executive Order 13337, which delegates the President's authority over this foreign affairs function to the Secretary of State and that the action of the Secretary of State was therefore presidential in nature and unreviewable under the APA.  In essence, Defendants assert that there was no "agency action" on the part of the State Department.  Federal Defendants and Enbridge have filed separate motions to dismiss on the grounds that the State Department's decision is unreviewable.  Because the Court must evaluate the sufficiency of the FEIS in relation to Plaintiffs' claims against the Forest Service and the Corps, the Court moves directly to that analysis and will reach Defendants' arguments in a forthcoming order on the pending motions to dismiss.

international oil pipelines are matters of foreign commerce and, therefore, the power to regulate these pipelines is under the exclusive and plenary constitutional authority of Congress to "regulate commerce with foreign nations." U.S. Const. art. I, § 8, cl. 3. Plaintiffs also assert that the President lacks statutory authority to regulate the pipelines and that congressional action is required.

Federal Defendants assert that neither the President nor the State Department has claimed authority to regulate pipelines, but rather that the State Department is involved in the permitting of the AC Pipeline because the pipeline crosses an international border, which implicates foreign affairs and national security concerns. Federal Defendants assert that throughout our country's history, Presidents have exercised their inherent authority to approve or reject such border crossings. Federal Defendants assert that the authority to issue a permit for a border-crossing facility derives from the President's constitutional authority over foreign affairs as Commander in Chief and they cite to several examples of Presidents doing so in the past. *See, e.g.*, 38 U.S. Op. Atty. Gen. 163 (1935) (gas pipeline); 30 U.S. Op. Atty. Gen. 217 (1913) (electrical power); 24 U.S. Op. Atty. Gen. 100 (1902) (wireless telegraphy); 22 U.S. Op. Atty. Gen. 514 (1899) (cables). Federal Defendants also argue that the permit only issued to facilitate the border crossing and that the State Department is not regulating the entire pipeline. Instead, Federal Defendants assert that the State Department is the "lead" agency on the EIS, that the State Department's role ends at the first mainline valve in the United States, and that there is no single agency that regulates the entire pipeline. In addition, Enbridge points out that the President has exercised authority in the past to regulate cross-border facilities. *See id.*

Enbridge further asserts that Congress has not authorized presidential permits as to international oil pipelines and thus evidences congressional acquiescence.

Executive Order 11423 provides that executive permission was required to construct or maintain facilities at the U.S. borders that connected the U.S. to a foreign country.  33 Fed. Reg. 11741 (Aug. 16, 1968).  In 2001, President Bush issued Executive Order 13212, indicating that it was the "policy of [the] Administration that executive departments and agencies (agencies) shall take appropriate actions, to the extent consistent with applicable law, to expedite projects that will increase the production, transmission, or conservation of energy."  66 Fed. Reg. 28357 (May 18, 2001).  In 2004, President Bush issued Executive Order 13337, the order at issue in this case, which empowers the Secretary of State to "receive all applications for Presidential permits . . . for the construction, connection, operation, or maintenance, at the borders of the United States, of facilities for the exportation or importation of petroleum [or] petroleum products .  . . to or from a foreign country."  69 Fed. Reg. 25299 (April 30, 2004).  Given the history of the President's issuance of permits for border crossings, the congressional silence on the issue of such border crossings, and the involvement of several agencies in the regulation of the pipeline, the Court, at this stage in the litigation, determines that

Plaintiffs have not established a substantial probability that they can demonstrate that the issuance of the Permit was unconstitutional.[5]

**B.     Violation of NEPA**

Plaintiffs' primary argument is that the State Department's issuance of the AC Pipeline permit violates NEPA in four fundamental ways:  (1) failing to include the SLD Pipeline and LSr Pipeline in the FEIS; (2) failing to assess reasonably foreseeable indirect and cumulative impacts of the AC Pipeline project; (3) failing to adequately evaluate the risks, impacts, and mitigation measures associated with spills, operational leaks and abandonment; and (4) failing to take a hard look at the project's stated purpose and need, or to consider a reasonable range of alternatives.  The Court considers each argument in turn.[6]

**1.     Connected and Cumulative Actions**

NEPA requires that an EIS consider "connected" and "cumulative" actions. 40 C.F.R. § 1508.25(a).  Actions are connected if they "(i) [a]utomatically trigger other actions which may require environmental impact statements; (ii) [c]annot or will not proceed unless other actions are taken previously or simultaneously; or (iii) [a]re

---

[5]     In so holding, the Court recognizes that the Permit appears to reach beyond the actual border crossing.  This is not to say, however, that the President is regulating the pipeline beyond the border crossing.

[6]     Plaintiffs also assert that the Corps and Forest Service failed to satisfy the requirements of NEPA in issuing permits for the AC Pipeline and SLD Pipeline projects. The Court discusses below whether the Corps and Forest Service satisfied their NEPA obligations.

interdependent parts of a larger action and depend on the larger action for their

justification." 40 C.F.R. § 1508.25(a)(1)(i)-(iii).  Cumulative actions are those actions

that when viewed together "have cumulatively significant impacts." 40 C.F.R.

§ 1508.25(a)(2).  A piecemeal evaluation of connected projects, or "segmentation," is not

permitted under NEPA when the segmented project "has no independent justification, no

life of its own, or is simply illogical when viewed in isolation."  *One Thousand Friends*

*of Iowa v. Mineta*, 364 F.3d 890, 894 (8th Cir. 2004) (internal quotations omitted).

Plaintiffs argue that the failure to include the SLD and LSr Pipelines in the EIS

violates the requirement to assess connected and cumulative actions.  In particular,

Plaintiffs assert that the AC Pipeline and the SLD Pipeline are inextricably intertwined

because the increased capacity to transport heavy crude oil to the United States created by

the AC Pipeline makes it necessary to increase the supply of diluent.  Plaintiffs also point

out that Enbridge plans to construct the AC Pipeline and SLD Pipeline simultaneously

and in the same corridor and that Enbridge applied for related certificates and permits

together.  Plaintiffs further assert that the LSr Pipeline and the SLD Pipeline are

connected actions and should have been considered in a single EIS with the AC Pipeline.

In particular, Plaintiffs point out that Enbridge will reverse the flow of an existing line

(the Reversal Pipeline) to transport diluent, and they assert that if the Reversal Pipeline

were not being diverted to transport diluent to Canada, there would be no reason to

construct the LSr Pipeline.

Enbridge maintains that the three pipelines are not "connected actions" under

NEPA but rather that they are separate pipelines with "independent utility."  Federal

Defendants assert that there was no segmentation here because the allegedly connected or cumulative actions are not potential future agency actions and, alternatively, that the projects have "independent utility."

In Section 1.5.2.2 of the FEIS, the State Department responds to comments on the scope of the EIS.  (FEIS at 1-17.)  It explains that the scope of the AC Pipeline project consists of the construction and operation of the AC Pipeline and the expansion of associated pump stations in the United States.  (*Id.*)  It also explains that the proposed AC Pipeline project does not include the SLD Pipeline or LSr Projects as connected actions because they "would have independent utility relative to the Alberta Clipper Project."  (*Id.*)[7]  In Section 1.7, the FEIS addresses in further detail the SLD and LSr Pipelines, explaining the Southern Lights Program consists of three projects, the SLD Pipeline project, the Reversal Pipeline project, and the LSr project.  (FEIS at 1-26.)  The FEIS indicates that neither the AC Pipeline nor the SLD Pipeline depend upon the other to operate and that they are separate and distinct projects.  (FEIS at 1-2; App. A-27.)  For example, the FEIS explains that the current diluent supplies for use in the Alberta, Canada, tar sands are insufficient to meet the demands for the dilution of heavy crude oil and that the SLD Pipeline project is designed to meet a *portion* of that demand.  (FEIS at 1-28.)  While the AC Pipeline will transport heavy crude oil that has been blended with diluent, the diluent will not necessarily be supplied by the SLD Pipeline.  Thus, the SLD

---

[7]     The FEIS also explains that those projects are considered in the Cumulative Impacts analysis.  (FEIS at 1-18.)

Pipeline is not being constructed solely for the purpose of transporting oil through the AC Pipeline. Instead, "[p]ortions of the Alberta heavy crude oil that will be diluted with the diluent from the [SLD] Project will be transported to other regions in North America via existing Enbridge pipelines and other existing, planned, and proposed pipelines." (FEIS 1-28.)

Plaintiffs also assert that the LSr and the SLD projects are connected actions because the LSr pipeline is necessary to replace the capacity lost due to the Reversal Pipeline project. However, the LSr Pipeline is fully constructed and has been operational since April 2009. (FEIS 1-29.) It is currently being used to transport light, sour crude oil without the need for diluent and before the completion of the SLD Pipeline, Reversal Pipeline, or the AC Pipeline. While the FEIS also notes that the "previous use and capacity of the pipeline used for the Reversal Project . . . will be replaced by the Southern Lights LSr Project" (FEIS at 1-29), this does not necessarily demonstrate that the actions are connected. Since the SLD Pipeline project is not yet constructed, the current independent operation of the LSr Pipeline strongly suggests its independent utility.

Based on the above reasons, the Court concludes that Plaintiffs have not shown a substantial probability that they can demonstrate that the State Department's determination that these pipelines were not connected actions under NEPA was arbitrary or capricious. Moreover, Plaintiffs have not demonstrated that they are likely to succeed in showing that the State Department acted arbitrarily or capriciously in deciding not to consider the pipelines as cumulative actions but rather to analyze the cumulative impacts of the pipelines under 40 C.F.R. § 1508.25(c).

## 2.    Direct, Indirect, and Cumulative Impacts

NEPA requires that an EIS consider the potential direct, indirect, and cumulative impacts[8] of a proposed action.  40 C.F.R. § 1508.25(c).  "Direct impacts" "are caused by the action and occur at the same time and place."  40 C.F.R. § 1508.08(a).  "Indirect impacts" are those effects caused by the action that are reasonably foreseeable but later in time or farther removed in distance.  40 C.F.R. § 1508.8(b).  A "cumulative impact" is

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.

Plaintiffs allege that the FEIS fails to adequately consider the indirect and cumulative impacts of the AC Pipeline Project.  In particular, Plaintiffs assert that the FEIS fails to consider the following indirect impacts:  (1) the impacts in the United States caused by increased exploitation and development of Canadian tar sands driven by the AC Pipeline; (2) the impacts of the refineries in the United States that will cause additional air, water, and climate pollution; and (3) the impacts of increased consumption of liquid petroleum-based fuels on air quality and climate change.  Plaintiffs also assert that the FEIS fails to consider significant cumulative impacts, specifically the impacts of possible future upgrades and increases in capacity to the AC Pipeline, the impacts of

---

[8]    Effects and impacts are used synonymously in the NEPA regulations. 40 C.F.R. § 1508.8(b).

increased importation, refining and use of tar sands crude oil, and the impacts of increased greenhouse gas ("GHG") emissions.

### a. *Impacts Caused By Increased Exploitation of Canadian Tar Sands*

Plaintiffs assert that the EIS fails to analyze the impacts in the United States caused by increased exploitation of Canadian tar sands, such as GHG emissions and impacts on migratory species. Federal Defendants argue that these indirect effects, which affect the environment in Canada, are transboundary impacts and that there is not a sufficiently close causal nexus between the construction and operation of the AC Pipeline and the development of the Canadian tar sands.

A "but for" causal relationship is not enough to make an agency responsible for a particular effect under NEPA. *U.S. Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004). NEPA requires "a reasonably close causal relationship" between the effect and the alleged cause. *Id*. Here, the FEIS notes that the development of the Canadian tar sands is under the jurisdiction of the Canadian government and that Canadian governmental agencies oversee that development and are responsible for reviewing the Canadian portion of the AC Pipeline. (FEIS at 1-18.) In addition, the FEIS considers the development of Canadian tar stands in relation to GHG emissions, concluding that "it is expected that the oil sands in Canada would continue to be developed and the refinery emissions from that oil would still occur whether in Canada, the United States, or overseas even if the Alberta Clipper Project were not built." (FEIS 4-402.) The record suggests that the Canadian tar sands are being developed independently from the AC

Pipeline project and that the need for the increased pipeline capacity arises due to the availability of oil from the Canadian tar sands. (*Id*. at 1-6 to 1-7.) On the current record, Plaintiffs have not established that they can demonstrate "a reasonably close causal relationship" between the alleged environmental impacts of Canadian tar sands development and the construction of the AC Pipeline so as to render the FEIS deficient.

### b.    *Refinery Impacts*

Plaintiffs assert that the FEIS does not adequately consider the impacts of the refineries in the United States that will cause additional air, water, and climate pollution. Plaintiffs maintain that the process of refining heavy crude oil extracted from tar sands yields significant increases in emissions of pollutants. Plaintiffs further contend that permits issued for refinery expansions will result in significant increases in the discharge of contaminants. Defendants contend that the impacts posed by current and future refinery expansions are fully discussed in the FEIS.[9]

Section 4.14.3.12 of the FEIS discusses, among other things, the potential impacts to air quality, GHG, and climate change associated with refining heavy crude oil transported via the AC Pipeline. (FEIS at 4-388, 4-390 to 4-400.) The FEIS explains that oil transported via the AC Pipeline could be delivered to over twenty-five refineries in the United States that are currently capable of refining heavy crude oil but that about 75% of Canadian crude oil currently being imported to the United States is delivered to

---

[9]    The State Department does not concede that it was required to analyze refining impacts because it has no authority over refineries and because refineries may continue to refine oil whether or not the AC Pipeline is constructed.

Midwest refineries and in particular to an area called the Petroleum Administration for

Defense District II ("District II"), "which includes Minnesota, Wisconsin, Michigan,

Illinois, Indiana, Ohio, and nine other states generally considered in the Midwest and

upper Midwest." (FEIS at 4-390.) In addition, the FEIS explains that because at least

fifteen refineries in District II that are capable of refining heavy crude oil are directly or

indirectly connected to the Enbridge pipeline infrastructure, those fifteen refineries could

theoretically receive oil from the AC Pipeline. (FEIS at 4-394.) The FEIS notes that, in

general, these fifteen refineries are capable or receiving and refining substantial volumes

of heavy crude oil, including tar sands oil from Canada. (*Id*.) The FEIS also states that:

> [t]he emissions from these existing refineries are authorized by existing air
> permits that define maximum emissions levels for criteria pollutants.
> Thus, if the oil transported via the Alberta Clipper Project was entirely
> transported to existing refineries capable and permitted to refine those
> volumes of heavy crude oil, there would be little, if any, incremental
> increase in existing permitted air emissions of the Alberta Clipper Project
> relative to current permitted conditions.

(FEIS at 4-394.) In addition, the FEIS notes that "[t]he air permitting process also

includes consideration of these emissions in a regional context to avoid significant

cumulative impacts to air quality." (*Id*.) The FEIS also notes that in practice any

refineries that are already processing heavy crude oil or upgrading to process

heavy crude oil would be required to upgrade their permits, which would establish

new emission limits, and to implement control measures. (FEIS at 4-394.) With

respect to refinery upgrades, the FEIS notes the following:

> Since it is expected that the oil transported via the Alberta Clipper Project
> would largely replace current supplies to refineries in the Midwest,
> refineries that have historically processed heavy crude oil would not be

expected to increase air emissions above their currently permitted emission levels. Existing refineries that may increase their actual refining of heavy crude oil without upgrades could result in incremental increases in emissions, but within permitted thresholds designed to avoid significant impacts to air quality (or be required to re-initiate the air permitting process to avoid significant impacts). Refineries that are considering upgrading their facilities, but have not formally proposed upgrades, may theoretically be of interest; but they typically have no publicly available projected emission estimates or permitted emission levels. Therefore, the best quantitative estimates of incremental increases in emissions associated with the refining of oil transported via the Alberta Clipper Project may be associated with Midwest refineries that have recently completed permitting to upgrade their facilities in order to refine additional heavy crude oil.

(FEIS 4-394 to 4-395.) The FEIS then discusses three major refineries' plans to upgrade and provides estimates of the incremental increases in emissions associated with refining heavy crude oil. (FEIS at 4-390 to 4-399.) For example, the FEIS discusses the Michigan Department of Environmental Quality's ("MDEQ") issuance of an air permit to upgrade a Detroit refinery that would increase its capacity of heavy crude oil, wherein the MDEQ found that

there will be no significant net emission increase above the past actual baseline emissions for any criteria pollutants . . . [and noted that] . . . [a]lthough the project will increase carbon monoxide (CO) emissions, [the Detroit refinery] was able to mitigate CO emissions with catalytic oxidation beds and by accepting lower CO emission limits in the permit.

(FEIS at 4-395.) The FEIS notes that the MDEQ also addressed climate change in its decision to issue the permit and found that the "energy efficiency steps taken by [the Detroit refinery] will partially mitigate GHG emissions, but the [refinery upgrade] will result in increased GHG emissions." (*Id*.) The FEIS also analyzes the planned upgrades of two other major refineries and uses the expected emissions at these refineries to

develop an estimate of the potential emissions and impact on water quality associated with refining the oil transported via the AC Pipeline.  (FEIS at 4-399 to 4-400.)

Plaintiffs assert that the FEIS dismisses the impacts of refining more heavy crude in the United States on air and water quality by relying on refineries complying with the requirements of the Clean Air Act and Clean Water Act.  Here, while the FEIS defers to relevant emission limits set in the CAA and CWA, it does not otherwise ignore the potential environmental impacts of the AC Pipeline with respect to refinery emissions.

The Court concludes that Plaintiffs have not demonstrated a substantial probability that they will succeed in showing that the State Department's consideration of the impacts of refining heavy crude oil extracted from Canadian tar sands in the United States was arbitrary or capricious.

> **c.**     ***Air Quality and Climate Impacts Caused By Increased Consumption***

Plaintiffs assert that the FEIS does not adequately address the air quality and climate change impacts of increased consumption of liquid petroleum-based fuels that would result from the AC Pipeline project.  In making this assertion, Plaintiffs assume that consumer demand for liquid-petroleum based fuels will increase.  However, Plaintiffs have not explained how the transportation of crude oil through the AC Pipeline would increase consumer demand.  The State Department explains in the FEIS that the crude oil from the AC Pipeline would replace crude oil from other sources.  In addition, the FEIS discusses the impact of GHG emissions by end users of the AC Pipeline petroleum products and explains that:

> [t]he volume of crude oil that would be transported via the Alberta Clipper
> Project would total about 3 percent of the crude oil processed in the
> United States.  Neither Enbridge nor DOS would control the destination of
> the oil or the ultimate refined product.  In addition, it is expected that
> neither the source nor the volume of oil transported via the Alberta Clipper
> would influence the ultimate type(s) of petroleum products refined.  As a
> result of the refining process, the emissions associated with the end use of
> the oil by the consumer are not expected to be influenced by the source oil.
> Thus, emissions associated with the ultimate use of the refined product
> would not differ from those end use emissions from other source oils.

(FEIS at 4-400.)  The FEIS also discusses GHG emissions during construction of the AC

Pipeline and refining of the crude oil.  The FEIS concludes that "the construction and

operation of the Alberta Clipper Project would incrementally increase GHG emissions"

and that "[r]efining at existing refineries that are not upgrading to increase their capacity

for processing heavy crude oil would not be expected to cause a substantial increase in

GHG emissions relative to those associated with refining heavy crude oil currently" and

that "GHG emissions from upgraded refineries or new refineries would represent an

incremental increase in GHG."  (FEIS at 4-401.)

Given the above, the Court concludes that it is not substantially probable that

Plaintiffs will be able to show that the consideration of air quality and climate impacts

was inadequate.

### d.    *Cumulative Impacts*

Plaintiffs assert that the EIS does not adequately address the cumulative impacts

of the AC Pipeline Project because (1) it does not assess the impacts associated with

future upgrades to increase capacity of the AC Pipeline; (2) it does not analyze the

impacts of increased importation, refining and use of tar sands crude oil in light of

combined increases in heavy crude supply from other pipeline projects; and (3) it does not adequately analyze the cumulative impact of GHG emissions.

First, Plaintiffs argue that the State Department failed to assess the impacts of future upgrades to the AC Pipeline including the impacts of installing and operating more powerful pumps, the increased energy needed to operate the AC Pipeline at an increased capacity and the corresponding increase in GHG emissions, and the impacts of refining the additional amount of tar sands crude.  Defendants cite to case law indicating that the impacts of an unplanned expansion need not be considered in the EIS.  *See, e.g.*, *Kleppe*, 427 U.S. at 410 n.20; *Gulf Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362, 369-71 (5th Cir. 2006).  Plaintiffs, however, cite to no authority suggesting that the FEIS must contain an analysis of an unplanned expansion of the pipeline.

The AC Pipeline, as currently planned, will have an average annual capacity of 450,000 barrels-per-day.  (FEIS at 2-50.)  The FEIS discusses in general terms what would be required to expand the pipeline to increase capacity to 800,000 barrels-per-day, such as the installation of additional pumps or upgrading existing pumps along the pipeline.  However, the EIS states that:

> [a]lthough the capacity of the proposed Alberta Clipper Project could be increased with those upgrades, *Enbridge does not have any plans to expand the Project*.  If Enbridge proposes to increase the capacity of the Project in the future, the proposed changes to the system would be reviewed by the appropriate federal, state, tribal, and local agencies, including reviews of potential environmental impacts.

(FEIS at 2-50 (emphasis added).)  Given that there is no current plan to expand the capacity of the AC Pipeline, Plaintiffs have not established a probability of success in

showing that the State Department acted arbitrarily or capriciously in declining to consider the impacts of an unplanned expansion.

Second, Plaintiffs argue that the FEIS does not adequately analyze the cumulative impacts of increased importation, refining, and use related to the AC Pipeline in light of the combined increases in heavy crude supply from other pipeline projects or the impacts related to reasonably foreseeable expansion in tar sands production, transport, and refining that will occur due to the supply of diluent from the SLD Pipeline. Plaintiffs assert that it is reasonably foreseeable that delivery to Canada of diluent through the SLD Pipeline will result in additional growth in tar sands mining, facilitate additional transport of heavy tar sands crude oil to the United States, and therefore increase air pollution and GHG emissions. Plaintiffs contend that the incremental impacts of the AC Pipeline are significant when considered along with other pipelines and pipeline expansion projects including the SLD Pipeline, the Keystone and Keystone XL pipelines, the North Dakota Expansion project, the Southern Access projects, and the MinnCan pipeline expansion.

As discussed above, Plaintiffs have not demonstrated a probability of success on their claim that the State Department's consideration of the impacts of refining heavy crude oil extracted from Canadian tar sands in the United States in relation to the AC Pipeline project was arbitrary or capricious. With respect to the cumulative effects, the FEIS considers both Enbridge and non-Enbridge pipeline projects in its analysis of cumulative impacts in Section 4.14 and acknowledges that there are other existing and proposed projects that could result in similar impacts to those of the AC Pipeline project. Specifically, the FEIS states that:

> . . . Existing large-scale pipelines in the [region of influence] include the pipelines within the existing Enbridge right-of-way, the Keystone oil pipeline, the MinnCan oil pipeline, and the Great Lakes Gas natural gas pipeline [].
>
> There are currently six pipelines in the right-of-way between Neche, North Dakota and Clearbrook, Minnesota, and four existing pipelines in the Enbridge right-of-way between Clearbrook, Minnesota, and Superior, Wisconsin.  These existing pipelines transport crude oil or petroleum products.  A fifth pipeline would be installed within the corridor south of Clearbrook (Diluent Project) at approximately the same time as the Alberta Clipper pipeline, and the associated acreage impacts of the Diluent Project pipeline have been incorporated into the environmental review described throughout Section 4.0 of this EIS. . . .

(FEIS at 4-380.)  The FEIS goes on to describe each "large-scale" project and specifically discusses the impacts of these projects, including potential effects on geology, soils and sediments, water resources, wetlands, vegetation, wildlife, fisheries, threatened and endangered species, land use, socioeconomics, cultural resources, and air quality, GHG, and climate change.  (FEIS at 4-380 to 4-389.)  The FEIS also describes additional expansion projects and small-scale projects.  (FEIS at 1-30 to 1-31 & 4-382.)  In addition, the FEIS states that "[i]mpacts associated with construction of the LSr Project are described in the EA for that project (Enbridge 2008) and have been considered in the assessment of cumulative impacts presented in Section 4.14."  (FEIS at 1-29.)  Given the above, and on the current record, the Court concludes that Plaintiffs are not likely to establish that the analysis of these cumulative impacts was arbitrary or capricious.

Third, Plaintiffs argue that the EIS does not adequately analyze the cumulative impact of GHG emissions.  Section 4.14.3.12 of the EIS addresses "Air Quality,

Greenhouse Gases, and Climate Change."  (FEIS at 4-388.)  The FEIS considers the potential GHG emissions associated with the construction of the AC Pipeline, operation of the AC Pipeline, refining heavy crude oil, refinery upgrades, new refineries, and end use of refined petroleum products.  (FEIS at 4-388 to 4-403.)  The FEIS also estimates the total carbon dioxide emissions associated with the AC Pipeline and discusses mitigation measures to offset emissions.  On the current record, the Court concludes that Plaintiffs are not likely to be able to establish that the analysis of the cumulative impact of increased GHG emissions was arbitrary or capricious.

### 3.      Evaluation of Spills and Leaks and Abandonment

Plaintiffs assert that the FEIS does not adequately address the impact that spills and operational leaks from the AC Pipeline would have on the environment or human health or the particular risks of a diluent leak or spill from the SLD Pipeline.  Plaintiffs assert that diluent has different chemical and physical properties than heavy crude oil and that the FEIS fails to identify the chemicals that the diluent will contain or offer an analysis of the unique environmental consequences of a diluent leak.

The FEIS notes that the U.S. Department of Transportation ("DOT"), Pipeline and Hazardous Materials Safety Administration ("PHMSA"), Office of Pipeline Safety ("OPS") is responsible for monitoring the operation of liquid hydrocarbon pipeline systems in the United States.  (FEIS at 1-12.)  The FEIS notes that Enbridge has an Emergency Response Plan ("ERP") for both the AC Pipeline and SLD Pipeline that has

been approved by PHMSA and complies with the requirements of the Occupational

Safety and Health Administration ("OSHA").  (FEIS at 2-47 & App. E.)[10]

The ERP "describes planning, prevention and control measures to minimize impacts

resulting from spills of fuels, petroleum products, or other regulated substances as a result

of construction."  (*Id*. at App. E at 1.)  The ERP contains requirements regarding spill

prevention, storage and handling of fuels and hazardous liquids, spill management,

notification responsibilities, sill containment and cleanup, and storage and disposal of

contaminated materials.  (*Id*. at 1-10.)  The FEIS also includes Enbridge's

Petroleum-Contaminated Soil Management Plan and Pipeline Integrity and Emergency

Response Measures.  (FEIS App. J & Q.)  As noted in the FEIS, Enbridge would also be

required to develop a comprehensive ERP for review and approval by OPS prior to

operation and to have a written pipeline Integrity Management Program within one year

of the start of operation, subject to review and approval of OPS.  (FEIS at 4-348.)

Section 4.13 of the FEIS addresses the reliability and safety of the AC Pipeline

and provides information on safety standards, spill history, potential spills, spill impacts,

and mitigation of spills.  With respect to spill impacts, the FEIS discusses potential

impacts to geological features, soils, water resources, biological resources, wildlife,

land-use, socioeconomics, cultural resources, and air.  (FEIS at 4-365 to 4-373.)  With

---

[10]     The ERP is set forth as Exhibit E to the FEIS and it titled "Enbridge Spill
Prevention, Containment, and Control Plan for the Alberta Clipper Pipeline and the SLD
Pipeline Projects."

respect to mitigation, the FEIS discusses both construction spills and operation spills. (FEIS at 4-356 & 4-373 to 4-374.)  With respect to operation leaks, the FEIS explains that Enbridge would incorporate operation of the AC Pipeline to its existing operations monitoring program, including Enbridge's existing Supervisory Control and Data Acquisition ("SCADA") system, its system for small leak detection, the Enbridge Control Center, right-of-way inspections and monitoring, training, and public awareness. The SCADA system includes pipeline sensing devices, remote computers at each pump station, real-time communications, and automated alarms.  (FEIS at 2-46, 4-374 to 4-375.)  To detect smaller releases, Enbridge operates a similar system to SCADA that can monitor smaller deviations in flow.  (*Id*.)  The FEIS also discusses maintenance procedures designed to avoid accidental releases.  (*Id*.)  The Environmental Analysis ("EA") of the AC Pipeline and the SLD Pipeline, which is attached to the FEIS, specifically considers the impact of spills and leaks in connection with the AC Pipeline and the SLD Pipeline in the Leech Lake Reservation and the CNF.  (App. U at 3-2 to 3-8.)

Plaintiffs also argue that the FEIS does not consider the operational impacts of transporting diluent in the SLD Pipeline.  In particular, Plaintiffs assert that the FEIS fails to identify the chemicals in diluent and contains no evaluation of the consequences of a diluent leak.[11]  Federal Defendants argue that the State Department was not required to

---

[11]     Plaintiffs also argue that Defendants failed to consider the operational "downstream" impacts from diluent transported by the SLD Pipeline such as increases in

(Footnote Continued on Next Page)

conduct an analysis of the risks of a diluent spill in addition to the PHMSA's analysis

because the SLD Pipeline was not within the scope of the FEIS.  Enbridge asserts that the

focus of the FEIS was appropriately on the cumulative and other impacts of construction

of the AC Pipeline and SLD Pipeline because construction is responsible for the primary

environmental impacts.

      The FEIS does, albeit briefly, consider the nature of diluent.  The FEIS notes that

conventional oil and diluent "are both hydrocarbons" (App. A at A-286) and offers a

description of diluent:

> Diluent is a generic term that encompasses mixture range of hydrocarbons
> used for [the purpose of diluting crude oil so it can be transported over
> long distances].  Diluent is also referred to as condensate, natural gas oil,
> or pentane plus.  The most prevalent types are condensate and naphtha.
> Diluent is expected to have a similar composition and physical
> characteristics to gasoline.  Therefore, if released into the environment,
> diluent will behave in a similar manner to gasoline.

(FEIS App. U at 3-3.)  As discussed above, the FEIS discusses potential impacts due to

spills of refined products during construction or operation, such as gasoline and other

petroleum-based products.  (FEIS at 4-359.)  Thus, the record suggests that Defendants

addressed the impacts of a diluent spill by concluding that a diluent spill would behave

similarly to a gasoline spill.

      While the Court acknowledges that the FEIS's discussion of diluent is brief, the

---

(Footnote Continued From Previous Page)

air pollution, specifically GHG emissions caused by refining and burning additional
heavy crude.  The Court discusses below those potential impacts in its analysis of the
Corps' and the Forest Service's obligations under NEPA.

Court cannot say that Plaintiffs, at this stage in the litigation, have established a substantial probability that they will succeed in showing that the FEIS's evaluation of potential leaks and spills, even with respect to diluent, was arbitrary or capricious.

Plaintiffs also assert that the FEIS fails to analyze the end-of-life impacts or mitigation measures that should be required to ensure restoration upon abandonment of the pipeline. The FEIS notes that Enbridge has not submitted plans for abandonment of pipeline facilities at the end of its operational life. (FEIS at 2-51.) The FEIS also indicates that the AC Pipeline is expected to operate for fifty years or more and that "[a]bandonment plans would be submitted to the appropriate agencies for review and approval prior to abandonment of the pipelines . . . and would be responsive to regulations that are in place at the time." (FEIS at 2-51.) Plaintiffs assert that abandonment of the pipeline is inevitable and foreseeable and that the impacts of abandonment must be considered in order to comply with NEPA.

Considering the foregoing, the Court concludes that Plaintiffs have not established a substantial probability that the State Department's decision not to complete its NEPA analysis with respect to abandonment of the pipeline, which will occur fifty or more years from now, was arbitrary or capricious.

### 4.    Stated Purpose and Alternatives

An EIS must "specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. The EIS must "[r]igorously explore and objectively evaluate" all reasonable alternatives, but it need only "briefly discuss" the reasons why other alternatives were

eliminated from more detailed study.  *City of Bridgeton v. FAA*, 212 F.3d 448, 455 (8th

Cir. 2000) (citing 40 C.F.R. § 1502.14).  "[A] detailed statement of alternatives cannot as

a practical matter 'include every alternative device and thought conceivable by the mind

of man.'"  *Id.* (citation omitted).  The Court reviews an agency's selection of the

alternatives to be fully discussed in an FEIS under a "rule of reason."  *Id.* (citations

omitted).

> Here, the State Department's stated purpose reads as follows:

> The overall purpose of the Alberta Clipper Project is to transport additional crude oil into the United States and eastern Canada from existing Enbridge facilities in western Canada to meet the demands of refineries and markets in those areas.  Enbridge has proposed the Project to (1) meet the increased demand for heavy crude oil by refiners in the United States and offset decreasing domestic crude oil supply from some regions of the United States that have traditionally served refineries in [District II—the U.S. Midwest]; (2) reduce U.S. Dependence on oil obtained from outside of North America by increasing access to more stable and secure Canadian crude oil supplies; and (3) meet demonstrated shipper interest in an overall Enbridge system expansion.

(FEIS at 1-2.)  Section 3 of the FEIS analyzes alternatives to the AC Pipeline Project.  In

this section, the FEIS describes several alternatives, including no action (assuming the

AC Pipeline is not built), system alternatives (considering other methods for providing

crude oil supplies to the Midwest markets and beyond), major route alternatives

(assessing the feasibility of other pipeline routes for transporting crude oil from Neche,

North Dakota, to Superior, Wisconsin), route variations (evaluating relatively short

alternative routes to avoid or minimize impacts to specific features), aboveground facility

alternatives (considering other locations for siting pump stations), and Superior Terminal

expansion alternatives (describing alternative sites for expansion of the Superior Terminal).  (FEIS at 3-1 to 3-66.)

Plaintiffs assert that the State Department failed to take a "hard look" at alternatives to the AC Pipeline project because (1) the stated purpose for the need for the AC and diluent projects—to meet a projected increase in demand for Canadian petroleum-based fuels—is erroneous; (2) the FEIS assumes that the construction of the pipeline is the only feasible way to meet the purported increased demand; and (3) the FEIS failed to adequately evaluate the alternative to increasing supply capacity without new pipeline construction.

Plaintiffs first assert that the AC Pipeline is based on the erroneous premise that there is an increasing need for Canadian crude oil in the United States and therefore the State Department cannot reject the "no action" alternative based on this premise. Plaintiffs cite to data from the 2009 U.S. Energy Information Administration ("EIA") report projecting that crude oil imports from Canada will decline between the present and 2030.  The FEIS, however, also cites to EIA data projecting growth in the "unconventional" oil supply from Canada for the same time period.  (FEIS 1-4 ("[T]he EIA projects that the balance between domestic supply and demand will require the 'unconventional' oil supply from Canada, which is predominately heavy crude from reserves in western Canada, to grow from approximately 1.5 million bpd in 2008 to over 4.3 bpd by 2030.").)  The EIS documents the demand for crude oil sources in the refinery market to be served by the AC Pipeline in Section 1.2.2.1.  On this record, Plaintiffs are not likely to succeed in showing that the stated purpose for AC and diluent projects—to

meet a projected increase in demand for Canadian petroleum-based fuels—is arbitrary or capricious.  In addition, Plaintiffs have not demonstrated that they are likely to succeed in showing that the stated purpose aimed at reducing U.S. dependence on oil obtained from outside of North America by increasing access to more stable and secure oil supplies is arbitrary or capricious.

Plaintiffs argue that the second flaw in the State Department's alternatives analysis is that it did not rigorously explore alternatives such as energy efficiency, renewable energy, clean technologies, and demand-side management.  With respect to this category of alternatives, the FEIS states:

> Energy conservation and renewable energy have been identified as potential alternatives to the proposed Project.  Energy conservation alone cannot reasonably offset the demand for oil or other forms of energy for end users that ultimately would be served the proposed Project.  Consequently, it cannot negate the need for the Project.  Although energy conservation and efficiency measures are important elements in addressing future energy demands for the Midwest market, current and projected participation in energy conservation and efficiency measures will reduce the energy demands by a small fraction of the projected energy demand within the foreseeable future.  Renewable energy sources, including wind and solar power, will increasingly play an important role in power generation for the Midwest market, especially as it related to electrical demand.  However, these sources represent a small fraction of the projected energy demands for the market for the foreseeable future, especially related to providing refined petroleum products for the transportation sector.

(FEIS at 3-3.)  Plaintiffs argue that this explanation is conclusory and does not meet NEPA's requirements to rigorously explore all reasonable alternatives.  While it is true that an FEIS must rigorously explore and objectively evaluate all reasonable alternatives, an FEIS must only "briefly discuss" the reasons why an alternative was eliminated from a

more detailed evaluation.  *See City of Bridgeton*, 212 F.3d at 455.  Here, Plaintiffs have

not demonstrated a likelihood of success on the claim that the State Department acted

arbitrarily or capriciously in deciding that an alternative relying only on energy

conservation and renewable energy was not reasonable.

Finally, Plaintiffs argue that the State Department failed to adequately evaluate the

alternative of increasing supply capacity without new pipeline construction.  Plaintiffs

urge that upgrades and expansions to existing pipelines will satisfy any increase in

demand for tar sands crude oil.  The State Department excluded this alternative from

consideration after concluding that utilizing existing pipeline capacity was not feasible

because it could not provide the incremental capacity available from the AC Pipeline.

(FEIS at 3-4.)  In addition, the FEIS concludes that expansion of existing pipelines would

require the excavation and replacement of pipeline and that such expansion would raise

safety concerns, require equipment not available in the United States, and be constrained

by the work area.  (FEIS at 3-4 to 3-5.)  Further, the FEIS concludes that pipe

replacement would not substantially reduce environmental impacts.  (*Id*.)  Given this,

Plaintiffs have not established a substantial probability that they will be able to

demonstrate that this conclusion was unreasonable.

### 5.    NEPA Claims against Corps and the Forest Service

Plaintiffs have also alleged NEPA claims against the Corps and the Forest

Service, asserting that both agencies failed to do an independent EIS and instead relied on

the State Department's allegedly deficient EIS.  Plaintiffs assert that both the Corps and

the Forest Service had an independent obligation to comply with NEPA before issuing

permits for the AC Pipeline and the SLD Pipeline and that the EIS had to discuss both the

AC Pipeline and the SLD Pipeline.  In addition, Plaintiffs assert that the FEIS does not

adequately evaluate the impacts of the SLD Pipeline.  In particular, as discussed above,

the Plaintiffs assert that the FEIS fails to identify the chemicals in diluent and contains no

evaluation of the environmental consequences of a diluent leak and otherwise fails to

evaluate the indirect impacts from the diluent pipeline.

The Corps and the Forest Service were cooperating agencies with respect to the

AC Pipeline FEIS prepared by the State Department.  (FEIS at 1-9 to 1-10.)  "A

cooperating agency may adopt . . . the environmental impact statement of a lead agency

when, after an independent review of the statement, the cooperating agency concludes

that its comments and suggestions have been satisfied."  40 C.F.R. § 1506.3(c).  A

cooperating agency must, however, make an independent determination as to whether the

EIS satisfies its own NEPA obligations.  *Sierra Club v. U.S. Army Corps of Eng'rs*, 295

F.3d 1209, 1215 (11th Cir. 2002) (explaining that cooperating agencies are permitted to

adopt a lead agency's EIS if the cooperating agency undertakes an "independent review

of the statement" and determines that their "comments and suggestions have been

satisfied").[12]

---

[12]     Thus, to the extent that the Corps and Forest Service rely on the State
Department's FEIS, the Court's analysis of that FEIS is relevant to Plaintiffs' claims
against the Corps and Forest Service.

Here, the record demonstrates that the Corps and the Forest Service were both fully engaged in the NEPA review of the projects.  For example, the Corps ROD notes that "[t]he review of the proposed Project was an intensive, collaborative effort among various Federal and State agencies and Indian tribes."  (Corps ROD at 1.)  While both the Corps and the Forest Service relied on the FEIS, they also conducted their own analysis.

After the State Department issued the AC Pipeline FEIS, the Corps issued a public notice regarding Enbridge's applications to the Corps for permits relating to the AC Pipeline and the SLD Pipeline.  After reviewing the permit applications and the public comments made regarding the applications, the Corps prepared its ROD.  In its ROD, the Corps explains that its review included both the AC Pipeline and the SLD Pipeline. (Corps ROD at 1 ("The Alberta Clipper pipeline and the SLD Pipeline are the subject of the Army, Clean Water Act and Rivers and Harbors Act permit application to discharge dredged and fill material into waters of the U.S. and to cross navigable waters, respectively, for construction of the pipelines in Minnesota and Wisconsin.").)  The Corps considered both information in the FEIS, as well as supplemental information provided by Enbridge, including an Analysis for Section 404(b)(1) of the Clean Water Act for both the AC Pipeline and SLD Pipeline (Decl. of Luther Hajek in Supp. of Defs.' Surreply in Opp. to Pls.' Mot. for a Prelim. Inj. ("Hajek Surreply Decl.") ¶ 2, Ex. 15); Pipeline Segment Supplemental Submittals (*id*. ¶ 3, Ex. 16); Summaries of Compensatory Mitigation Sites (*id*. ¶ 4, Ex. 17); and Special Permit Conditions (*id*. ¶ 6, Ex. 19).  The Corps ROD describes the Diluent Project:  "The Southern Lights Diluent project, combined with the Southern Lights Reversal project [Line 13], is proposed to

return diluent from the United States to Canada to blend with the heavy crude oil."
(Corps ROD at 3.)  The Corps ROD goes on to analyze the potential impacts of both the
AC Pipeline and the SLD Pipeline, including but not limited to, impacts to wetlands, fish
and wildlife, water quality, historic, cultural, scenic, and recreational values,
considerations of property ownership, floodplain management, water supply and
conservation, energy conservation and development, noise, air quality, and cumulative
impacts. (Corps ROD at 12-33.)  In addition, the Corps notes in its ROD that it reviewed
the DEIS and provided comments to ensure that the FEIS contained information needed
to support the Corps' permit decision.  (Corps ROD at 11 ("While the Corps' comments
covered the entire scope of the EIS, they focused on aquatic resource issues to ensure that
the Final EIS would meet the Corps' needs for any future permit decision.").)

       For its part, the Forest Service prepared an EA of the Proposed Alberta Clipper
and Southern Lights Diluent Pipeline Project, and requested the EA be set forth in an
appendix to the EIS.  (Forest Service ROD at 2.)  The EA explains that the scope of its
review is "two new pipelines, referred to as the Alberta Clipper Project and the Southern
Lights Diluent Project" and contains an analysis of the potential impacts of both the AC
Pipeline and the SLD Pipeline on the CNF and the Leech Lake Reservation.  (FEIS App.
U at 1-1, 3-1 to 3-96.)

       Plaintiffs assert that both the Corps and the Forest Service failed to analyze the
indirect "downstream" effects from the operation SLD Pipeline.  Specifically, Plaintiffs
assert that the delivery of additional diluent to Canada via the SLD Pipeline will induce
additional growth in tar sands mining and facilitate additional transport of heavy tar sands

crude oil to refineries in the United States, causing an increase in GHG emissions. Enbridge asserts that this issue was not raised in comments to the DEIS and therefore is not properly before the Court.  Without reaching that issue, the Court concludes that Plaintiffs are not likely to succeed in showing that the Corps or the Forest Service acted arbitrarily or capriciously in their consideration of the indirect effects of the diluent pipeline.  In particular, the FEIS discussed current and future refinery expansion and estimates of GHG emissions associated with refining heavy crude oil.  (FEIS at 4-390 to 4-403.)  The FEIS also considers the cumulative GHG emissions impacts of heavy crude refining.  (*Id*.)  Moreover, there is no indication that Defendants found that it was "reasonably foreseeable" that the transport of diluent through the SLD Pipeline would increase the exportation of heavy sands crude oil to the United States beyond what it considered with respect to refinery estimates.  While the purpose of the diluent pipeline is to dilute heavy crude so that it can be transported back to the United States, the maximum amount of heavy crude that can be transported to the United States is determined by pipeline capacity.  The capacity of the AC Pipeline and the cumulative capacity of other pipelines were considered in the FEIS.

For the reasons stated above, the Court concludes that Plaintiffs have not demonstrated a likelihood of success on their claim that the Corps and the Forest Service failed to comply with their obligations under NEPA.  Therefore this factor weighs in favor of denying the injunction.

###### C.      Irreparable Harm

Plaintiffs contend that they will suffer irreparable harm in the absence of a preliminary injunction.  To support their motion for a preliminary injunction, Plaintiffs must show that irreparable harm is likely.  *Winter v. Natural Res. Defense Council, Inc.*, 129 S. Ct. 365, 375 (2008).  "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable."  *Amoco Prod. Co. v. Village of Gambell*, *AK*, 480 U.S. 531, 545 (1987).

Plaintiffs assert that the construction of the AC Pipeline, which will involve clearing of trees and vegetation, removing topsoil, and filling wetlands, will cause significant harms that will be long-term or permanent.  In particular, Plaintiffs note that the route will cut through a calcareous fen, a rare wetland habitat, and that construction would adversely modify that habitat.  In addition, Plaintiffs assert that the AC Pipeline's route could harm fisheries, water-bodies, and aquatic ecosystems through, but not limited to, increased sedimentation, degradation and alteration of aquatic habitat, increased runoff and erosion, and changes in channel morphology and stability.  Further, Plaintiffs submit evidence from its members regarding potential harm.  For example, members have testified that the AC Pipeline would interfere with their use and enjoyment of the CNF and other locations on the AC Pipeline's route.  Another member fears an increase in air pollution.  Plaintiffs also submit expert testimony describing environmental impacts of the Canadian processing of tar sands crude oil on the climate and migratory birds in

the United States, increased GHG emissions from refining, and other harms associated with the operation of the AC Pipeline.

Defendants dispute Plaintiffs' contention of irreparable harm. Federal Defendants argue that harm to the environment will be minimized by taking advantage of a pre-existing pipeline route. Federal Defendants point out that the AC Pipeline will be constructed, for the most part, along an existing right-of-way where pipelines already exist. Specifically, Federal Defendants assert that nearly 90% of the AC Pipeline's proposed route in the United States will be within or adjacent to an existing Enbridge pipeline corridor. Federal Defendants also point out that the Corps projected that the AC Pipeline project would result in permanent loss of roughly twelve acres of wetland and that the remaining impacts to wetlands would be temporary. Further, Federal Defendants note that the Corps' permits require Enbridge to restore the temporarily restored wetlands to pre-construction condition. With respect to the calcareous fen, the Corps submitted a calcareous fen management plan titled, *Background and Fen Management Plan Gully 30 Calcareous Fen* dated November 2009 and an amendment to that plan dated November 17, 2009. The Fen Management Plan addresses mitigation to the calcareous fen area during pipeline construction and the plan was approved by the Minnesota Department of Natural Resources, the Corps, the Minnesota Public Utilities Commission, and the Minnesota Pollution Control Agency.[13]

---

[13]     Plaintiffs request that the Court disregard the Fen Management Plan and related approvals, claiming that they are irrelevant, untimely, and not part of the administrative

(Footnote Continued on Next Page)

Enbridge asserts that Plaintiff has exaggerated the potential environmental harm resulting from the AC Pipeline project.  Enbridge contends that Plaintiffs' claims of irreparable harm describe the type of temporary disruption typical of any pipeline construction or generalized concerns about climate change and air pollution.  Enbridge argues that while the very act of construction requires disturbance, many state and federal agencies have analyzed the project and have imposed measures to protect the environment.  Enbridge asserts that the disturbances due to construction will be relatively short lived and halting construction now would cause more environmental impacts, such as creating the potential for greater soil erosion.

The Court concludes that while Defendants' arguments have merit, Plaintiffs have demonstrated that they are likely to suffer some irreparable injury if the AC Pipeline construction continues.  Therefore, the Court concludes that this factor weighs in favor or Plaintiffs.

### D.    Balance of the Hardships

The balance of the hardships factor requires the Court to balance the irreparable harms likely to be suffered by Plaintiffs against the harms to Defendants if an injunction halted construction of the AC Pipeline.  Plaintiffs assert that halting construction would not harm Defendants.  With respect to the State Department, Plaintiffs assert that any

_____

(Footnote Continued From Previous Page)

record.  Because the Fen Management Plan relates to the issue of irreparable harm, the Court appropriately considers it.

harm would not be irreparable and would not harm its long-term interests in securing

increased access to Canadian tar sands oil.  Further, Plaintiffs contend that any economic

harm suffered by Enbridge is outweighed by the irreparable environmental injuries that

pipeline construction and operation would cause.

Enbridge asserts that halting construction of the AC Pipeline would cause

substantial and irrecoverable monetary costs to Enbridge, as well as significant

environmental harms.  Enbridge asserts that nearly 250 miles of pipeline right-of-way has

already been cleared and approximately 220 miles have been graded.  (Crawford Decl.

¶ 18.)  Approximately 2,800 workers are employed with 200 to 300 more to be hired.

(*Id*. at ¶ 12.)  If an injunction issued, Enbridge contends that it would incur significant

de-commissioning and re-commissioning costs, termination fees, and other costs.  (*Id*. at

¶¶ 20-24.)  In addition, Enbridge asserts that it would be required to pay contractors at the

rate of nearly $4 million a day despite no work being performed on the pipeline.  (*Id*.)

Enbridge also asserts that an injunction would result in environmental harm because

existing excavations would be exposed to the elements, which could cause extensive

erosion, harm wetlands and rivers, and undermine required pollution mitigation efforts.

In addition, Enbridge asserts that it is in the process of performing large excavations next

to public roads which would remain exposed and unsupervised in the event of an

injunction.  Federal Defendants tie their interests to those of the public, asserting that the

Deputy Secretary of State concluded that the national interest would be served by

issuance of the permit to Enbridge because the AC Pipeline would increase the oil supply

to the United States from a stable and reliable trading partner.

Considering the weight of the likely irreparable harm to Plaintiffs against the weight of economic harms to Enbridge, environmental harms resulting from an injunction, and the interest of the public, the Court concludes that this factor weighs slightly in favor of Defendants.

### E.    Public Interest

Plaintiffs assert that the public interest favors issuance of a preliminary injunction because it will help to preserve the environment and will prevent Defendants from acting in a manner inconsistent with the applicable law.  Both Enbridge and Federal Defendants assert that the AC Pipeline will serve the national interest because it involves the development of domestic energy resources and that there is an interest in avoiding judicial intrusion into the State Department's national interest determination.  Enbridge also argues that continuing construction of the AC Pipeline will serve the public interest by avoiding harms to businesses, communities, and individuals involved in the construction of the pipeline and that pipeline construction will lead to continued economic benefits and employment.

The Court agrees that the public has an interest in developing energy resources, particularly an oil supply from a stable source, and in avoiding environmental and public harm that would result in halting construction of the AC Pipeline.  The Court also acknowledges the public interest in avoiding environmental harm caused by construction of the pipeline.  After balancing these interests, the Court concludes that the public's interests that are served by construction of the pipeline slightly outweigh the public interests served by halting construction.  In making this determination, the Court notes

that the harms to the environment that will be caused by the construction of the pipeline

are mitigated by the fact that the AC Pipeline is largely being constructed in an existing

pipeline corridor.

## CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons set forth

above, **IT IS ORDERED** that:

1.      Plaintiffs' Motion for a Preliminary Injunction (Doc. No. 91) is **DENIED**.

2.      Plaintiff's Motion to Amend Plaintiffs' Motion for Preliminary Injunction

to Conform to Amended Complaint (Doc. No. 125) is **GRANTED**.


Dated:  February 3, 2010                    s/Donovan W. Frank
                                            DONOVAN W. FRANK
                                            United States District Judge