# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Sierra Club; Minnesota Center for
Environmental Advocacy; Indigenous
Environmental Network; and National
Wildlife Federation;

          Plaintiffs,

v.

Hillary Clinton, in her official capacity
as Secretary of State; James Steinberg,
in his official capacity as Deputy Secretary
of State; United States Department of State;
Lieutenant General Robert L. Van Antwerp,
in his official capacity as U.S. Army Chief
of Engineers and Commanding General
of U.S. Army Corps of Engineers; Colonel
Jon L. Christensen, in his official capacity
as District Engineer and Commander of the
U.S. Army Corps of Engineers; the United
States Army Corps of Engineers; Tom Tidwell,
in his official capacity as Chief of the United
States Forest Service; Rob Harper, in his
Official capacity as Forest Supervisor for the
Chippewa National Forest; and the United
States Forest Service;

          Defendants,

and

Enbridge Energy, Limited Partnership,

          Defendant-Intervenor.

Civil No. 09-2622 (DWF/RLE)

**MEMORANDUM
OPINION AND ORDER**

_____

Douglas P. Hayes, Esq. and Eric E. Huber, Sierra Club Environmental Law Program;
J. Martin Wagner, Esq. and Sarah H. Burt, Esq., Earthjustice; and Kevin Reuther, Esq.,
Minnesota Center for Environmental Advocacy, counsel for Plaintiffs.

Luther L. Hajek, Esq., U.S. Department of Justice, Chad A. Blumenfield, Assistant United States Attorney, United States Attorney's Office, counsel for Defendants.

Daniel J. Herber, Esq., and John F. Beukema, Esq., Faegre & Benson LLP; David H. Coburn, Esq., and Sara Beth Watson, Esq., Steptoe & Johnson LLP, counsel for Defendant-Intervenor.

---

## INTRODUCTION

Plaintiffs Sierra Club, Minnesota Center for Environmental Advocacy ("MCEA"), Indigenous Environmental Network, and National Wildlife Federation (together, "Plaintiffs") bring this action against United States Department of State ("State Department"); Hillary Clinton, in her official capacity as Secretary of State; James Steinberg, in his official capacity as Deputy Secretary of State; the United States Army Corps of Engineers (the "Corps"); Lieutenant General Robert L. Van Antwerp, in his official capacity as U.S. Army Chief of the Corps; Colonel Jon L. Christensen, in his official capacity as District Engineer and Commander of the U.S. Army Corps of Engineers; the United States Forest Service ("Forest Service"); Tom Tidwell, in his official capacity as Chief of the Forest Service; Rob Harper, in his official capacity as Forest Supervisor for the Chippewa National Forest (together, "Federal Defendants"); and Intervenor-Defendant Enbridge Energy ("Enbridge") (collectively, "Defendants").

Plaintiffs claim that Defendants violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, *et seq.*, and the Administrative Procedure Act (APA), 5 U.S.C. § 706, by issuing permits to build and operate an oil pipeline—

the Alberta Clipper Pipeline ("AC Pipeline")—based on an inadequate Environmental Impact Statement ("EIS"). Plaintiffs also allege that the State Department's issuance of a permit for the construction and operation of the AC Pipeline is unconstitutional. In this litigation, Plaintiffs seek an order prohibiting Defendants from issuing permits for the construction and operation of the AC Pipeline. Federal Defendants and Enbridge have each moved separately to dismiss Plaintiffs' First Amended Complaint. For the reasons set forth below, the Court grants in part and denies in part the motions.

## BACKGROUND

The facts of this case are more fully set forth in the Court's February 3, 2010 Memorandum Opinion and Order ("February 3, 2010 Order") denying Plaintiffs' Motion for a Preliminary Injunction. The Court incorporates those facts by reference and briefly summarizes the background below. This case involves the construction and operation of the AC Pipeline—an underground pipeline that will extend from Hardisty, Alberta, Canada, to Superior, Wisconsin. The AC Pipeline is being constructed by Enbridge and will have the capacity to transport approximately 450,000 barrels-per-day of crude oil.

In May 2007, Enbridge submitted an application for a Presidential Permit to construct and operate the AC Pipeline. (Decl. of Luther L. Hajek in Supp. of Defs.' Opp. to Plfs.' Mot. for a Prelim. Inj. ("Hajek Decl.") ¶ 2, Ex. 1 (Department of State's Record of Decision and Nat'l Interest Determination ("State Department ROD")) at 5.) After receiving the application, the State Department conducted an environmental review and prepared a Final Environmental Impact Statement ("FEIS") under NEPA. On August 3, 2009, Deputy Secretary of State James Steinberg signed the State Department ROD and

Presidential Permit, indicating the State Department's intent to issue a Presidential Permit to Enbridge. The State Department determined that the construction and operation of the AC Pipeline serves the national and strategic interests of the United States by "increas[ing] the diversity of available supplies among the United States' worldwide crude oil sources in a time of considerable political tension in other major oil producing countries and regions," shortening the transportation pathway for crude oil imports, "increas[ing] crude supplies from a major non-Organization of Petroleum Exporting Countries producer which is a stable and reliable ally and trading partner with the United States," and providing additional supplies of crude oil to make up for declines in imports from other suppliers. (State Department ROD ¶ 2, Ex. 1 at 25.) On August 20, 2009, the State Department issued the Presidential Permit (the "AC Pipeline Permit"). The Permit grants Enbridge permission "to construct, connect, operate, and maintain pipeline facilities at the border of the United States and Canada at Neches, North Dakota, for the transport of crude oil and other hydrocarbons between the United States and Canada." (Hajek Decl. ¶ 3, Ex. 2 at 1.) The Permit provides that the "United States facilities" consist of "[a] 36-inch-diamter pipeline extending from the United States-Canada border near Neches, North Dakota, up to and including the first mainline shut-off valve or pumping station in the United States." (*Id*.) Enbridge began constructing the AC Pipeline on August 20, 2009.

The State Department issued the Permit pursuant to Executive Order No. 13337, which empowers the Secretary of State to "receive all applications for Presidential permits . . . for the construction, connection, operation, or maintenance, at the borders of

the United States, of facilities for the . . . exportation or importation of petroleum [or] petroleum products . . . to or from a foreign country." 69 Fed. Reg. 25,299 at § 1 (April 30, 2004). The Executive Order also provides:

> This order is not intended to, and does not, create any right, benefit, or trust responsibility, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities, or entities, its officers or employees, or any other person.

(69 Fed. Reg. 25,299 at § 6.)

Enbridge is also constructing the Southern Lights Diluent Pipeline ("SLD Pipeline"), a 20-inch diameter pipeline extending from Manhattan, Illinois, to Clearbrook, Minnesota. At Clearbrook, the SLD Pipeline will connect with an existing Enbridge pipeline (Enbridge Line 13). (Final Envtl. Impact Statement for the Alberta Clipper Pipeline Project ("FEIS") at 1-28 to 1-29.) Endbridge intends to reverse the flow of Line 13 to create a diluent delivery line to transport diluent from Illinois to Canadian oil sands producers. Diluent is a light petroleum liquid, used to facilitate the flow of heavy crude oil, which must be diluted in order to be transported through a pipeline. (*Id.* at 1-28.)

Enbridge also obtained permits from the Corps under the Clean Water Act and River and Harbors Act because both the AC Pipeline and the SLD Pipeline cross wetlands and waters of the United States. Before issuing permits, the Corps issued a Record of Decision ("Corps ROD"), relying on the DEIS, FEIS, and additional information addressing potential impacts on wetlands and waterbodies. (Hajek Decl. ¶ 4, Ex. 3.) The AC Pipeline and SLD Pipeline also cross the Chippewa National Forest

("CNF") in Minnesota. Enbridge applied for and received authorization from the Forest Service to construct the two pipelines in the CNF. (Record of Decision on AC and SLD Pipelines Across the CNF ("Forest Service ROD")), Plf. Ex. 9.) The CNF and the Leech Lake Band of Ojibwe jointly completed an Environmental Assessment ("EA") of the impacts of the expansion of the right-of-way through the CNF. The Final EA was issued and published as an appendix to the State Department FEIS.

Enbridge also recently constructed and completed the now operational LSr Pipeline to transport light and medium sour crude originating in Saskatchewan to the United States. Prior to construction of the LSr Pipeline, the State Department issued a draft and final EA addressing the impacts. The State Department made a finding of no significant impact ("FONSI"). Because the LSr Pipeline crosses the international border, the LSr Pipeline project required a Presidential Permit.

In their First Amended Complaint, Plaintiffs allege: (1) a violation of NEPA and the APA for failure to evaluate a full range of actions; (2) a violation of NEPA and the APA for failure to adequately analyze indirect and cumulative impacts; (3) a violation of NEPA and the APA for failure to adequately evaluate risks, impacts, and mitigation measures associated with spills and operational leaks; (4) a violation of NEPA and the APA for failure to adequately evaluate the no action alternative; (5) a violation of NEPA and the APA for failure to adequately evaluate the diluent project in the LSr Environmental Assessment; and (6) a violation of the Unites States Constitution and the APA.

At the heart of this action is Plaintiffs' challenge to the issuance of three sets of permits: (1) the State Department's issuance of a Presidential Permit for the construction and operation of the AC Pipeline; (2) the Corps' permits allowing Enbridge to dredge and fill wetlands and place structures underwater in the construction of the AC Pipeline and the SLD Pipeline; and (3) the Forest Service's special use permits allowing Enbridge to construct and operate the AC Pipeline and SLD Pipeline in the CNF.

## DISCUSSION

### I.     Motion to Dismiss Standard

Defendants move to dismiss Plaintiffs' Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Rule 12(b)(1) is the proper vehicle by which to seek dismissal of a claim for lack of federal jurisdiction. Fed. R. Civ. P. 12(b)(1). A motion to dismiss for lack of subject matter jurisdiction may challenge a plaintiff's complaint either on its face or on the factual truthfulness of its averments. *See Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). When a defendant brings a facial challenge—a challenge that, even if truthful, the facts alleged in a claim are insufficient to establish jurisdiction—a court reviews the pleadings alone, and the non-moving party receives the same protections as it would defending against a motion brought pursuant to Rule 12(b)(6). *Id*. In a factual challenge to jurisdiction, the court may consider matters outside the pleadings and the non-moving party does not benefit from the safeguards of Rule 12(b)(6). *Id*. Here, Defendants claim that no presumption of truthfulness attaches to Plaintiffs' allegations and that matters outside of the pleadings may be considered. However, Defendants have not demonstrated that their

jurisdictional challenge is factual in nature. The Court therefore applies the standards of Rule 12(b)(6).[1]

In deciding a motion to dismiss under Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged. *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). A court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. As the United States Supreme Court

---

[1] In any event, the Court's decision with respect to jurisdiction would be the same under either standard as there appear to be no factual disputes and the relevant portions of the administrative record, such as the FEIS and AC Pipeline Permit, are embraced by the Amended Complaint.

recently reiterated, "[t]he threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under *Twombly*. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 555). In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556.

## II.    NEPA Claims Against the State Department

Defendants argue that Plaintiffs' First through Fourth Claims for Relief, which allege various NEPA violations, should be dismissed for lack of jurisdiction insofar as they are asserted against the State Department. Federal Defendants assert that the Court lacks jurisdiction because (1) a ruling from this Court will not necessarily redress Plaintiffs' injuries and therefore Plaintiffs lack standing; and (2) judicial review of a presidential permit is not available under the APA. Enbridge also asserts that Plaintiffs' First through Fourth claims should be dismissed on jurisdictional grounds because the issuance of the AC Pipeline Permit is an unreviewable Presidential action, not an agency action subject to APA review. Alternatively, Enbridge asserts that these counts should be dismissed for failure to state a claim pursuant to Rule 12(b)(6).

### A.    Redressability

Federal Defendants assert that Plaintiffs lack standing because they cannot show that their alleged injuries are likely to be redressed by a favorable ruling on their NEPA claims. Federal Defendants argue that redress of Plaintiffs' alleged injury is dependent on actions outside of the control of the State Department because the President has ultimate authority over the issuance of presidential permits for border crossings. Federal

Defendants contend that even if the Court were to vacate the AC Pipeline Permit, it is conjectural whether Plaintiffs' injuries would be redressed because the President could simply re-authorize the border crossing under his inherent Constitutional authority rather than under the executive order process.

In order to establish standing, Plaintiffs must demonstrate (1) that they have suffered an injury-in-fact; (2) a causal relationship between the injury and the challenged conduct; and (3) that the injury will likely be redressed by a favorable decision. *Pucket v. Hot Springs Sch. Dist.*, 526 F.3d 1151, 1157 (8th Cir. 2008). Because Plaintiffs have alleged procedural injuries under NEPA, the redressability standard is relaxed. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 & 573 n.7 (1992).

The Court is not convinced by Federal Defendants' arguments. Here, Plaintiffs allege that they have been injured because the State Department issued the AC Pipeline Permit based on a FEIS that violated NEPA by, among other things, failing to consider all the reasonably foreseeable environmental impacts of the AC Pipeline project. If the Court finds that the State Department violated NEPA and thus requires the State Department to comply with NEPA before deciding whether to issue a permit, it is likely that Plaintiffs' injury will be redressed. Plaintiffs' injury would occur at the time the State Department failed to comply with NEPA because such a failure would increase the risk of environmental harm. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 816 (8th Cir. 2006) ("Injury under NEPA occurs when an agency fails to comply with that statute" and "[t]he injury-in-fact is increased risk of environmental harm stemming from the agency's allegedly uninformed decision-making."). Plaintiffs'

alleged injury is procedural in nature and, even though the President may be the ultimate decision-maker with respect to the issuance of the AC Pipeline Permit, the President's future actions or inactions are too speculative to preclude standing in this case.

### B.     Review Under the APA

Defendants also assert that the Permit is not subject to judicial review under the APA because Plaintiffs have not identified a waiver of sovereign immunity or a private right of action that would allow for judicial review of these claims.  In particular, Defendants assert that the State Department's decision to issue the AC Pipeline Permit was made pursuant to Executive Order 13337, which delegates the President's authority over foreign affairs to the Secretary of State, and that the action of the State Department was therefore presidential in nature and unreviewable under the APA.  Defendants assert that there was no "agency action" on behalf of the State Department when it issued the AC Pipeline Permit and therefore there is no review under the APA.  Plaintiffs, on the other hand, assert that they are entitled to relief under the APA because the State Department's FEIS was a final agency action.

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  Here, Plaintiffs seek review under the general review provisions of the APA and therefore the challenge must involve a "final agency action."  5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.").  In *Sierra Club v. U.S. Army Corps of Engineers*, the Eighth Circuit Court of

Appeals held that the Corps' decision to issue a FONSI constituted a "final agency action" under NEPA. 446 F.3d at 816. In doing so, the Eighth Circuit noted that "the Supreme Court has strongly signaled that an agency's decision to issue either a FONSI or an [EIS] is a 'final agency action' permitting immediate judicial review under NEPA." *Id*. at 815 (citing *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998)).[2]

In *Ohio Forestry*, the Sierra Club challenged a United States Forest Service Plan for Ohio's Wayne National Forest (the "Plan") under the National Forest Management Act of 1976 (NFMA). 523 U.S. at 729. The Supreme Court held that the challenge was not justiciable because it was not ripe for review. *Id*. at 732. The Supreme Court noted that the Plan set logging goals, selected suitable areas for timber production, and determined probable methods of timber harvest, but did not authorize the cutting of trees. *Id*. at 729. Instead, before the Forest Service could permit logging, it had to, among other things, conduct an EA under NEPA. *Id*. at 730. The Supreme Court distinguished the Plan from an EIS:

> Nor does the Plan, which through standards guides future use of forests, resemble an [EIS] prepared pursuant to NEPA. That is because in this respect NEPA, unlike the NFMA, simply guarantees a particular procedure, not a particular result . . . Hence a person with standing who is injured by a failure to comply with the NEPA procedure may complain of

---

[2] An agency must first prepare an EA to determine whether an EIS is required. 40 C.F.R. § 1508.9(a)(1). An EA is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]." *Id*. If an agency's EA suggests that no significant impacts are likely, the agency issues a FONSI. If, on the other hand, significant environmental impacts are likely, the agency must prepare an EIS.

> that failure at the time the failure takes place, for the claim can never get riper.

*Id.* at 737.  Plaintiffs assert that the State Department's issuance of the FEIS is a "final agency action."  Enbridge argues that the FEIS was not a final agency action because the State Department ROD and the AC Pipeline Permit—not the FEIS—authorized the construction of the AC Pipeline.  Enbridge asserts that the "action" was therefore that of the President.

Here, the State Department recognized that issuing the AC Pipeline Permit to Enbridge would constitute a "major federal action" under NEPA, took on the role as the "lead agency," and exercised its authority to prepare and issue the FEIS for the AC Pipeline.  Indeed, in its Notice of Intent to Prepare an EIS, the State Department acknowledged that the AC Pipeline project constituted a major federal action, triggering the preparation of an EIS:

> On July 27, 2007, the Department of State published notice of intent to prepare an environmental assessment and to conduct scoping hearings for the Alberta Clipper Project (72 FR 41381).  Based on public comments received during twelve public hearings conducted along the proposed pipeline route in August 2007, comments received by the Department during the 45-day public comment period, and on consultations with other federal agencies, the Department of State has concluded that the issuance of the Presidential Permit to [Enbridge] for the Alberta Clipper Project would constitute a major federal action that may have a significant impact upon the environment within the meaning of the National Environmental Policy Act (NEPA).  For this reason, the Department of State intends to prepare an environmental impact statement (EIS) to address reasonably foreseeable impacts from the proposed action and alternatives to the proposed action. . . . .

73 Fed. Reg. 16920 (March 31, 2008).

The AC Pipeline Permit itself grants Enbridge permission "to construct, connect, operate, and maintain pipeline facilities at the border of the United States and Canada at Neches, North Dakota, for the transport of crude oil and other hydrocarbons between the United States and Canada." (Hajek Decl. ¶ 3, Ex. 1 at 1.) The AC Pipeline Permit also notes that the "United States facilities" consist of "[a] 36-inch diameter pipeline extending from the United States—Canada border . . . up to and including the first mainline shut-off valve or pumping station in the United States." (*Id.*) That the AC Pipeline Permit allows for the border crossing, however, does not insulate the State Department's analysis (or alleged lack thereof) of the environmental impacts of the entire pipeline project from judicial review under the APA. Nor does it convert the State Department's preparation of the FEIS into a presidential action.[3] Thus, the Court holds, based on Eighth Circuit precedent, that the State Department's FEIS constitutes a final agency action reviewable by this Court under the APA.[4]

---

[3]     Defendants rely heavily on two recent district court decisions for the proposition that the State Department's issuance of the AC Pipeline Permit is not subject to judicial review under the APA. *See Sisseto- Wahpeton Oyate v. U.S. Dep't of State*, 659 F. Supp. 2d 1071, 1082 (D.S.D. 2009) and *Natural Res. Def. Council, Inc. v. U.S. Dep't of State*, 658 F. Supp. 2d 105, 113 (D.D.C. 2009). These cases are not binding on this Court and, in any event, the Court respectfully disagrees with those decisions insofar as they hold that any action taken by the State Department pursuant to an executive order, and in particular the preparation of an EIS for a major federal action, is not subject to judicial review under the APA.

[4]     Because the Court concludes that the State Department's FEIS is a final agency action subject to judicial review and the Court therefore has jurisdiction, the Court does not reach Defendants' remaining jurisdictional arguments.

**C.     Failure to State a Claim Under NEPA**

In their Amended Complaint, Plaintiffs allege that the FEIS and the issuance of the Permit violated NEPA and the APA.  Enbridge moves to dismiss these claims for failure to state a claim.  Under the APA, the reviewing court must affirm an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706 (2)(a).  *See also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983); *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 375 (1989).  The Court considers whether the Defendants considered the relevant factors and whether they made a "clear error of judgment."  *Motor Vehicles*, 463 U.S. at 43.  NEPA requires federal agencies to prepare an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  An EIS must contain a "detailed statement" addressing, among other things, the environmental impacts of and alternatives to the proposed action.  *Id*.  *See also Kleppe v. Sierra Club*, 427 U.S. 390, 401-02 (1976).  The court's review is to "insure that the agency has taken a 'hard look' at the environmental consequences."  *Kleppe*, 427 U.S. at 410 n.21.

Plaintiffs' primary argument is that the State Department's issuance of the FEIS and AC Pipeline Permit violated NEPA by:  (1) failing to include the SLD Pipeline and LSr Pipeline in the EIS as "connected," "cumulative" and "similar" actions; (2) failing to assess reasonably foreseeable indirect and cumulative impacts of the AC Pipeline project; (3) failing to adequately evaluate the risks, impacts, and mitigation measures associated with spills, operational leaks and abandonment; and (4) failing to take a "hard

look" at the AC Pipeline project's stated purpose and need, or to consider a reasonable range of alternatives, including the "no action" alternative. The Court discusses each argument below.

### 1. Connected and Cumulative Actions

In their First Claim for Relief, Plaintiffs assert that the FEIS violates NEPA because it fails to include all "connected" and "cumulative" actions. (Am. Compl. ¶¶ 77-81.) Enbridge asserts that this claim should be dismissed because the SLD Pipeline and LSr Pipeline do not meet the legal definition of "connected actions," Plaintiffs have failed to sufficiently allege that the pipelines lack independent utility, and Plaintiffs have failed to allege facts that would support their claim that the LSr Pipeline is a connected action because it is already operational. Plaintiffs argue that they have set forth facts describing the SLD and LSr Pipelines and their relationship to the AC Pipeline sufficient to support the claim that these pipelines are "connected," "cumulative," and "similar" under NEPA guidelines. In particular, Plaintiffs allege that the SLD Pipeline is integral to and connected with the AC Pipeline project because the increased capacity to transport tar sands crude oil to the United States created by the AC Pipeline makes it necessary to increase the supply of diluent; that Enbridge plans to construct the AC Pipeline and SLD Pipeline simultaneously and in the same corridor; that Enbridge applied for related certificates and permits together; and that the LSr Pipeline will replace capacity to import light sour crude oil that would be lost due to the reversal of flow from Line 13 to transport diluent. (Am. Compl. ¶¶ 2, 22-26, 67, 78-80.)

NEPA requires that an EIS consider "connected" and "cumulative" actions. 40

C.F.R. § 1508.25(a). Actions are connected if they "(i) [a]utomatically trigger other actions which may require environmental impact statements; (ii) [c]annot or will not proceed unless other actions are taken previously or simultaneously; or (iii) [a]re interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1). Cumulative actions are those actions that when viewed together "have cumulatively significant impacts." 40 C.F.R. § 1508.25(a)(2). The Court discussed the FEIS's consideration and analysis of "connected" and "cumulative" actions in detail in its February 3, 2010 Order in the context of Plaintiffs' motion for preliminary injunction. Although the Court found that Plaintiffs had not established a probability of success on the merits of this NEPA claim, the Court cannot say, at this stage in the litigation, that Plaintiffs have failed to state a claim for relief under NEPA in their First Claim for Relief. Instead, the Enbridge's arguments involve factual issues and do not provide the Court with a proper basis to dismiss the claims pursuant to Rule 12(b)(6). The Court will consider these arguments at the summary judgment stage with the benefit of the full administrative record.

## 2.    Direct, Indirect, and Cumulative Impacts

In their Second Claim for Relief, Plaintiffs assert that Defendants failed to adequately analyze indirect and cumulative environmental impacts in the FEIS. (Am. Compl. ¶¶ 82-90.) Specifically, Plaintiffs allege that:

> [t]he final EIS for the Alberta Clipper pipeline does not account for: a) the upstream emissions generated by the increased tar sands development induced by increased U.S. transport and refining capacity; b) refinery upgrades and expansions necessary to accommodate the increased volumes and weight if crude oil delivered by the pipelines; c) the reasonably

foreseeable future expansion of the AC pipeline capacity from 450,000 to 800,000 bpd; d) the downstream use of the oil; or e) the global warming impacts resulting from the connected diluent pipeline.

(Am. Compl. ¶ 85.) The Amended Complaint also asserts that the FEIS failed to consider the cumulatively significant impacts of the AC Pipeline when added to other pipelines. (*Id.* ¶ 88.)

Enbridge asserts that this claim should be dismissed because the indirect and cumulative impacts identified by Plaintiffs were either considered or were not within the scope of the required NEPA review. Enbridge argues that the impacts of oil sands extraction activities in Canada are not caused by the AC Pipeline or SLD Pipeline and are therefore beyond the scope of NEPA review, that the State Department was not required to consider oil sands extraction impacts as "cumulative impacts" of the AC Pipeline and SLD Pipeline, and that there was no obligation for the FEIS to address "downstream" indirect impacts resulting from refinery upgrades[5] or the impacts associated with future expansion of the AC Pipeline. Enbridge further asserts that the issue of the impacts of climate change on the CNF was not raised in comments filed by Plaintiffs on the Draft EIS or EA prepared by the Forest Service and therefore the issue was forfeited by Plaintiffs. Finally, Enbridge asserts that Plaintiffs' claim that the FEIS does not consider the cumulative impacts of two other cross-border pipelines (the Keystone and Keystone XL) being built or planned by a competitor of Enbridge is unsupported.

---

[5] Enbridge asserts that an analysis was done nonetheless.

NEPA requires that an EIS consider the potential indirect and cumulative impacts of a proposed action. 40 C.F.R. § 1508.25(c). "Indirect impacts" are those effects caused by the action that are reasonably foreseeable, but later in time or farther removed in distance. 40 C.F.R. § 1508.8(b). A "cumulative impact" is

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7. A "but for" causal relationship is not enough to make an agency responsible for a particular effect under NEPA. *U.S. Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004). NEPA requires "a reasonably close causal relationship" between the effect and the alleged cause. *Id.* The Court explained in its February 3, 2010 Order that Plaintiffs failed to demonstrate a substantial probability that they can establish "a reasonably close causal relationship" between the alleged environmental impacts of Canadian tar sands development and the construction of the AC Pipeline so as to render the FEIS deficient. The Court also concluded that Plaintiffs failed to demonstrate a substantial probability that they would succeed in showing that the State Department's consideration of the indirect and cumulative impacts was arbitrary or capricious. The arguments raised by Enbridge in support of its present motion to dismiss involve factual issues and do not provide the Court with a proper basis to dismiss the claims pursuant to Rule 12(b)(6). Defendants' arguments will be addressed on summary judgment with the benefit of the full administrative record.

### 3.     Evaluation of Spills and Leaks and Abandonment

In their Third Claim for Relief, Plaintiffs assert that the State Department failed to adequately evaluate risks, impacts, and mitigation measures associated with spills and operational leaks of the AC Pipeline and the SLD Pipeline.  (Am. Compl. ¶¶ 91-95.) Plaintiffs focus particularly on the FEIS's alleged inadequate analysis of a diluent leak. (*Id.* ¶ 93.)  Enbridge asserts that this cause of action should be dismissed because the FEIS fully assesses the impacts if a spill or leak were to occur and also discusses the safety and response plans that Enbridge maintains.

The Court discussed in detail the FEIS's analysis of leaks and spills in the February 3, 2010 Order.  In that order, the Court acknowledged that the FEIS's discussion of diluent is brief, but held at that early stage in the litigation that Plaintiffs failed to demonstrate a substantial probability that they will succeed in showing that the FEIS's evaluation of potential leaks and spills, even with respect to diluent, was arbitrary and capricious.  Even though Plaintiffs failed to establish a probability of success on the merits of this NEPA claim, the Court cannot say that Plaintiffs have failed to state a claim for relief.  Defendants' arguments do not provide the Court with a proper basis to dismiss the claims pursuant to Rule 12(b)(6) and will be considered on summary judgment.

### 4.     Stated Purpose and Alternatives

In their Fourth Claim for Relief, Plaintiffs allege that the State Department failed to adequately evaluate the "no action" alternative to the AC Pipeline project and based the purpose of the AC Pipeline project on inaccurate assumptions about future demand

for heavy tar sands crude oil.  (Am. Compl. ¶¶ 96-104.)

Enbridge argues that this claim fails as a matter of law because the demand for heavy crude oil in the primary refinery market to be served by the AC Pipeline is fully documented in the FEIS and that the "no action" alternative would not satisfy the need for transportation service to meet the increased demand.  Enbridge also argues that the State Department fulfilled its NEPA obligations and was not required to address the environmental consequences of different projects or energy solutions as alternatives to the AC Pipeline proposal.

Plaintiffs assert that the State Department failed to take a "hard look" at alternatives to the AC Pipeline project because (1) the stated purpose for the need for the AC Pipeline and diluent projects—to meet a projected increase in demand for Canadian petroleum-based fuels—is based on inaccurate assumptions about demand; (2) the FEIS assumes that the construction of the pipeline is the only feasible way to meet the purported increased demand; and (3) the FEIS failed to adequately evaluate the alternative to increasing supply capacity without new pipeline construction.

An EIS must "specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action."  40 C.F.R. § 1502.13.  Here, the State Department's stated purposed and need reads as follows:

> The overall purpose of the Alberta Clipper Project is to transport additional crude oil into the United States and eastern Canada from existing Enbridge facilities in western Canada to meet the demands of refineries and markets in those areas.

(FEIS at 1-2.)  The Court addressed the FEIS's analysis of stated purposes and alternatives in its February 3, 2010 Order and concluded that Plaintiffs did not establish a probability that they will be able to succeed in establishing that the State Department failed to take a "hard look" at project alternatives.  However, as with the NEPA claims discussed above, the Court concludes that Enbridge's arguments challenging the viability of this NEPA claim do not provide a basis for dismissal pursuant to Rule 12(b)(6).  The Court will consider these arguments on summary judgment.

### III.    Southern Lights LSr Pipeline

In their Fifth Claim for Relief, Plaintiffs allege that the State Department's EA, FONSI, and issuance of a presidential permit to Enbridge for the Southern Lights LSr Pipeline violated NEPA because the LSr Pipeline's EA did not analyze the impacts of the SLD Pipeline.  (Am. Compl. ¶¶ 105-111.)  Defendants assert that this count should be dismissed for the same jurisdictional reasons they argued with respect to Plaintiffs' First through Fourth Claims for Relief and, additionally, because the claim is moot.  For the same reasons discussed above, the Court declines to dismiss this count on jurisdictional grounds.  The Court does find, however, that the claim is moot.  Plaintiffs did not challenge the LSr presidential permit.  The LSr Pipeline has been built and is operational.  Thus, no effective relief is available with respect to the LSr Pipeline.  *See One Thousand Friends of Iowa v. Mineta*, 364 F.3d 890, 893 (8th Cir. 2004) (holding that a NEPA claim does not present a controversy when the proposed action is complete

and no effective remedy available).[6]  The Court therefore dismisses Plaintiffs' Fifth

Claim for Relief.

## IV.     Unconstitutionality of the Presidential Permit

In their Sixth Claim for Relief, Plaintiffs assert that the State Department's

issuance of the AC Pipeline Permit is unconstitutional because the President has no

constitutional or statutory authority to issue presidential permits allowing for the

importation of tar sands crude oil from Canada.  In particular, Plaintiffs assert that tar

sands oil pipelines are foreign commerce and, therefore, the power to regulate these

pipelines is under the exclusive and plenary constitutional authority of Congress to

"regulate commerce with foreign nations."  U.S. Const. art. I, § 8, cl. 3.  Plaintiffs also

assert that the Constitution grants the President no authority over foreign commerce and

that the President, therefore, can only act with Constitutional authorization.

Defendants assert that this count should be dismissed for failure to state a claim.

In particular, Defendants assert that the President's constitutional authority to issue such

permits is well-established and that acts of Congress have affirmed the Presidential

authority in this area.  Federal Defendants assert that the authority to issue a permit for a

border-crossing facility does not derive from a delegation of congressional authority

---

[6]     Plaintiffs contend that no federal agency has studied the full impacts of the SLD
diluent project and request a declaration that the LSr EA is inadequate and an injunction
against further construction and operation of the SLD Pipeline, not against the LSr
Pipeline.  The Court declines to consider relief related to the allegedly inadequate EA for
a pipeline that has been constructed and is operating (the LSr Pipeline) by halting
construction of a separate pipeline (the SLD Pipeline).  The time for challenging the LSr
Pipeline's EA has past.

under the Commerce Clause, but rather from the President's constitutional authority over foreign affairs and his authority as Commander in Chief. Federal Defendants assert that neither the President nor the State Department has claimed authority to regulate pipelines; but rather, the State Department is involved in the permitting of the AC Pipeline because the pipeline crosses an international border and, therefore, implicates foreign affairs and national security concerns. Federal Defendants assert that throughout our country's history, Presidents have exercised their inherent authority to approve or reject such border crossings. Similarly, Enbridge asserts that the authority to issue the AC Pipeline Permit rests with the Executive Branch.

Executive Order 11423 granted the Secretary of State the authority to grant or deny permits for certain types of border crossing facilities, including oil pipelines. 33 Fed. Reg. 11741 (Aug. 16, 1968). In 2001, President Bush issued Executive Order 13212, indicating that it was the "policy of [the] Administration that executive departments and agencies (agencies) shall take appropriate actions, to the extent consistent with applicable law, to expedite projects that will increase the production, transmission, or conservation of energy." 66 Fed. Reg. 28357 (May 18, 2001). In 2004, President Bush issued Executive Order 1337, the order at issue in this case, which empowers the Secretary of State to "receive all applications for Presidential permits . . . for the construction, connection, operation, or maintenance, at the borders of the United States, of facilities for the . . . exportation or importation of petroleum [or] petroleum products . . . to or from a foreign country." 69 Fed. Reg. 25299 (April 30, 2004).

The AC Pipeline crosses the international border between the United States and

Canada. The President issued the AC Pipeline Permit to facilitate the border crossing.

Defendants' assertion that the President's authority to issue the border-crossing Permit comes by way of his constitutional authority over foreign affairs and authority as Commander in Chief is well- recognized. *See, e.g.*, 38 U.S. Atty. Gen 163 (1935) (gas pipeline); 30 U.S. Op. Atty. Gen. 217 (1913) (electrical power); 24 U.S. Op. Atty. Gen. 100 (1902) (wireless telegraphy); 22 U.S. Op. Atty. Gen. 514 (1899) (submarine cables); *see also Natural Res. Def. Council*, 658 F. Supp. 2d at 109. Further, despite the fact that cross-border permits for pipelines have been issued by Presidents in the past, Congress has not attempted to exercise any exclusive authority over the permitting process. Congress's inaction suggests that Congress has accepted the authority of the President to issue cross-border permits. For these reasons, the Court determines that Plaintiffs have failed to state a claim that the issuance of the Permit was unconstitutional. Therefore, the Court dismisses Plaintiffs' Sixth Claim for Relief.

## V.      Claims Against the Forest Service and the Corps

Defendants assert that Plaintiffs' claims against the Forest Service and the Corps should be dismissed because they fail to set forth with any particularity the actions of these agencies that resulted in NEPA violations. Defendants assert that the vast majority of Plaintiffs' allegations relate to the conduct of the State Department. In their Amended Complaint, Plaintiffs allege that the Forest Service and the Corps were required to perform a NEPA analysis before granting permits for the AC Pipeline and SLD Pipeline projects, that the Forest Service and the Corps relied on the State Department's allegedly inadequate FEIS, and that the Forest Service and the Corps otherwise failed to conduct

an independent environmental review of the diluent pipeline.  The Court concludes that Plaintiffs have met the basic pleading requirements in asserting NEPA claims against the Forest Service and the Corps.

## CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons set forth above, **IT IS HEREBY ORDERED** that:

1.      Federal Defendants' Motion to Dismiss (Doc. No. [73]) and Enbridge's Motion to Dismiss (Doc. No. [88]) are **GRANTED IN PART** and **DENIED IN PART** as follows:

     a.      Plaintiffs' Fifth and Sixth Claims for Relief are **DISMISSED WITH PREJUDICE**.

     b.      As to Plaintiffs' First through Fourth Claims for Relief, Defendants' motions are **DENIED**.

Dated:  February 24, 2010       s/Donovan W. Frank
                       DONOVAN W. FRANK
                       United States District Judge