# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

|  |  |
|---|---|
| SIERRA CLUB, MINNESOTA CENTER FOR ENVIRONMENTAL ADVOCACY, INDIGENOUS ENVIRONMENTAL NETWORK, and NATIONAL WILDLIFE FEDERATION,<br><br>Plaintiffs,<br><br>v.<br><br>HILLARY CLINTON, in her official capacity as Secretary of State, JAMES STEINBERG, in his official capacity as Deputy Secretary of State, UNITED STATES DEPARTMENT OF STATE,, Lieutenant General ROBERT L. VAN ANTWERP, in his official capacity as U.S. Army Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers; Colonel JON L. CHRISTENSEN, in his official capacity as District Engineer and Commander of the U.S. Army Corps of Engineers; the UNITED STATES ARMY CORPS OF ENGINEERS, TOM TIDWELL, in his official capacity as Chief of the United States Forest Service; ROB HARPER, in his official capacity as Forest Supervisor for the Chippewa National Forest; and the UNITED STATES FOREST SERVICE,<br><br>Defendants,<br>and<br><br>ENBRIDGE ENERGY, LIMITED PARTNERSHIP<br><br>Intervenor-Defendant. | **Civ. No. 0:09-cv-02622-(DWF/RLE)**<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Hon. Donovan W. Frank<br>U.S. District Judge<br><br><u>Hearing Date</u>:  August 9, 2010<br><u>Time</u>:  9:00 am |

# TABLE OF CONTENTS

INTRODUCTION………………………………………………….………...1

STATEMENT OF FACTS……………………………………………….....1

   I.   Enbridge's Pipeline Expansion Proposal…………………………………1

   II.   Federal Review and Permitting……………………………………….......2

ARGUMENT………………………………………………………………4

   I.   This Court Has Jurisdiction to Review Plaintiffs' Claims…………………4

   II.   Standard of Review…………………………………………………5

   III.   Defendants' Environmental Review Violates the National
       Environmental Policy Act……………………………………………6

       A.   Defendants' Failure to Include in the FEIS a Valid
           Statement of Purpose and Need and to Consider
           Reasonable Alternatives Including the No-Action
           Alternative—Violates NEPA……………………………………......6

           1.   Defendants failed to take the required hard look at
               Enbridge's stated purpose and need for the project………………......6

           2.   Defendants' summary dismissal of the "no action"
               alternative and failure to address other feasible alternatives
               violates NEPA……………………………………………………13

       B.   The FEIS Violates NEPA Because it Fails to Evaluate the
           Impacts of the SLD Pipeline……………………………………..19

           1.   Defendants failed to take a "hard look" at the impacts of diluent
               leaks and spills during operation of the SLD Pipeline……………...19

           2.   The FEIS improperly segmented the AC and SLD pipelines………….....22

               a.   The AC and SLD are connected actions…………………………….24

               b.   The AC and SLD pipelines are cumulative and similar actions……..28

               c.   Because Defendants improperly segmented the AC and SLD
                   pipelines, the SLD pipeline "escaped the reach of NEPA"…………29

**C.** **Defendants' Failure to Assess Reasonably Foreseeable Indirect and Cumulative Impacts Violates NEPA**……………………………………..31

1. The FEIS fails to consider the trans-boundary impacts of increased tar sands extraction due to the AC project……………………………...31

2. The FEIS fails to evaluate the effects of the project relative to alternative sources of energy……………………………………………..36

**D.** **Defendants' Failure to Consider the Impacts of Abandonment of the Pipelines Violates NEPA**……………………………………...38

**CONCLUSION**………………………………………………………………40

## INTRODUCTION

Plaintiffs Sierra Club, Minnesota Center for Environmental Advocacy, Indigenous Environmental Network, and National Wildlife Federation (collectively "Plaintiffs") are entitled as a matter of law to summary judgment because Defendants U.S. Department of State, U.S. Army Corps of Engineers, and U.S. Forest Service *et al.* (collectively "Defendants") violated the National Environmental Policy Act, 42 U.S.C. §§4321 *et seq.* ("NEPA"), its implementing regulations, and the Administrative Procedure Act, 5 U.S.C. §§701 *et seq.* ("APA"), when they issued their final Environmental Impact Statement ("EIS") and permitting decision notices for the Alberta Clipper ("AC") and Southern Lights diluent ("SLD") pipeline projects.

The EIS violates NEPA because it: i) fails to provide a valid statement of purpose and need, and to consider reasonable alternatives—including the "no action" alternative—for the projects; ii) fails to take a "hard look" at the impacts of the SLD pipeline; iii) fails to assess all reasonably foreseeable indirect and cumulative impacts of the projects; and iv) fails to evaluate the impacts of abandonment of the pipelines.

## STATEMENT OF FACTS

### I.      Enbridge's Pipeline Expansion Proposal

Enbridge Energy, Limited Partnership, and its affiliates ("Enbridge") are significantly expanding the pipeline system they own and operate between Alberta, Canada and the United States.  This expansion includes the AC pipeline and the related Southern Lights pipeline.[1]

The AC pipeline is a 992-mile long, 36-inch diameter pipeline running from

---

[1] *See* Map of Alberta Clipper and Southern Lights Projects, Dkt. No. 95.

Hardisty, Alberta, Canada, crossing the U.S.-Canada border near Neche, North Dakota, and continuing through northern Minnesota to a terminal in Superior, Wisconsin. The Alberta Clipper pipeline will carry approximately 450,000 barrels per day ("bpd") of heavy crude oil, or bitumen, from the Canadian tar sands fields to refineries throughout the Midwestern United States.

The Southern Lights pipeline will transport "diluent"[2] from Midwestern refineries to the Alberta tar sands where it is used to dilute heavy tar sands crude to make it suitable for transport in a pipeline. The 188-mile segment of diluent pipeline is being constructed at the same time and in the same right-of-way as the AC pipeline from Superior, Wisconsin to Clearbrook, Minnesota, where it will be joined with an existing pipeline in the Enbridge system.

## II.     Federal Review and Permitting

Because Enbridge's pipeline expansion project involves construction on the U.S.-Canada border, Enbridge applied to the State Department for a presidential permit for the construction of the AC pipeline. Enbridge also sought a presidential permit for the SLD pipeline, but the State Department determined that no additional permit was required because the diluent would cross the border in an existing pipeline.

For both the AC and SLD pipelines, Enbridge also applied for: i) U.S. Army Corps of Engineers permits to dredge and fill wetlands and place structures in or under water-bodies pursuant to section 404 of the Clean Water Act and section 10 of the Rivers and Harbors Act; and ii) a U.S. Forest Service special use permit to site and construct the

---

[2] Because bitumen from the Canadian tar sands is too viscous to be pumped through a pipeline, it must be diluted with lighter liquid hydrocarbons, known as "diluent," in order to be transported by pipeline. ACP146 (FEIS, 1-28).

pipelines through the Chippewa National Forest.

Even though the State Department was only permitting one of the pipelines in the project, it undertook the role of lead federal agency for NEPA purposes and assumed responsibility for conducting the environmental review for the expansion project. While the other agencies cooperated with the Department of State, no other federal agency conducted an independent NEPA review.[3] Each agency relies on the State Department's EIS to satisfy its NEPA obligations.

The State Department issued a draft EIS for the AC project on December 5, 2008, and a final EIS ("FEIS") on June 8, 2009. The Department excluded the SLD pipeline from its definition of the project under review, asserting that the pipeline was not a connected action for NEPA purposes.[4] ACP135, 144 (FEIS, 1-17, 1-26).

On August 20, 2009, the State Department issued its Record of Decision ("ROD") and a presidential permit for the AC pipeline. ACP23-49.

On August 24, 2009, the Army Corps issued Enbridge permits to dredge and fill wetlands and place structures in or under water-bodies in connection with construction of the AC and SLD pipelines. COE1-87. The Army Corps did not conduct independent NEPA review but relied on its participation in the State Department's preparation of the AC EIS.

---

[3] The Forest Service, in cooperation with the Leech Lake Reservation, provided a separate "environmental analysis" in an appendix to the State Department's FEIS. ACP2520-693 (FEIS App. U).

[4] In the introduction to the EIS, the State Department claims that the 188-mile segment of the diluent pipeline that extends between Clearbrook, Minnesota and Superior, Wisconsin, is included in the cumulative impacts analysis, ACP144 (FEIS, 1-26), but the environmental analysis in Chapter 4 of the FEIS does not address the significant environmental impacts of the SLD pipeline. The remaining 490 miles of new construction of the SLD pipeline between Superior and Manhattan, Illinois are completely omitted.

On June 29, 2009, the Chippewa National Forest Supervisor issued its ROD and special use permits for the construction and maintenance of the AC and SLD pipelines in the Chippewa National Forest.  DOS9061-86.  Plaintiffs filed a timely administrative appeal on August 17, 2009, challenging the Forest Service's failure to conduct an independent NEPA analysis and its reliance on the State Department's inadequate FEIS.  On September 24, 2009, the Appeal Reviewing Officer recommended that the appeal be denied and the ROD affirmed.  DOS11608-19.  On September 28, 2009, the Forest Service's Appeal Deciding Officer adopted the recommendation of the Reviewing Officer.  DOS11620-21.

## ARGUMENT

## I.    This Court Has Jurisdiction to Review Plaintiffs' Claims

Plaintiffs' claims that the federal agencies violated a federal statute—the National Environmental Policy Act, 42 U.S.C. §§4321 *et seq*.—present questions of federal law that this Court has jurisdiction to review under 28 U.S.C. §1331.  The APA waives the government's sovereign immunity and provides a private cause of action for challenges to final agency actions that violate NEPA.  5 U.S.C. §§702, 706; *Cent. S. Dakota Coop. Grazing Dist. v. USDA*, 266 F.3d 889, 894 (8th Cir. 2001).  The State Department's ROD, the Army Corps' issuance of permits to dredge and fill wetlands and place structures in or under water-bodies in connection with construction of the Alberta Clipper and diluent pipelines, and the Forest Service's Appeal Deciding Officer's final denial of Plaintiffs' administrative appeal of the Chippewa National Forest special use permits, all constitute final agency actions subject to judicial review under the APA.  5 U.S.C. §§702, 704; 36 C.F.R. §215.18(c).  *See also*, Memorandum Opinion and Order on Motions to Dismiss ("MTD Order"), Dkt. No. 185 at 14.

Plaintiffs have established constitutional and prudential standing to bring these NEPA claims.  *See* Declarations of Lois Norrgard, Joshua Davis, Mary Smith Johnson, Ami Charli Aarlgaard, Shelley Steva, Steven Caron, Tom Goldtooth, Gary Botzek, and Keith Blomstrom, Dkt. Nos. 8-17 to 8-23; 151-1; 152-2.  *See also*, MTD Order at 9-11 ("Plaintiffs' alleged injury is procedural in nature and, even though the President may be the ultimate decision-maker with respect to the issuance of the AC Pipeline Permit, the President's future actions or inactions are too speculative to preclude standing in this case.").

## II.   <u>Standard of Review</u>

Summary judgment must be granted where "there is no genuine issue as to any material fact and…the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-27 (1986).  Plaintiffs' NEPA claims are subject to judicial review under the APA, which requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §706(2)(a); *Missouri Coalition for the Environment v. FERC*, 544 F.3d 955, 958 (8th Cir. 2008).

NEPA requires that the federal permitting agencies "take a 'hard look' at the environmental consequences" of a major federal action before taking that action. *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983). To comply with this standard, an agency must prepare a "'detailed statement' (generally, an EIS), 42 U.S.C. §4332(2)(C), from which a court can determine whether the agency has made a good faith effort to consider the values NEPA seeks to protect." *Mid States*

*Coalition for Progress v. Surface Transportation Board*, 345 F.3d 520, 533 (8th Cir. 2003).  In reviewing the agency's action, the Court must consider "whether the decision was based on consideration of the relevant factors and whether there has been a clear error of judgment."  *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

III.   **Defendants' Environmental Review Violates the National Environmental Policy Act**

   A.   **Defendants' Failure to Include in the FEIS a Valid Statement of Purpose and Need and to Consider Reasonable Alternatives—Including the No-Action Alternative—Violates NEPA**

The FEIS is inadequate because its statement of purpose and need is based on a flatly incorrect assumption that U.S. demand for additional "unconventional" crude oil from Canada necessitates the permitted pipelines.  As a result of the narrowly defined and inaccurate statement of purpose and need, the FEIS fails to consider and evaluate other reasonable alternatives, including the No Action Alternative.

   1.   *Defendants failed to take the required hard look at Enbridge's stated purpose and need for the project*

Providing an accurate statement of purpose and need is a fundamental requirement of environmental review under NEPA.  *Simmons v. U.S. Army Corps. of Eng'rs,* 120 F.3d 664, 666 (7th Cir. 1997).  The stated purpose and need for a project necessarily dictates the alternatives to be evaluated.  40 C.F.R. §1502.13 (EIS must "specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action").  The agency responsible for conducting the EIS "bears the responsibility for defining at the outset the objectives of an action" and "must look hard at the factors relevant to the definition of purpose."  *Citizens Against Burlington,*

*Inc., v. Busey,* 938 F.2d 190, 196 (D.C. Cir. 1991).

> One obvious way for an agency to slip past the strictures of NEPA is to contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence). If the agency constricts the definition of the project's purpose and thereby excludes what truly are reasonable alternatives, the EIS cannot fulfill its role. Nor can the agency satisfy the Act.

*Muckleshoot Indian Tribe v. U.S. Forest Serv*., 177 F.3d 800, 812-14 (9th Cir. 1999). The alternatives analysis is the "heart" of an EIS. 40 C.F.R. §1502.14.

Here, Defendants adopted Enbridge's inaccurate assertion that U.S. demand for additional crude oil necessitates the construction of the pipeline infrastructure it proposed. *Compare* ACP120 (FEIS, 1-2), *with* ACP29203 (Enbr. Pres. Perm. App. at 10). This Court quotes the same incorrect assertion in its Order denying Plaintiffs' motion for a preliminary injunction. PI Order at 33 ("the balance between domestic supply and demand will require the 'unconventional' oil supply from Canada...to grow") (quoting FEIS, 1-4)).

As explained below, the EIS's assessment of demand is based on Defendants' misreading of forecasts from the U.S. Energy Information Agency (EIA). There is no evidence in the administrative record to support the conclusion that domestic demand for Canadian "unconventional" crude necessitates building the Alberta Clipper. Although Plaintiffs repeatedly pointed out the error to Defendants,[5] Defendants failed to correct the

---

[5] Plaintiffs and others raised concerns about the EIS's purpose and need statement from the start. *See, e.g.,* ACP7793 (Wisconsin DNR Comment on preliminary DEIS) ("[T]here should be some supporting information to show there is an [increased] demand at refineries to substantiate this purpose…. Shouldn't there be a discussion of [c]urrent demand trends.... What are the known and proposed refinery expansions?"). Plaintiffs explained in detailed comments on both the draft and final EIS that the assumption of increased U.S. demand for tar sands crude was not supported by the federal government's own forecasts. MCEA DEIS Comments, Dkt. No. 131-1 at 5-15 (providing thorough

error or amend the statement of purpose and need.  This clear error shows that Defendants did not take the "hard look" NEPA requires and demonstrates that the statement of purpose and need, upon which the entire project is based, is unreasonable.

The FEIS defines the purpose of the project narrowly: "to transport additional crude oil into the United States and eastern Canada from existing Enbridge facilities in western Canada to meet the demands of refineries and markets in those areas."  ACP120 (FEIS, 1-2).  It goes on to posit that the project is needed to:  "meet the increased demand from heavy crude oil by refiners in the United States and offset the decreasing domestic crude oil supply"; "reduce U.S. dependence on oil obtained from outside of North America"; and "meet demonstrated shipper interest in an overall Enbridge system expansion."  *Id.*  Further, the FEIS states that "to meet the anticipated demand, the proposed Alberta Clipper Project would provide approximately 450,000 bpd of heavy crude oil capacity."  *Id.*

However, the FEIS's statement of purpose and need is based on erroneous assertions that are contradicted by the very evidence Defendants cite in support.  There is no record evidence of "anticipated demand" in the United States for the additional half million barrels per day of heavy crude that Enbridge has offered to transport.  There is likewise no record evidence of a "decreasing domestic crude oil supply."  Indeed, the federal forecasts cited in the FEIS contemplate *increased* domestic production and *decreased* demand for Canadian crude imports, including heavy, unconventional crude

---

review of federal projections demonstrating that the stated purpose and need for the project was flawed); ACP3106-11 (MCEA FEIS Comments at 3-8) (discussing unwarranted assumptions and errors made in the discussion of crude oil supply and demand, including that the FEIS conflates Canadian industry production forecasts with forecasts for U.S. demand for Canadian crude).

imports.

The EIA publishes annual forecasts of U.S. demand for imported crude oil generally, as well as for specific types of crude from specific sources, such as Canadian heavy crude oil. *See* EIA, *Annual Energy Outlook 2009* (March 2009) ("AEO 2009").[6] The AEO 2009 is cited in the FEIS at 1-4, 3-2. However, as Plaintiffs made clear in their comments to the draft EIS,[7] the AEO 2009 does not support the proposition for which Defendants cite it.

The AEO 2009 forecasts that overall U.S. demand for imported crude will "decline dramatically":

---

[6] The AEO 2009 was inadvertently omitted from the administrative record. Counsel for Defendants has assured Plaintiffs that Defendants will supplement the record to include the report and all exhibits and tables thereto. The report is available at http://www.eia.doe.gov/oiaf/archive/aeo09/index.html (last visited May 20, 2010), and is filed herewith as Exhibit 1 to Decl. of Sarah Burt in Support of Pls. Mot. for Summ. J.

[7] Plaintiffs' comments on the draft EIS were inadvertently omitted from the administrative record. However, Plaintiffs filed a copy of the comments with this Court as an exhibit to Plaintiffs' Reply in Support of Plaintiffs' Motion for PI. Dkt. No. 131-1. Counsel for Defendants has assured Plaintiffs that they will supplement the record to include the comments and exhibits thereto. Because this could not be done prior to the filing of this motion, Plaintiffs' DEIS comments are cited throughout as MCEA DEIS Comments, Doc 131-1.



MCEA DEIS Comments, Doc 131-1 at 9 (reproducing graph from AEO 2009 Early

Release Presentation, (Dec. 17, 2008)).

In addition, the EIA forecasts that crude oil imports from Canada—including both

conventional and unconventional crude—will *decrease* not increase as assumed by

Defendants as the basis for the statement of purpose and need in the FEIS.  Again, tables

and other information from the AEO  2009 project declining imports of Canadian crude:



MCEA DEIS Comments, Dkt. No. 131-1 at 10 (created using data from AEO 2009 Table 127, Dkt. No. 110-2).

Rather than acknowledging that the EIA forecasts show declining domestic demand overall and declining domestic imports from Canada, Defendants obfuscated.  As support for their assertions concerning U.S. demand and imports, Defendants cited an irrelevant forecast of Canadian heavy crude oil *production*:

> [T]he EIA projects that the balance between domestic supply and demand will require the 'unconventional' oil supply from Canada, which is predominately heavy crude from reserves in western Canada, to grow from approximately 1.5 million bpd in 2008 to over 4.3 million bpd by 2030.  This increase in heavy crude imports is consistent with the observation that many U.S. refineries have been, or are in the process of being, retrofitted to accommodate heavy crude....

ACP122 (FEIS, 1-4).

This statement is incorrect for multiple reasons.  First, the AEO 2009 table relied on does not balance *domestic* supply and demand, as the FEIS suggests.  Rather, that table reports forecasts of *worldwide* production and consumption.  *See* AEO 2009, Table A21 at 148-49.  Thus, Defendants are using projected increases in global demand for crude oil (for example in India and China) as a basis for asserting the need for a pipeline that runs to Duluth.

Second, the reported growth in Canadian heavy crude reserves from 1.5 million bpd to 4.3 million bpd in 2030 is a forecast of increased Canadian *production* overall.  *Id.*  It says nothing about U.S. demand or U.S. imports.  It is simply incorrect to suggest, as Defendants' FEIS does, that this report forecasts an "increase in heavy crude imports."

Third, Defendants' FEIS incorrectly assumes that domestic crude oil production declines, when in fact the very table cited forecasts increases in both conventional and

unconventional U.S. domestic *production* of oil, just as it forecasts increases in Canadian production. *See Id.* (predicting increased U.S. production of conventional liquid fuels from 7.8 million bpd in 2006 to 10.4 million bpd in 2030, and increased U.S. production of unconventional liquid fuels from 0.3 million bpd to 2.3 million bpd).

Despite receiving comments explaining their error, Defendants repeated their mistake in the ROD, again asserting that a supposed U.S. supply and demand imbalance will "require the unconventional crude supply in Canada to grow from approximately 1.5 million bpd in 2008 to over 4.3 million bpd by 2030." ACP32 (DOS Draft ROD at 10).

Defendants' error was confirmed recently in oil company filings with the Federal Energy Regulatory Commission ("FERC"). These "shippers," the same companies Enbridge contended were demanding a major infrastructure expansion, petitioned FERC for relief from AC-related tariffs because the AC project was unnecessary and the Enbridge system has excess capacity. According to Suncor's January 13, 2010 FERC Petition, "Enbridge's own projections show that there will be 471,000 bpd in excess capacity on the Lakehead System in 2013 even if Alberta Clipper is not placed into service. Adding the Alberta Clipper increases the excess capacity to 921,000 bpd." *Petition of Suncor Energy Marketing, Inc*., FERC Docket No. OR-10-005-000 (January 13, 2010), ¶27.[8] Indeed, the Suncor Petition quotes from Enbridge's own documents and testimony in the spring and summer of 2009, which show that predictions of growth in both production and demand were wrong and that the company would have excess capacity on its existing pipeline system. *Id.* at ¶¶24-27. As with the EIA forecasts, this information was available and known to Enbridge well before the August 20, 2009 ROD

---

[8] Filed herewith as Exhibit 2 to Decl. of Sarah Burt in Support of Pls. Mot. for Summ. J. *See also* Pls. Request for Judicial Notice filed herewith.

in this case and prior to beginning construction on the U.S. portion of its pipelines.  At the time Defendants took their final actions, it was clear that "shipper interest" in an Enbridge expansion was *not* a justification for the project.

This Court should not countenance a federal agency's willful ignorance of the facts before it.  Despite Plaintiffs' comments explaining these errors, Defendants reported false information in the FEIS, failed to correct the error in their ROD, and even repeated the errors in their arguments to this Court.  *See* Defs.' Mem. in Opp. to Mot. for PI, Dkt. No. 82 at 25.  Simply repeating the same error does not make it true.  Scrutiny of the EIA's forecasts reveals that they provide no support for the FEIS's statement of purpose and need.

When the government relies on erroneous information to reach its conclusion, its NEPA document is inadequate.  As Judge Tunheim recently stated in a case remanding environmental review to the Forest Service: "The absence of any supporting data in the EA deprives interested parties of information relevant to the agency's decision-making process and thus undermines the procedural safeguards of NEPA."  *Izaak Walton League of America, Inc. v. Kimbell*, 516 F. Supp. 2d 982, 996 (D. Minn. 2007).  Here, Defendants' reliance on patently false assumptions deprives both the public and the governmental agencies of informed decision making, a key benefit and purpose of NEPA.

### 2.  *Defendants' summary dismissal of the "no action" alternative and failure to address other feasible alternatives violates NEPA*

An EIS need not consider every conceivable alternative to a project, but it must "'[r]igorously explore and objectively evaluate' all reasonable alternatives."  *City of Bridgeton v. FAA,* 212 F.3d 448, 455 (8th Cir. 2000) (citing 40 C.F.R. §1502.14).  In evaluating the alternatives reviewed in an EIS, the court applies a "rule of reason."

*Friends of Boundary Waters Wilderness v. Dombeck,* 164 F.3d 1115, 1128 (8th Cir. 1999).  The court must consider whether the EIS "adequately sets forth sufficient information to allow the decision-maker to consider alternatives and make a reasoned decision."  *Id.*  Where there is a "viable but unexamined" alternative, the EIS is inadequate.  *Id.*

The range of alternatives evaluated in an EIS is not limited by the desires of the project proponent.  CEQ's guidance specifically provides:

> In determining the scope of alternatives to be considered, the emphasis is on what is "reasonable" rather than on whether the proponent or applicant likes or is itself capable of carrying out a particular alternative.  Reasonable alternatives include those that are practical or feasible from the technical and economic standpoint and using common sense, rather than simply desirable from the standpoint of the applicant.

*CEQ Forty Questions,* 46 Fed. Reg. 18027 (March 23, 1981).

In this case, Defendants' misunderstanding of U.S. demand forecasts for Canadian crude oil compromised the development and evaluation of alternatives to the project.  If demand forecasts had been accurately disclosed and analyzed in the EIS, the "no action" alternative would not have been summarily dismissed and other feasible alternatives would have been evaluated.  Ultimately, the Department of State's determination that the Alberta Clipper pipeline was in the "national interest" lacks an informed basis because it assumed, incorrectly, that the United States needs additional unconventional heavy crude from Canada.  Thus, the very purpose of NEPA—to be "action-forcing" by providing accurate and thorough information to decision-makers, *Kleppe v. Sierra Club*, 427 U.S. 390, 409 (1979)—was not realized here because of the false assumptions offered as justification for the project.

Defendants did not "rigorously explore or objectively evaluate" the "no action"

alternative.  Instead, it was summarily dismissed based on misinterpreted data.  The FEIS states that the "no action" alternative "would not meet the purpose and need of the proposed action."  ACP211 (FEIS, 3-2).  It states, incorrectly, that "[t]he current EIA projection is that meeting domestic demand will require the 'unconventional' oil supply from Canada," and that "[i]mplementation of the No Action Alternative would not alter the increasing need for Canadian crude oil in the United States."  ACP212 (FEIS, 3-3).  Thus, dismissal of the "no action" alternative was explicitly linked to the erroneous and wholly unsupported claim that U.S. consumers have an "increasing need for Canadian crude oil."  The "no action" alternative was "viable but unexamined," and, as a result, the EIS is inadequate.  *See Friends of Boundary Waters,* 164 F.3d at 1128.

Defendants had an obligation both to verify the accuracy of the information used to dismiss the "no action" alternative and to respond to the substantive comments they received challenging their assumptions.  40 C.F.R. §§1506.5(a), 1503.4(a).  They did neither.  For example, the Wisconsin Department of Natural Resources ("DNR") (in addition to Plaintiffs) commented that the evaluation of the "no action" alternative "alludes to 'anticipated demand' but provides no information as to (1) what the existing and projected demands for this source are and (2) how this pipeline addresses the difference between existing and future demands for this source."  ACP858.  Defendants' response was that "the EIS has been updated to provide market supply and demand data in the discussion of the No Action Alternative."  *Id.*  However, the FEIS's discussion of the "no action" alternative, ACP211-12 (FEIS, 3-2 to 3-3), neither explains "what the existing and projected demands for this source are" nor "how this pipeline addresses the difference between existing and future demands for this source."  The questions are only

addressed by the inaccurate statement that "meeting domestic demand will require the 'unconventional' oil supply from Canada...and that supply will grow from approximately 1.5 million bpd in 2008 to over 4.3 million bpd by 2030." *Id.* (citing AEO 2009). There is no objective data or analysis in the record to support the statement that future U.S. demand requires additional imports of Canadian heavy crude. The EIA forecasts state the opposite.

In addition to the erroneous rejection of the "no action" alternative, Defendants' misreading of federal energy forecasts resulted in the exclusion from consideration of other feasible alternatives to the pipeline. For example, although undisclosed in the FEIS, in March 2009 the Canadian Association of Petroleum Producers ("CAPP") proposed an alternative which would have avoided construction of the U.S. portions of the Alberta Clipper:

> By March, 2009, construction of the Canadian portion of the Alberta Clipper was well underway, but construction of the U.S. portion had not yet begun. During that month, CAPP expressed concern that economic conditions warranted a reevaluation of industry expansion plans, and asked Enbridge to accommodate the rapidly changing conditions and avert growing inefficiency and excess costs by utilizing existing pipeline capacity in conjunction with the proposed Keystone XL Pipeline project. According to CAPP, doing so would achieve greater economic efficiency and improved benefits for all crude oil shippers. CAPP proposed a plan that became known as the Gretna Option, which entailed (1) using the Canadian portion of the Alberta Clipper Project from Hardisty, Alberta to Gretna, Manitoba to transport crude oil nominated for the Keystone XL Pipeline; (2) constructing an interconnection between the Enbridge pipeline system and the Keystone XL Pipeline in the Gretna area; and (3) utilizing the newly-constructed Keystone XL Pipeline to transport oil south from Gretna to Cushing and the U.S. Gulf Coast.

*Suncor Petition,* ¶24. This alternative—developed by the Canadian trade group that *promotes* tar sands production—was never considered by Defendants because

they failed to take seriously Plaintiffs' comments and objections to their misreading of demand forecasts.[9]

Likewise, the FEIS contains no discussion or analysis of renewable fuels and conservation as an alternative for meeting U.S. demand for liquid fuel energy.[10]  The analyses of "system" alternatives (*e.g.*, other pipelines, trucking or rail) as well as "route" alternatives are all premised on the assumed "need" to deliver heavy crude from Canada to the Midwest.  ACP212-75 (FEIS, 3-3 to 3-66).  Plaintiffs raised conservation and renewables as possible alternatives in their scoping comments, ACP10243-44, and their comments on the DEIS. Dkt. No. 131-1 at 19.  The NEPA regulations specifically require consideration of energy requirements and conservation potential in the NEPA analysis.  40 C.F.R. §1502.16(e).  Despite both Enbridge's proposal and the Department of State's national interest determination setting in relief important questions about energy policy, continued U.S. dependence on fossil fuels and the effect this infrastructure expansion will have on efforts to promote conservation and alternative fuels, Defendants gave these issues short shrift in the FEIS.  In contrast to the "hard

---

[9] Plaintiffs' comments likewise pointed to upgrades on existing pipeline capacity as well as the additional capacity of the recently constructed Keystone pipeline as alternatives that should have been evaluated in the EIS.  MCEA DEIS Comments, Dkt. No. 131-1 at 21-22.  These suggestions, like the "no action" alternative, were summarily dismissed. ACP213-14 (FEIS, 3-4 to 3-5).

[10] The only reference to conservation or renewable fuels is in the FEIS's short dismissal of the "no action" alternative.  There, it says, without any analysis or record support, that "[e]nergy conservation alone cannot reasonably offset the demand for oil...for end users that ultimately would be served by the proposed Project.  Consequently, it cannot negate the need for the Project."  ACP211 (FEIS, 3-3).  The FEIS then refers to renewables, "including wind and solar power," and concludes that "these sources represent a small fraction of the projected energy demands...for the foreseeable future, especially related to providing refined petroleum products for the transportation sector."  *Id.*

look" NEPA requires, Defendants took no look whatsoever at whether future U.S. consumer demand for liquid fuels could be met without construction of the AC pipeline.

Where an agency fails to verify the information it is relying on to eliminate an alternative and fails to offer meaningful responses to comments received, it fails to satisfy NEPA. *Utahns for Better Transp. v. U.S. Dept of Transp.,* 305 F.3d 1152, 1165 (10th Cir. 2002). In *Utahns for Better Transportation* the court found the agency's NEPA review inadequate based on the failure to verify cost estimates of an alternative to a highway improvement project, noting that the cost information was "more than a technical requirement" given that cost was offered as a justification for rejecting the alternative. *Id.* In the same way, here Defendants have offered the assumption of increased U.S. demand for unconventional crude from Canada as a justification for rejecting reasonable alternatives, including the "no action" alternative. But they have failed to verify or otherwise provide any record support for their supposition.

The alternatives analyzed in the EIS are inadequate because they were developed under an incorrect assumption that increased Midwest demand for liquid fuels necessitates delivery of additional heavy crude oil from Canada. In fact, there is no objective record evidence pointing to an increase in demand for Canadian heavy crude in the Midwest or elsewhere in the United States. Defendants' narrow and incorrect statement of purpose and need infected the development and evaluation of reasonable alternatives. As a result, no "rigorous" and "objective" exploration of available alternatives has been conducted and the EIS is inadequate.

**B.    The FEIS Violates NEPA Because it Fails to Evaluate the Impacts of the SLD Pipeline**

    *1.    Defendants failed to take a "hard look" at the impacts of diluent leaks and spills during operation of the SLD Pipeline*

As Plaintiffs argue at length in their comments on the draft and final EIS, DEIS Comments, Doc 131-1 at 49-53; ACP3112-13, and in their briefs and at oral argument on their motion for preliminary injunction, the EIS does not adequately analyze the potential environmental impacts of the SLD pipeline and, in particular, the risks or impacts that spills and operational leaks of diluent would have on the environment or human health.[11]

Other commenters also pointed out this shortcoming of the FEIS.  For example, the Wisconsin DNR wrote:

> Another important issue not evaluated in the DEIS is that of potential spills of diluent.  The DEIS deals with the potential for petroleum spills from the proposed Alberta Clipper pipeline, but not diluent spills from the proposed Southern Lights pipeline.  It is unclear in the document as to what the properties of diluent are, and what its likely effects on the environment may be should a spill occur.  We assume that, due to its lower viscosity, diluent would be much more mobile in the environment than is the petroleum.  This deficit should be corrected.

ACP834 (FEIS App. A at A-36).  *See also* ACP10204 (Minn. DNR Scoping Comments, Sept. 24, 2007).

Yet Defendants fail to address this deficit in the FEIS, instead stating flatly that the FEIS "does not address operational aspects" of the diluent pipeline.  *Id.*  Both the

---

[11] As explained in Plaintiffs' Reply In Support of Motion for PI, the failure to examine the risks and impacts of a diluent spill as distinct from a spill of tar sands crude is significant because diluent is composed of light hydrocarbons with different chemical and physical properties than heavy crude oil and it reacts differently when released into the environment.  *See* Dkt. No. 93 at 13 n.4.

Forest Service and the Army Corps permitted the SLD pipeline directly and are thus required to conduct a full NEPA review of all direct, indirect and cumulative impacts of that pipeline, 40 C.F.R. §§1502.16(a)-(b), 1508.25(c), yet neither one supplements the State Departments' EIS to analyze the operational impacts of the SLD pipeline.  As a result, no federal agency has yet taken the "hard look" NEPA requires at the potential environmental impacts of the SLD pipeline, which include the impacts on water quality, public health, wildlife and habitat from diluent leaks and spills, as well as the cumulative and indirect impacts of making additional diluent available for tar sands extraction and transport.

NEPA requires that the agency present a "detailed statement" so that a court may determine whether the agency has made a good-faith effort to consider the values NEPA seeks to protect.  *Minn. Pub. Interest Research Group v. Butz,* 541 F.2d 1292, 1299 (8th Cir. 1976).  An EIS is "more than a mere disclosure document."  40 C.F.R. §1502.1.  It "must not merely catalog environmental facts, but also explain fully its course of inquiry, analysis and reasoning."  *Friends of Boundary Waters*, 164 F.3d at 1127-28.  "General statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Klamath-Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 993-94 (9th Cir. 2006) (quoting *Ocean Advocates v. Army Corps of Eng'rs,* 361 F.3d 1108, 1128 (9th Cir. 2004)); *see also Lands Council v. Powell*, 395 F.3d 1019, 1028 (9th Cir. 2005) (holding a cumulative effects analysis violated NEPA because it failed to provide "adequate data of the time, place, and scale" and did not explain in detail "how different project plans … affected the environment."); *Sierra Club v. Bosworth*, 352 F.Supp.2d  909, 926 (D. Minn. 2005)

("simply listing past timber sales on public land, without providing a more detailed analysis of the cumulative effects of those sales, does not constitute the 'hard look' required under NEPA").

Defendants' argument that they have addressed the operational aspects of the SLD rests entirely on one sentence on page 4-359 of the FEIS: "[f]or the proposed Project, the materials that could be released during construction or operation include the following: …Refined oil (diesel, gasoline, hydraulic fluid, transmission oil, lubricating oil and grease, waste oil, mineral oil, solvents, and other petroleum-based products)."  ACP633 (FEIS, 4-359).  Defendants claim that this sentence is an adequate assessment of the risks, and environmental and human health impacts of operational leaks and spills that might result from the transport of 180,000 bpd of diluent because Appendix U of the FEIS describes diluent as having "similar composition and physical characteristics to gasoline.  Therefore, if released into the environment, diluent will behave in a similar manner to gasoline."  ACP2561 (FEIS App. U at 3-3).  However, nowhere in the FEIS is there an assessment of the impacts of a release of gasoline.  Nowhere in the FEIS is there a response plan or description of measures that would be taken to control, mitigate, or address such a release.[12]

This Court, in its PI Order, noted that "the FEIS's discussion of diluent is brief." Not having the benefit of the full record in this matter, what the Court may not have realized is that the single sentence in the FEIS was the whole of the federal government's investigation into this issue.  Although it was permitting a new pipeline that will deliver

---

[12] While such plans have been drafted to address releases of heavy crude oil, *see* ACP1574-91 (FEIS App. E), ACP1078-85 (FEIS App. Q), these plans do not address the distinct characteristics and necessary responses to a spill of diluent or other refined hydrocarbons such as gasoline.

180,000 barrels per day of diluent through northern Minnesota's water-rich environment, the federal government's administrative record contains *no* further information about diluent or its environmental effects.  The statement that a diluent-like substance might be released into the environment as a result of the project, without assessing the potential magnitude or environmental consequences of that release, or discussing measures to minimize such consequences, falls short of NEPA's requirements that an EIS include a "full and fair discussion" of the significance of all "direct," "indirect," and "cumulative" effects of the action, 40 C.F.R. §§1502.1, 1502.16(a)-(b), 1508.25(c), as well as a discussion of "means to mitigate adverse environmental impact." *Id.* §1502.16(h).  The single sentence on page 4-359 of the FEIS does not constitute a detailed analysis of the risks or environmental impacts of diluent leaks and spills during operation of the SLD pipeline.  Defendants' failure to provide this analysis is arbitrary and capricious and in violation of NEPA.

## 2.   *The FEIS improperly segmented the AC and SLD pipelines*

As established above, the Forest Service and the Army Corps each permitted the SLD pipeline directly and each is thus required to ensure that a full review of all direct, indirect and cumulative impacts of the SLD pipeline has been completed and considered. In addition, the State Department violated NEPA by segmenting the AC and SLD pipelines and omitting the SLD pipeline from the scope of the AC EIS.

On July 27, 2007, the State Department issued Notices of Intent to prepare separate Environmental Assessments (EAs) for the Southern Lights Reversal ("LSr") pipeline[13] and the AC pipeline.  Alberta Clipper Notice of Intent to Prepare an EA, 72

---

[13] The LSr pipeline is a new 313-mile 20-inch pipeline constructed between Cromer,

Fed. Reg. 41381 (July 27, 2007); LSr Project Notice of Intent to Prepare an EA, 72 Fed. Reg. 41383 (July 27, 2007). The State Department did not issue a Notice of Intent to prepare an EA for the SLD pipeline and to date no federal agency has conducted an environmental review for the SLD pipeline. The State Department determined it would proceed with an EA for the LSr pipeline, but prepare an EIS for the Alberta Clipper pipeline. Defendants' EA for the LSr pipeline did not evaluate environmental impacts from the SLD pipeline. In its final EA and Finding of No Significant Impact ("FONSI") for the LSr pipeline, the State Department justified its omission of the SLD pipeline by representing that the SLD pipeline would be evaluated in the NEPA analysis for the Alberta Clipper project. Southern Lights LSr FONSI, 73 Fed. Reg. 32620 (June 9, 2008) ("The Alberta Clipper pipeline…and the construction by Enbridge of another pipeline that would bring diluent north to the oil sands project, will be addressed in a separate Environmental Impact Statement that is being prepared for the Alberta Clipper project by the DOS working with other agencies.").

NEPA requires that decision-makers address in a single EIS all "connected," "cumulative," and "similar" actions. 40 C.F.R. §1508.25(a). Analysis should be done in a single document when the record raises "substantial questions about whether there will be significant environmental impacts from the collection of anticipated projects." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 999 (9th Cir. 2004). *See also, One Thousand Friends of Iowa v. Mineta*, 364 F.3d 890, 894 (8th Cir. 2004) ("segmentation is improper when the segmented project has *no* independent

---

Manitoba, Canada, and Clearbrook, Minnesota to transport light sour crude. ACP147 (FEIS, 1-29). Diversion of a segment of existing Enbridge pipeline—Line 13—to form part of the SLD pipeline necessitated the construction of the LSr pipeline to replace that diverted capacity. *Id.*

justification, no life of its own, or is simply illogical when viewed in isolation.") (internal quotations omitted).

Courts have routinely held that agencies may not break a project or activity into components to avoid the full range of environmental analysis and that cumulative impacts analysis is necessary for all reasonably foreseeable results of the action under consideration.  *See, e.g.*, *One Thousand Friends*, 364 F.3d at 894  ("A state improperly segments a project when it seeks to escape the reach of NEPA."); *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 969 (9th Cir. 2006) (The purpose of this requirement is "to prevent an agency from dividing a project into multiple 'actions,' each of which individually has an insignificant environmental impact, but which collectively have a substantial impact.").  Defendants improperly segmented the SLD pipeline from the AC pipeline.  Instead of preparing one EIS for the entire expansion project, as NEPA requires, Defendants segregated the component parts of Enbridge's proposal and conducted the environmental review in separate pieces.

### a.  The AC and SLD are connected actions

Actions are connected if they "(i) [a]utomatically trigger other actions which may require environmental impact statements; (ii) [c]annot or will not proceed unless other actions are taken previously or simultaneously; [or] (iii) [a]re interdependent parts of a larger action and depend on the larger action for their justification."  40 C.F.R. §1508.25(a).  The AC and SLD pipelines are interdependent parts of a larger action, and thus connected actions within the meaning of the CEQ regulations.[14]

---

[14] In their Opposition to Plaintiffs' Motion for Preliminary Injunction, Defendants argue that the AC and SLD pipelines are not connected or cumulative actions because they are not "future agency actions."  Def. Opp. To Motion for PI, Dkt. No. 82 at 13.  However,

Diluent is necessary to make heavy tar sands crude transportable by pipeline, including the Alberta Clipper pipeline.  ACP146 (FEIS, 1-28).  The AC pipeline's additional 450,000 bpd capacity necessitates increased supplies of diluent.  *Id.* (Production from Alberta's tar sands will require 316,000 bpd of diluent by 2015 to serve pipeline expansions).  According to the Forest Service Environmental Assessment, the SLD pipeline is needed, in part, to "enabl[e] recycling of diluents between the refinery and production center, helping to satisfy an increasing demand for crude oil supplies in the Midwestern United States and eastern Canada."  ACP2533 (FEIS App. U at 1-3).  The interdependence of the AC and SLD pipelines is highlighted by Enbridge's assertion that access to diluents from U.S. refining centers will "facilitate increased production of growing supplies of crude oil for delivery to the United States from Canada."[15]  Actions related to the diluent pipeline are thus connected actions, and section 1508.25(c) of the NEPA regulations requires the State Department to fully assess the AC and SLD pipelines in a single EIS.

Although Enbridge argues that the diluent pipeline has independent utility, Enb. Opp. to Mot. for PI, Dkt. No. 78 at 16, it treats the pipelines as one project.  Enbridge applied for presidential permits for the pipelines together, referencing the other pipeline in each application.  *See, e.g.*, ACP29206 (Pres. Permit App., at 13).  Enbridge is

---

federal permits are required for the SLD pipeline, *see* COE1-87; DOS9061-86, and courts have repeatedly held that connected or cumulative actions must be considered together "regardless of what agency or person undertakes such other actions."  *Oregon Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1132-33 (9th Cir. 2007).  *See also*, 40 C.F.R. §1508.7; *Choate v. Army Corps of Eng'rs*, 2008 WL 4833113, *12 (E.D. Ark.) (Agency's argument that elements of the project are not connected actions "because they are 'within the expertise and jurisdictions of different governmental agencies'…is baseless.").

[15] Enbridge Website, http://www.enbridge-expansion.com/expansion/main.aspx?id=1216&tmi=290&tmt=4, (last visited May 19, 2010), Dkt. No. 105 at 1.

constructing the AC and SLD pipelines simultaneously and in the same corridor.
ACP166 (FEIS, 2-14).  Enbridge applied for a certificate of need and routing permit for
both pipelines together from the Minnesota Public Utilities Commission ("MPUC"),
which accepted Enbridge's single application and opened a single docket for
consideration of the pipelines together.  *See* MPUC Notice of Permit Application
Acceptance, Dkt. No. 107.  Enbridge likewise applied for permits from the Army Corps
of Engineers and special use permits from the U.S. Forest Service for the two pipelines
jointly.  Both the Army Corps and the Forest Service evaluated the permit applications
for both pipelines together.  *See* COE1-87 (ACE Permits); DOS9061-86 (Forest Service
ROD).

In its Memorandum Opinion and Order on Plaintiffs' Motion for Preliminary
Injunction ("PI Order"), the Court found that Plaintiffs had not demonstrated likelihood
of success on the merits of this claim.  PI Order, Doc 183 at 16.  In so holding, the Court
relied on statements in the FEIS "that the scope of the AC Pipeline project consists of the
construction and operation of the AC Pipeline and the expansion of associated pump
stations in the United States."  *Id.* at 15.  However, the scope of what must be included in
the EIS is not determined by the project proponent's description of the project, but rather
by the legal criteria set forth in sections 1508.7 and 1508.25 of the NEPA regulations.  As
described above, the SLD pipeline should have been included in the scope of the EIS
because it is a connected, cumulative and similar action.

The Court also concluded that the diluent pipeline has independent utility because
the FEIS states that

> current diluent supplies for use in the Alberta, Canada, tar sands are
> insufficient to meet demands for the dilution of heavy crude oil and that the

> SLD Pipeline project is designed to meet a *portion* of that demand.  (FEIS at 1-28.)  While the AC Pipeline will transport heavy crude oil that has been blended with diluent, the diluent will not necessarily be supplied by the SLD Pipeline.  Thus, the SLD Pipeline is not being constructed solely for the purpose of transporting oil through the AC Pipeline.

*Id.* at 15-16.  This reasoning overlooks two important facts.  First, the increase in heavy crude production due to increased transit capacity via the AC pipeline is a significant percentage of the demand for dilution of heavy crude oil.  ACP146 (FEIS, 1-28).  Without this increase, current supplies of diluent would be sufficient to meet transportation needs.  ACP15172 (MCEA Scoping Comments, May 7, 2008) (there is "a strong connection between diluent from Upper Midwest refineries and the need for moving increased amounts of that diluent back to the tar sands in Alberta to aid in increased extraction").  Because the SLD pipeline depends for its justification on the additional transport requirements of the AC pipeline, it does not have independent utility and is a connected action.  40 C.F.R. §1508.25(c); *Choate v. Army Corps of Eng'rs.*, 2008 WL 4833113, *13 (E.D. Ark) (construction of a shopping center and transportation improvements to serve the center are connected actions because "it would be irrational, or at least unwise to undertake one action without subsequent actions.").

Second, diluent is a fungible product.  It is not manufactured to specifications for a particular pipeline and stored separately from diluent manufactured for other pipelines.  Thus it is not important whether diluent is dedicated to heavy crude that will be transported through the AC pipeline or added to a general supply to be used for heavy crude that will be transported to other regions in North America through other pipelines.  What is important is the total available supply of diluent, and the SLD pipeline is necessary to ensure that there is sufficient diluent to meet the total demand, including the

dramatic increase in demand caused by the AC pipeline.  *See, e.g.* DOS59 (Enbridge App. for Forest Service Permit) (Transport [of]…diluent to the oil sands region…makes additional Canadian crude oil deliveries to the U.S. possible").  There is thus a "but for" relationship between the increased amount of heavy crude that will be transported by pipeline due to the increase in capacity provided by the AC pipeline, and the need for more diluent.  The SLD pipeline is thus a necessary part of the AC project and connected thereto.

> b.  *The AC and SLD pipelines are cumulative and similar actions*

Cumulative actions are those with "cumulatively significant impacts and should therefore be discussed in the same impact statement."  40 C.F.R. §1508.25(a).  Actions are "similar" if they have "similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography."  *Id*.  Because the Alberta Clipper and the diluent pipeline share common timing and geography and will have cumulatively significant impacts, they must be considered comprehensively in a single EIS.

The AC and SLD pipeline are being constructed side by side in the same right of way at approximately the same time.  ACP166 (FEIS, 2-14).  This requires widening the trench along which the pipelines will be laid, ACP169-70 (FEIS, 2-17 to 2-18), disturbing more soil and wetlands, and increasing heavy equipment traffic and related harms, including increased soil compaction and contamination, sedimentation of water-bodies, noise, and air pollution from greenhouse gas, engine and fugitive dust emissions.  ACP171, 294, 319-21, 343, 370.  The threat of operational leaks and spills that would contaminate soil and water resources is also dramatically increased along the pipeline

route.  May Decl., Dkt. No. 104 at ¶¶8, 23.  Operation of the SLD pipeline requires

additional pump stations, which increases operational noise and GHG emissions.

ACP147 (FEIS, 1-29).

Finally, refining the tar sands crude delivered by the AC pipeline will affect air

and water quality, as well as the climate, due to increased GHG emissions.  May Decl. at

¶¶42-47.  These impacts are cumulatively significant when added to the impacts of

processing increased quantities of crude oil into diluent (which is highly refined) for

transport through the SLD pipeline.  These cumulative impacts must also be considered

in the EIS.

> ### c.  *Because Defendants improperly segmented the AC and SLD pipelines, the SLD pipeline "escaped the reach of NEPA"*

In *One Thousand Friends of Iowa*, the Eighth Circuit held that an agency

"improperly segments a project when it seeks to escape the reach of NEPA."  364 F.3d at

894.  However, the court found no NEPA violation because the segmented section of the

project would be subject to NEPA as the highway project progressed.  *Id.*  Here, in

contrast, the State Department omitted the SLD pipeline from both the LSr EA and the

AC EIS, but there is no future NEPA review that will examine the impacts of the SLD

pipeline.  The diluent pipeline thus escaped the reach of NEPA and Plaintiffs were denied

the informational benefits of NEPA with regard to risks and impacts of the diluent

pipeline.  *See Robertson v. Methow Valley Citizens' Council*, 490 U.S. 332, 349 (1989)

(purpose of NEPA is "to insure that the public has sufficient information to challenge the

agency"); *Baltimore Gas and Elec. Co.,* 462 U.S. at 97 (NEPA requires agency to

"inform the public that it has indeed considered environmental concerns in its decision

making process").

Moreover, Plaintiffs relied on Defendants' misrepresentation that the SLD pipeline would be included in the AC EIS in making their decision not to challenge the omission of the SLD pipeline from the LSr EA.  MCEA DEIS Comments, Dkt. No. 131-1 at 18. This Court dismissed as moot Plaintiffs' claim that the LSr EA should have included the diluent pipeline because the LSr pipeline has already been completed.  MTD Order at 22-23.  If the State Department is permitted to exclude the SLD pipeline from the scope of the Alberta Clipper, the SLD pipeline will escape all NEPA review and Plaintiffs will have no recourse for obtaining information about environmental and health risks posed by the project.  Defendants' failure to honor their commitment to include the SLD pipeline within the scope of the AC EIS is arbitrary and capricious.  *Mid-States*, 345 F.3d at 550 (8th Cir. 2003) ("We find it significant that when the Board was defining the contours of the EIS, it stated that [the agency] would evaluate the potential air quality impacts associated with the increased availability and utilization of Powder River Basin Coal.  Yet, the DEIS failed to deliver on this promise.").

### C.   Defendants' Failure to Assess Reasonably Foreseeable Indirect and Cumulative Impacts Violates NEPA

NEPA directs federal decision-makers to "recognize the worldwide and long-range character of environmental problems."  42 U.S.C. §4332(2)(F).  To achieve this, the CEQ regulations require that an EIS include, among other things: (i) a "full and fair discussion" of the significance of all "direct," "indirect," and "cumulative" effects of the action, 40 C.F.R. §§1502.1, 1502.16(a)-(b), 1508.25(c); and (ii) a discussion of "means to mitigate adverse environmental impact."  *Id.* §1502.16(h).

#### 1.   *The FEIS fails to consider the trans-boundary impacts of increased tar sands extraction due to the AC project*

Trans-boundary impacts must be considered in an EIS when there is  "'a reasonably close causal relationship' between the environmental effect and the alleged cause."  *Department of Transportation v. Public Citizen*, 541 U.S. 752, 767 (2004) (quoting *Metropolitan Edison Co. v. People Against Nuclear Energy,* 460 U.S. 766, 774 (1983)).  It is undisputed that the FEIS does not include any analysis of the trans-boundary impacts—*i.e.*, the impacts in the United States—resulting from the increased exploitation and development of Canadian tar sands driven by the AC project.  *See* ACP136 (FEIS, 1-18) ("The activities in Canada are beyond the NEPA authority of DOS and therefore were not evaluated in this EIS.").  *See also* ACP826-28 (FEIS App. A, State Department response to Plaintiffs' comments) ("Analyzing the environmental impacts of activities in Canada is outside the scope of NEPA and this EIS.").

Despite the State Department's refusal to consider it, the administrative record contains evidence that tar sands extraction in Canada has significant environmental impacts in the United States.  It involves enormous open pit mines and intensive drilling that are turning over 100,000 square kilometers of the Canadian boreal forest into a wasteland.  MCEA DEIS Comments, Dkt. No. 131-1 at 26; May Decl. at ¶62.  This forest is home to many sensitive wildlife species, such as caribou and lynx, many of which migrate across the US-Canada border.  *Id.*  In addition, the peat bogs destroyed by the mining are the single best carbon sink of any habitat in terms of tons of carbon captured and stored.  MCEA DEIS Comments, Dkt. No. 131-1 at 27**.**  Their destruction adds to the negative global warming impacts of this project as stored greenhouse gases are released and sequestration capacity is lost.  *Id.* at 25.  Tar sands mines also require extensive toxic

tailings ponds that threaten wildlife and water.  *Id.* at 27-28.  Collectively, these pools of waste cover almost 20 square miles, and are so vast that they can be seen from space.  *Id.* The deadly nature of these tailings ponds was demonstrated in May 2008 when over 500 migrating ducks died after landing in a tar sands tailings pond.  *Id.*  The EIS also omits consideration of black carbon emissions from the extraction, which is a critical climate forcing agent causing Arctic warming.  *Id.* at 32-34.

In its PI Order, this Court held that on the record before it, Plaintiffs had not shown "a reasonably close causal relationship between the alleged environmental impacts of Canadian tar sands development and the construction of the AC pipeline so as to render the FEIS deficient."  PI Order at 18-19.  That was based on the Court adopting Defendants' argument that "the Canadian tar sands are being developed independently from the AC Pipeline project and that the need for the increased pipeline capacity arises due to the availability of oil from the Canadian tar sands." *Id.*

However, the Court made this finding before the administrative record was filed. The administrative record establishes the direct connection between the AC pipeline's transportation of 450,000 bpd of tar sands crude oil and the extraction of that oil.  The record shows that the existing crude oil pipeline export capacity from Canada's tar sands region is insufficient to accommodate the forecasted crude oil supply growth.  ACP125 (FEIS, 1-7).  Limits on infrastructure, such as pipelines, limit the expansion of tar sands oil extraction, while increased infrastructure increases the rapid development of Canadian tar sands.  MCEA DEIS Comments, Dkt. No. 131-1 at 25.  The record supports the conclusion that pipeline infrastructure expansions drive the development of tar sands in Canada.  The record includes Enbridge's own statements that the AC and SLD pipelines

are "to support the growth and development of the Canadian oil sands." ACP30007 (excerpt from Enbridge Website). *See also,* ACP3105 (MCEA FEIS Comments, July 2, 2009) ("Enbridge proposed the Alberta Clipper to…expand export opportunities for Canadian tar sands oil producers."); ACP19346 (Dogwood *et al.* Letter, Aug. 5, 2009) ( "[Alberta] Clipper will enable expanded tar sands production in Canada.").

Defendants' assertion that the extent of tar sands extraction is unrelated to the capacity and costs of transporting the resulting crude to refining centers and markets is illogical, unsupported by the record, and contrary to Enbridge's statement that the pipelines are "to support the growth and development of the Canadian oil sands." ACP30007. This assertion relies on the assumption that the tar sands crude would be transported and refined elsewhere—namely Asia—if the AC pipeline were not built. However, that is speculative and far in the future at best. Canada currently exports 70 percent of its production to the United States, and expects to export an additional 1.1 million bpd of heavy crude oil to the United States by 2015. ACP125. There is no pipeline to the West Coast that would enable the amount of Canadian tar sands crude that is shipped to the United States to be shipped directly to Asia. ACP19343-49. Only 300,000 bpd of tar sands crude flows from Alberta west, and only 10 percent of this is shipped to Asian markets. ACP19346. Expansions to that system have not been formally proposed and the Asian market is not developed to receive it. *Id.* Contrary to Defendants' contentions, the administrative record shows that "a number of tar sands companies have expressed skepticism about the prospects of exporting tar sands products to Asia, including Devon Energy, Canadian Oil Sands Trust (the largest shareholder in Syncrude, the largest tar sands producer), and Husky Energy." ACP19346.

In addition to the connection between the AC pipeline and extraction of the tar sands oil (and regardless of whether the tar sands crude were shipped to the United States or Asia), there is a close causal relationship between tar sands extraction and the SLD pipeline because adding diluent to the tar sands crude is necessary for transport of the crude oil.  As noted above, Enbridge states that the AC and SLD pipelines are "to support the growth and development of the Canadian oil sands."  ACP10238.  A report by the Canadian Association of Petroleum Producers, excerpted in the administrative record at ACP15174-93, makes "a strong connection between diluent from Upper Midwest refineries and the need for moving increased amounts of that diluent back to the tar sands in Alberta *to aid in increased extraction*, and…draws a line straight to increased refining in the US, especially the Upper Midwest *in connection with increased tar sands output and increased availability* through pipelines such as the Alberta Clipper Project."  ACP15171 (emphasis added).

Other courts have recognized the need to analyze trans-boundary impacts in similar situations.  In *Border Power Plan Working Group v. Dept. of Energy*, 260 F.Supp.2d 997 (S.D. Calif. 2003), the court held that the defendants were required to consider the trans-boundary impacts of certain power turbines in Mexico in an EIS on a transmission line from the turbines into the United States.  That was because the line was the only "current means" evidenced by the record through which the turbine could transmit its power, and the turbines and transmission lines were "two links in the same chain."  *Id.* at 1017.  Similarly, the U.S. tar sands pipelines are the only current means for shipping significant amounts of tar sands crude to market, and they are necessary links in the chain of extraction, shipping and refining of tar sands.  Shipping it to Asia is not a

"current" alternative.  ACP19346.

NEPA required Defendants to consider the impacts that the AC and SLD pipelines will have in Canada due to increased tar sands development.  *Gov't. of the Province of Manitoba v. Salazar*, 2010 WL 744713 (D.D.C. March 5, 2010).  Defendants refused, stating that "[t]he scope of this EIS is limited to matters within U.S. jurisdiction." ACP1027-28, 1031-33, 1036, 1043.  In *Gov't of Manitoba*, the court, relying on the CEQ's Guidance on NEPA Analyses for Transboundary Impacts (July 1, 1997),[16] held that the defendants were required to consider the impacts in Canada of their U.S. water supply project.  2010 WL 744713 *13 (citing *Swinomish Tribal Cmty. v. FERC*, 627 F.2d 499, 510-12 (D.C. Cir. 1980); *Wilderness Soc'y v. Morton*, 463 F.2d 1261, 1261-63 (D.C. Cir. 1972)).  Because the AC and SLD pipelines are causally related to extraction of tar sands crude in Canada, the Defendants are required to take a "hard look" at the impacts in Canada of extraction.

### 2. The FEIS fails to evaluate the effects of the project relative to alternative sources of energy

In *Mid-States Coalition for Progress*, the court invalidated an FEIS for a rail line transporting coal on the grounds that it failed to explore the indirect effects of the project on the market for alternative sources of energy that had lesser air quality impacts.  The court held:

> [T]he proposition that the demand for coal will be unaffected by an increase in availability and a decrease in price, which is the stated goal of the project, is illogical at best.  The increased availability of inexpensive coal will at the very least make coal a more attractive option to future entrants

---

[16] Available at http://ceq.hss.doe.gov/nepa/regs/transguide.html (last visited May 19, 2010), filed herewith as Exhibit 3 to Decl. of Sarah Burt in Support of Pls. Mot. for Summ. J.

into the utilities market when compared with other potential fuel sources, such as nuclear power, solar power, or natural gas. Even if this project will not affect the short-term demand for coal, which is possible since most existing utilities are single-source dependent, it will most assuredly affect the nation's long-term demand for coal as the comments to the DEIS explained.

*Mid-States*, 345 F.3d at 549.

*Mid-States* is analogous to the instant case. Both cases involve expanded transportation infrastructure for fuels that cause significant air and GHG emissions. Both involve a resulting increase in availability of that fuel. And in both cases the reviewing agency did not assess the impacts of the increased availability of the fuel on developing less-polluting alternative sources of energy, such as wind, solar, nuclear, or natural gas.[17]

In their comments on the DEIS, Plaintiffs specifically raised the issues of i) the impact of increased availability of tar sands crude on the availability of other sources of energy, MCEA DEIS Comments, Dkt. No. 131-1 at 28-29; and ii) the impacts of the use of tar sands-derived fuels compared to the impacts of using alternative sources of energy. *Id.*

Because these issues were raised during the comment period on the draft EIS, "federal regulations require that the agency respond to the proposal in the FEIS." *Mid-States*, 345 F.3d at 547 (citing 40 C.F.R. §1503.4). The agency may respond in a variety of ways. For example, it may "[s]upplement, improve, or modify its analyses,...[m]ake factual corrections, [or e]xplain why the comments do not warrant further agency

---

[17] *Mid-States* was primarily concerned with the use of coal in power generation. The FEIS states that the end use of tar sands crude transported by the AC pipeline "could include combustion (e.g., vehicles, power generation, or other industrial facilities)." ACP674 (FEIS, 4-400). Thus the alternatives for power generation discussed in *Mid-States* are pertinent in this case.

response."  *Id*.  However, Defendants did not supplement, modify or correct the FEIS to consider these issues, or adequately address them in the Response to Comments section of the FEIS.  Nor did Defendants make the findings required under 40 C.F.R. §1502.22(b) that would allow them to not include this analysis in the EIS because relevant information is incomplete or unavailable.

Regarding the effect of the availability of tar sands crude on the development of alternatives, Defendants' Response to Comments noted a fragment of Plaintiffs' comments but summarily concluded that there is no evidence that the pipeline "will itself" significantly reduce the price of petroleum products and increase the use of such products.  ACP1028 (FEIS App. A at A-230).[18]  *Mid-States* rejected similar reasoning— that the demand for coal would be unaffected by an increase in availability and a decrease in price—as "illogical at best."  345 F.3d at 549.  Moreover, even if that response were true, it does not address the fact that the pipeline will increase the long term supply and availability of oil and thus delay or inhibit the development of alternative sources of energy.

In addition, Defendants did not compare the end-use impacts of tar sands-derived fuels to the use of alternatives.  The FEIS concludes only that "emissions associated with

---

[18] The Fond du Lac Band also raised these issues, submitting a report entitled "How the Oil Sands Got to The Great Lakes Basin: Pipelines, Refineries and Emissions to Air and Water" (University of Toronto 2008).  ACP14243-44.  The report discusses how "continued reliance on oil might inhibit the development of alternative energy sources such as wind or solar power."  ACP14250.  Relying on a 2008 report from the U.S. Conference of Mayors, it further states that "continued production and purchase of these higher-carbon unconventional or synthetic fuels slows the United States' transition to clean, renewable energy sources."  *Id.*  Defendants ignored this issue in their response to the Fond du Lac Comments, citing only section 4.14.3.12 of the EIS, which compares emissions associated with tar sands crude to those of conventional oil, rather than comparing tar sands crude to alternative energy sources.  ACP662, 664, 668 (FEIS, 4-388, 4-390, 4-394).

the ultimate use of the refined product would not differ from those end use emissions

from *other source oils.*"  ACP275 (FEIS, 4-400) (emphasis added).  There is no

comparison to non-oil sources.  This is essentially the same approach that the 8th Circuit

found violated NEPA in *Mid-States*.  345 F.3d at 549-50.  Because Defendants "entirely

failed to consider an important aspect of the problem," their decision was arbitrary and

capricious.  *Motor Vehicle Mfrs.*, 463 U.S. at 43.

**D.    Defendants' Failure to Consider the Impacts of Abandonment of the Pipelines Violates NEPA**

The FEIS is also silent on end-of-life impacts, and does not evaluate mitigation

measures, such as financial assurance, that should be required of Enbridge to ensure the

safe closure of the pipelines and restoration of the land upon abandonment of the

pipelines, which the EIS projects will occur in approximately 50 years.  ACP203 (FEIS,

2-51).  The FEIS must assess the cumulative impacts of the project when added to "all

other past, present and reasonably foreseeable future actions regardless of what agency

(Federal or non-Federal) or person undertakes such other actions."  40 C.F.R. §1508.7.

"An impact is reasonably foreseeable if it is sufficiently likely to occur that a person of

ordinary prudence would take it into account."  *Arkansas Wildlife Federation v. ACE,*

431 F.3d 1096, 1102 (8th Cir. 2005).  Because the lifespan of a pipeline is finite, there is

no question that closure or abandonment of the AC and SLD pipelines will occur.  The

FEIS must therefore consider the impacts of abandonment.

In its PI Order, this Court held that Plaintiffs had not shown a likelihood of

success on the merits of this claim because "Enbridge has not submitted plans for

abandonment of pipeline facilities at the end of its operational life," PI Order at 31, and

"[a]bandonment plans would be submitted to the appropriate agencies for review and

approval prior to abandonment of the pipelines...and would be responsive to regulations that are in place at the time." *Id.* However, the fact that Enbridge and the "appropriate agencies" have not yet taken steps towards a "reasonably foreseeable"—indeed certain— action, does not exempt Defendants from complying with NEPA's requirement that such impacts be included in the FEIS.

Understanding the dangers of leaving steel pipe contaminated with crude oil and diluent chemicals buried in the ground at the end of the project's lifespan, and understanding the measures that Enbridge might implement to mitigate these dangers, is essential information for landowners whose land the pipeline will cross. If these dangers are not considered until after the project is completed, adoption of the "no action" alternative in order to avoid or minimize adverse impacts is precluded. This defeats the very purpose of NEPA, which is to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. §1500.1(b); *see also, Robertson*, 490 U.S. 332, 349 (1989) (NEPA "ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast.").

## CONCLUSION

For the foregoing reasons, the Alberta Clipper EIS violates NEPA and the NEPA regulations. Plaintiffs respectfully request that this Court grant Plaintiffs' motion for summary judgment and remand with instructions to Defendants to provide the environmental analysis NEPA requires.

Respectfully submitted,

Dated:  May 21, 2010

  /s/ Sarah H. Burt

SARAH H. BURT (admitted *pro hac vice*)
J. MARTIN WAGNER (admitted *pro hac vice*)
Earthjustice
426 17th Street, 6th Floor
Oakland, CA 94612
Tel.: (510) 550-6700
Fax: (510) 550-6740
sburt@earthjustice.org
mwagner@earthjustice.org

  /s/  Kevin Reuther

KEVIN REUTHER (Minn. Bar No. 266255)
Minnesota Center for Environmental Advocacy
26 E. Exchange St., Suite 206
St. Paul, MN  55101
Tel.: (651) 223-5969
Fax: (651) 223-5967
kreuther@mncenter.org

  /s/ Eric E. Huber

ERIC E. HUBER (admitted *pro hac vice*)
DOUGLAS P. HAYES (admitted *pro hac vice*)
Sierra Club Environmental Law Program
1650 38th Street, Suite 102W
Boulder, Colorado 80301
Tel.: (303) 449-5595
Fax: (303) 449-6520
eric.huber@sierraclub.org
doug.hayes@sierraclub.org

*Attorneys for Plaintiffs*