# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Sierra Club; Minnesota Center for
Environmental Advocacy; Indigenous
Environmental Network; and National
Wildlife Federation,

Civil No. 09-2622 (DWF/RLE)

                    Plaintiffs,

v.

**MEMORANDUM
OPINION AND ORDER**

Hillary Clinton, in her official capacity as
Secretary of State; James Steinberg, in his official
capacity as Deputy Secretary of State; United States
Department of State; Lieutenant General Robert L.
Van Antwerp, in his official capacity as U.S. Army
Chief of Engineers and Commanding General of
U.S. Army Corps of Engineers; Colonel Jon L.
Christensen, in his official capacity as District
Engineer and Commander of the U.S. Army Corps
of Engineers; the United States Army Corps of
Engineers; Tom Tidwell, in his official capacity as
Chief of the United States Forest Service; Rob Harper,
in his official capacity as Forest Supervisor for the
Chippewa National Forest; and the United States
Forest Service,

                    Defendants,

and

Enbridge Energy, Limited Partnership,

                    Defendant-Intervenor.

_____

Douglas P. Hayes, Esq. and Eric E. Huber, Esq., Sierra Club Environmental Law
Program; J. Martin Wagner, Esq. and Sarah H. Burt, Esq., Earthjustice; and Kevin
Reuther, Esq., Minnesota Center for Environmental Advocacy, counsel for Plaintiffs.

Luther L. Hajek, Esq., U.S. Department of Justice; Chad A. Blumenfield, Assistant United States Attorney, United States Attorney's Office, counsel for Defendants.

Daniel J. Herber, Esq., and Bruce G. Jones, Esq., Faegre & Benson LLP; David H. Coburn, Esq., and Sara Beth Watson, Esq., Steptoe & Johnson LLP, counsel for Defendant-Intervenor.

_____

## INTRODUCTION

Plaintiffs Sierra Club, Minnesota Center for Environmental Advocacy ("MCEA"), Indigenous Environmental Network, and National Wildlife Federation (together, "Plaintiffs") brought this action against the United States Department of State ("State Department"); Hillary Clinton, in her official capacity as Secretary of State; James Steinberg, in his official capacity as Deputy Secretary of State; the United States Army Corps of Engineers (the "Corps"); Lieutenant General Robert L. Van Antwerp, in his official capacity as U.S. Army Chief of the Corps; Colonel Jon L. Christensen, in his official capacity as District Engineer and Commander of the U.S. Army Corps of Engineers; the United States Forest Service ("Forest Service"); Tom Tidwell, in his official capacity as Chief of the Forest Service; and Rob Harper, in his official capacity as Forest Supervisor for the Chippewa National Forest (collectively, "Defendants"). Enbridge Energy ("Enbridge") intervened in the action. Plaintiffs claim that Defendants violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq*., and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, when they issued their final Environmental Impact Statement ("EIS") and permits for the Alberta Clipper Pipeline ("AC Pipeline") and Southern Lights Diluent Pipeline ("SLD Pipeline") projects. The parties have filed cross-motions for summary judgment on Plaintiffs' NEPA claims. For

the reasons set forth below, the Court denies Plaintiffs' motion for summary judgment and grants Defendants' and Enbridge's motions for summary judgment.

## BACKGROUND

This case involves the construction and operation of the AC and SLD Pipelines in the United States. These pipelines are being constructed by Enbridge as part of a pipeline expansion project. The AC Pipeline is an underground pipeline that extends from Hardisty, Alberta, Canada, to Superior, Wisconsin. The AC Pipeline crosses the U.S.-Canada border near Neche, North Dakota.

In the United States, the AC Pipeline consists of approximately 326 miles of a 36-inch diameter pipeline extending from Neche, North Dakota, across Minnesota, to Superior, Wisconsin. At Superior, the AC Pipeline will connect with an existing mainline to Chicago, Illinois. The AC Pipeline will transport heavy crude oil, or bitumen, extracted from tar sands in Canada. The AC Pipeline project will have the capacity to transport approximately 450,000 barrels-per-day ("bpd") of crude oil. (App. of Admin. Record Materials for the Alberta Clipper Pipeline ("ACP") at 119.) The AC Pipeline will be installed primarily within or adjacent to an existing Enbridge pipeline corridor. (*Id.*)

The SLD Pipeline is a 20-inch diameter pipeline extending from Manhattan, Illinois, to Clearbrook, Minnesota. At Clearbrook, it will connect with an existing Enbridge pipeline, Line 13. (ACP at 146-47.) Enbridge intends to reverse the flow of Line 13 to create a diluent delivery line to transport diluent from Illinois to Canadian oil sands producers. Diluent is a light petroleum liquid used to facilitate the flow of heavy

3

crude oil, which must be diluted in order to be transported through a pipeline.  (*Id*.)  The new segment of the SLD Pipeline that will run from Superior, Wisconsin, to Clearbrook, Minnesota, will also be "installed primarily within or adjacent to the existing Enbridge pipeline corridor" and will be constructed at the same time as the AC Pipeline.  (*Id*. at 146-147.)

In May 2007, Enbridge submitted an application for a Presidential Permit to construct and operate the AC Pipeline.  (*Id*. at 27.)  This permit was required because the pipeline expansion involved construction on the U.S.-Canada border.  The State Department conducted an environmental review, during which it published a Notice of Intent to Prepare an EIS and to Conduct Supplemental Scoping in the Federal Register; conducted public meetings in North Dakota, Minnesota, and Wisconsin; accepted and reviewed public comments on its Draft Environmental Impact Statement ("DEIS"); and consulted with Indian tribes and several federal and state agencies, including the Corps, the U.S. Environmental Protection Agency, and the U.S. Fish and Wildlife Service.  (*Id*. at 45.)  The State Department published its Notice of Availability of the Final EIS ("FEIS") and request for public comments in the Federal Register.  (*Id*.)

On August 3, 2009, Deputy Secretary of State James Steinberg signed a Record of Decision ("ROD") and National Interest Determination and Presidential Permit, indicating the State Department's intent to issue a Presidential Permit to Enbridge (the "Permit").  The Permit grants Enbridge permission "to construct, connect, operate, and maintain pipeline facilities at the border of the United States and Canada at Neche,

North Dakota, for the transport of crude oil and other hydrocarbons between the United

States and Canada."  (*Id*. at 18.)

> The Summary of the State Department ROD states in part:
>
> DOS has determined, through review of the Alberta Clipper Project
> application, that the Alberta Clipper Project would serve the national
> interest, in a time of considerable political tension in other major oil
> producing regions and countries, by providing additional access to a
> proximate, stable, secure supply of crude oil with minimum transportation
> requirements from a reliable ally and trading partner of the United States
> with which we have free trade agreements that further augments the
> security of this energy supply.

(*Id*. at 24-25.)  The State Department ROD goes on to explain that the construction and

operation of the AC Pipeline serves the national and strategic interests of the United

States by "increas[ing] the diversity of available supplies among the United States'

worldwide crude oil sources in a time of considerable political tension in other major oil

producing countries and regions," shortening the transportation pathway for crude oil

imports, "increas[ing] crude supplies from a major non-Organization of Petroleum

Exporting Countries producer which is a stable and reliable ally and trading partner with

the United States," and providing additional supplies of crude oil to make up for declines

in imports from other suppliers.  (*Id*. at 47.)  On August 20, 2009, the State Department

issued the Permit.

Enbridge also obtained permits from the Corps under the Clean Water Act and

River and Harbors Act because both the AC Pipeline and the SLD Pipeline cross

wetlands and waters of the United States.  On June 11, 2009, the Corps issued Enbridge a

permit for the North Dakota portion of the AC Pipeline, and, on August 24, 2009, the

Corps issued Enbridge permits allowing the AC Pipeline and the SLD Pipeline to be constructed in Minnesota and Wisconsin.  (App. of Admin. Record Materials, Corps of Engineers ("COE") at 1-87.)  The Corps issued a Record of Decision ("Corps ROD"), relying on the AC Pipeline DEIS, the FEIS, and additional information that addressed potential impacts on wetlands and waterbodies.  (COE at 7379-7411.)

The AC Pipeline and SLD Pipeline also cross the Chippewa National Forest ("CNF") in Minnesota.  Enbridge applied for an amendment to an existing Special Use Authorization permit and for a Temporary Construction Special Use Permit from the Forest Service, seeking allowance to construct the two pipelines in the CNF.  (App. of Admin. Record Materials, Forest Service ("DOS") at 9063.)  The Forest Service issued a Record of Decision for the AC Pipeline and SLD Pipeline projects.  (DOS at 9061-9086.)  The CNF and the Leech Lake Band of Chippewa jointly completed an Environmental Assessment ("EA") of the impacts of the expansion of the AC and SLD Pipelines through the CNF.  (ACP at 2522-2693.)  The final EA was issued and published as an appendix to the State Department FEIS. The Forest Service subsequently issued the permits to Enbridge.

In their First Amended Complaint,[1] Plaintiffs challenge the issuance of three sets of permits under NEPA:  (1) the State Department's issuance of the Permit for the

---

[1]     Plaintiffs previously moved for a preliminary injunction.  The Court denied that motion in a Memorandum Opinion and Order dated February 3, 2010.  (Doc. No. 183.)  In addition, both Defendants and Enbridge previously moved to dismiss Plaintiffs' First Amended Complaint.  The Court granted those motions in part, dismissing Plaintiffs'

(Footnote Continued on Next Page)

construction and operation of the AC Pipeline; (2) the Corps' permits allowing Enbridge to dredge and fill wetlands and place structures underwater in the construction of the AC Pipeline and the SLD Pipeline; and (3) the Forest Service's special permits allowing Enbridge to construct and operate the AC Pipeline and SLD Pipeline in the CNF.

## DISCUSSION

### I.     Legal Standard and Scope of Review under the APA and NEPA

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank*, 92 F.3d at 747.  The nonmoving party must demonstrate the existence of specific facts in

_____

(Footnote Continued From Previous Page)

Fifth and Sixth Claims for relief, and denied the motions with respect to Plaintiffs' First through Fourth Claims for Relief.  (Doc. No. 185.)

the record that create a genuine issue for trial.  *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

Plaintiffs' claims are asserted under the APA.  The Court's review under the APA gives agency decisions a high degree of deference.  *Sierra Club v. Envtl. Prot. Agency*, 252 F.3d 943, 947 (8th Cir. 2001).  The Court must affirm an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  *See also Sierra Club v. Envtl. Prot. Agency*, 252 F.3d at 947; *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).  The Court considers whether Defendants considered the relevant factors and whether they made a "clear error of judgment."  *Motor Vehicles*, 463 U.S. at 43.  An agency's rule is arbitrary and capricious if it:  (1) relied on factors Congress did not intend it to consider; (2) "entirely failed to consider an important aspect of the problem"; (3) offered an explanation that runs counter to the evidence before the agency; or (4) "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id*.

NEPA requires federal agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  An EIS must contain a "detailed statement" on the environmental impact of the proposed action, any unavoidable adverse environmental effects of the proposed action, the

resource commitments involved in the proposed action, and alternatives to the proposed

action.  *Id.*; *see also Kleppe v. Sierra Club*, 427 U.S. 390, 401-02 (1976).  NEPA imposes

procedural requirements, not substantive results, on agencies.  *Robertson v. Methow*

*Valley Citizens Council*, 490 U.S. 332, 351 (1989) (NEPA prohibits uninformed, not

unwise, agency action).  NEPA does not allow a court to substitute its judgment for that

of an agency as to the environmental consequences of the agency's actions.  A court's

review is to "insure that the agency has taken a 'hard look' at the environmental

consequences."  *Kleppe*, 427 U.S. at 410 n.21.

## II.    Motions for Summary Judgment[2]

Plaintiffs assert that the environmental review for the AC Pipeline project violates

NEPA[3] in four fundamental ways:  (1) failing to include a valid statement of purpose and

need and to consider reasonable alternatives, including a "no-action" alternative;

(2) failing to evaluate the impacts of the SLD Pipeline; (3) failing to assess reasonably

foreseeable indirect and cumulative impacts of the AC Pipeline; and (4) failing to

---

[2]     Defendants submit that the issuance of the Presidential Permit for the AC Pipeline
was a discretionary act of the President and not reviewable by this Court.  The Court
previously rejected this argument and held that the State Department's FEIS constitutes a
final agency action reviewable by this Court under the APA.  (Doc. No. 185 at 14.)  The
Court will not depart from that ruling.

[3]     Plaintiffs' NEPA claims are asserted in their First through Fourth Claims for
Relief against the State Department, the Corps, and the Forest Service.  The Corps and
the Forest Service were cooperating agencies with respect to the AC Pipeline FEIS
prepared by the State Department.  Thus, to the extent that the Corps and Forest Service
rely on the State Department's FEIS, the Court's analysis of that FEIS is relevant to
Plaintiffs' NEPA claims against the Corps and Forest Service.

consider the impacts of abandonment of the AC Pipeline.  The Court considers each in turn.[4]

## A.    Stated Purpose and Need for the AC Pipeline

Plaintiffs assert that the State Department failed to provide an accurate statement of purpose and need because it relied on an incorrect assumption that U.S. demand for additional "unconventional" crude oil from Canada necessitated the development of AC and SLD Pipelines.  Plaintiffs assert that the incorrect assumption led to a narrowly defined statement of purpose and need and that the FEIS then failed to consider reasonable alternatives.

An EIS must "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13.  The agency conducting the EIS "bears the responsibility for defining at the outset the objectives of an action" and "must look hard at the factors relevant to the definition of purpose."  *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991).  The EIS must also "'[r]igorously explore and objectively evaluate' all reasonable alternatives, but it need only 'briefly discuss' the reasons why other alternatives were eliminated from more detailed study."  *City of Bridgeton v. FAA*,

---

[4]    Plaintiffs assert several additional claims in their Amended Complaint that were addressed in connection with Plaintiffs' Motion for Preliminary Injunction.  Based on Plaintiffs' representations to the Court and their proposed order, it appears that Plaintiffs intended to move for full summary judgment as opposed to a partial adjudication of their claims.  Therefore, the Court finds that any claims not specifically raised by Plaintiffs in the current motion have been abandoned.

212 F.3d 448, 455 (8th Cir. 2000) (citing 40 C.F.R. § 1502.14).  "[A] detailed statement

of alternatives cannot as a practical matter 'include every alternative device and thought

conceivable by the mind of man.'"  *Id.* (citation omitted).  The Court reviews an agency's

selection of the alternatives to be fully discussed in an FEIS under a "rule of reason."  *Id.*

(citations omitted).

>    In the FEIS, the State Department's stated purpose reads as follows:
>
>    The overall purpose of the Alberta Clipper Project is to transport additional
>    crude oil into the United States and eastern Canada from existing Enbridge
>    facilities in western Canada to meet the demands of refineries and markets
>    in those areas.  Enbridge has proposed the Project to (1) meet the increased
>    demand for heavy crude oil by refiners in the United States and offset
>    decreasing domestic crude oil supply from some regions of the
>    United States that have traditionally served refineries in [District II—the
>    U.S. Midwest]; (2) reduce U.S. dependence on oil obtained from outside of
>    North America by increasing access to more stable and secure Canadian
>    crude oil supplies; and (3) meet demonstrated shipper interest in an overall
>    Enbridge system expansion.

(ACP at 120.)

Plaintiffs assert that the stated purpose and need for the AC Pipeline project—

namely, to meet a projected increase in demand for Canadian petroleum-based fuels—is

based on erroneous assertions that there is anticipated demand in the United States for the

additional heavy crude that Enbridge will be transporting.  In particular, Plaintiffs assert

that there is no evidence in the administrative record that the demand for domestic crude

oil necessitates building the AC Pipeline.  Plaintiffs contend that the federal forecasts

cited in the FEIS actually contemplate *increased* domestic production and *decreased*

demand for Canadian crude imports.

Plaintiffs' challenge centers on the contention that there is no evidence of additional demand or decreasing domestic crude oil supply so as to justify one of the stated purposes for the AC Pipeline.  The Court notes that the stated purpose for the AC Pipeline to which Plaintiffs object is actually, in part, to "meet the increased demand for heavy crude oil by refiners in the United States and offset decreasing domestic crude oil supply from some regions of the United States that have traditionally served refineries in [District II—the U.S. Midwest]."  (*Id*.)

The FEIS notes that approximately 75 percent of Canadian crude oil currently imported to the United States is delivered to refineries in the Midwest and that at least fifteen refineries capable of refining heavy crude oil are already connected to Enbridge's pipeline infrastructure.  (*Id*. at 664, 668.)  In addition, the FEIS explains that because those fifteen refineries in District II are directly or indirectly connected to the Enbridge pipeline infrastructure, they could theoretically receive oil from the AC Pipeline.  (*Id*. at 668.)  The FEIS notes that, in general, these fifteen refineries are capable of receiving and refining substantial volumes of heavy crude oil, including tar sands oil from Canada. (*Id*.)  The FEIS also notes that some existing refineries have plans to expand their capacity to process heavy crude oil from Canada.  (*Id*. at 664-673.)  Three existing Midwest refineries, alone, are increasing their overall capacity for refining heavy crude oil by an amount greater than the capacity of the AC Pipeline.  (*Id*. at 669.)[5]

---

[5]    In addition, the administrative record includes Enbridge's Presidential Permit application, in which Enbridge clearly asserts that its existing system could not

(Footnote Continued on Next Page)

The FEIS also discusses crude oil supply and demand in the U.S. market, the world crude oil supply, the Western Canadian Sedimentary Basin ("WCSB") crude oil supply, and pipeline capacity from the WCSB. The FEIS relies on reports such as the U.S. Energy Information Administration's ("EIA") Annual Energy Outlook 2009 ("AEO 2009") (*id.* at 41477-41705), the 2006 Canadian National Energy Board ("CNEB") Energy National Assessment (*id.* at 31555-31639), and the June 2007 Canadian Association of Petroleum Producers ("CAPP") Report on Crude Oil Forecast, Markets, and Pipeline Expansions (*id.* at 41430-41476). These reports contain estimates of U.S. energy consumption, production of heavy crude oil from the Canadian tar sands, and markets for oil from the Canadian tar sands. (*Id.* at 122-125.)

The AEO 2009 report projects that total U.S. demand for oil is expected to be constant, growing a projected 1 million bpd between 2007 and 2030. (*Id.* at 41486-41487.) The report also projects that "unconventional" heavy crude oil from Canada (mainly from Western Canada) will supply more of the U.S. demand for oil, with a projected increase from 1.23 million bpd to 4.3 million bpd by 2030. (*Id.* at 41632 & 122 ("[T]he EIA projects that the balance between domestic supply and demand will require the 'unconventional' oil supply from Canada, which is predominately heavy crude from

---

(Footnote Continued From Previous Page)

accommodate the growth of oil production in Western Canada given the demand in the Midwest and Eastern Canada. (ACP at 29203-29204.)

reserves in western Canada, to grow from approximately 1.5 million bpd in 2008 to over 4.3 bpd by 2030.").)[6]

The FEIS also discusses potential negative impacts on the world oil supply, and specifically on suppliers of crude oil to the United States.  For example, the FEIS notes that attempts to increase capacity could be "negatively affected by shortages of skilled personnel and equipment, regulatory delays, cost inflation, and higher decline rates at existing fields."  (*Id.* at 123.)  In addition, the FEIS notes that "several of the top suppliers of crude oil to the United States are experiencing political instability and other problems that threaten oil production and export from those countries."  (*Id.*)  With this background on world supply, the FEIS explains that the oil sands located in the WCSB contain over 170 billion barrels of recoverable oil reserves, the second largest recoverable oil reserve behind Saudi Arabia.  (*Id.* at 124.)  The 2006 CNEB Assessment reports forty-six existing and proposed oil sands development projects.  (*Id.* at 124, 31578.)  The 2006 CNEB Assessment also projects an increase in crude production in the WCSB (an increase from 2.4 million bpd in 2007 to 3.9 million bpd in 2015) due to the rapid growth of oil sands production, and that "an additional 1.1 million bpd of heavy crude oil will be flowing from the basin to the United States by 2015."  (*Id.* at 124, 125.)

---

[6]      Plaintiffs point to a chart in an early release of the AEO 2009 Report to argue that U.S. dependence on imported oil will actually decrease because consumption will decrease while domestic supply will increase.  The chart, however, does not provide information on imported crude oil from Canada, and is therefore of limited value.

The FEIS also cites to reports that project a pipeline capacity shortfall based on projected growth in the production of Canadian heavy crude.  In particular, the 2007 CAPP Report states that the pipeline capacity for shipping heavy crude to the Midwest and PADD III is 1.3 million bpd.  (*Id*. at 125.)  The 2006 CNEB Report, however, projects that an additional 1.1 million bpd will flow to the United States by 2015 and exports of heavy crude oil to the United States will exceed pipeline capacity by 2009. (*Id*. at 125.)

Plaintiffs take issue, in particular, with the FEIS's reliance on reports that forecast Canadian heavy crude oil *production*.  Plaintiffs claim that the Canadian production forecast is irrelevant to this issue of U.S. demand or U.S. imports.  Plaintiffs assert that they pointed out this error in the State Department's analysis in their comments to the DEIS and FEIS, but that the State Department repeated the error in the ROD and to this Court.  Plaintiffs also assert that data from the AEO 2009 report actually projects that U.S. demand for imported crude oil will decline and that crude oil imports from Canada will decrease between the present and 2030.

Plaintiffs' arguments fail for several reasons.  First, the reports relied on in the FEIS, as discussed above, provide ample evidence to support the conclusion that U.S. demand for heavy crude oil from Canada will increase.  Second, while Plaintiffs cite to annual national crude oil demand forecasts, these forecasts do not necessarily address the issue of market demand of Enbridge's customers and pipeline capacity shortfall.  In particular, even if a particular forecast shows a decline in nationwide crude oil demand over the next several years, it does not necessarily demonstrate that additional pipeline

capacity is not needed to meet demand for the supply of heavy crude oil from Canada to certain regions. The FEIS supports the existence of a demand for crude oil that is being driven at least in part by the expanded capacity of Midwest refineries to process heavy crude oil imported from Canada. The reports relied on in the FEIS do *not* demonstrate that Enbridge has the capacity to transport the supply of oil from the Canadian tar sands to the Midwest refineries without the AC Pipeline.

The second stated purpose of the AC Pipeline is to reduce U.S. dependence on less stable crude oil suppliers by increasing access to Canadian crude oil supplies. Indeed, the State Department notes in the FEIS that much of the heavy crude oil currently supplied to the U.S. refineries is from relatively unstable and insecure foreign sources. The State Department concluded that crude oil transported through the AC Pipeline would replace or supplement a portion of the heavy crude oil being supplied by unstable sources and would "serve the national interest by providing U.S. refineries access to secure, reliable and economic sources of growing crude oil supplies." (*Id.* at 122.) The AC Pipeline would increase the diversity of available supplies of crude oil sources and would allow the United States to increase non-OPEC crude oil supplies and take advantage of a shorter transportation pathway. (*Id.* at 47.)

The third stated purpose is aimed at meeting shipper interest in an overall Enbridge system expansion. Enbridge's Permit Application explains:

> The Alberta Clipper has been developed in consultation with western Canadian producers seeking increased capacity out of the WCSB and into the traditional and extended PADD II [Midwest], and eastern Canada markets. Additionally, through interconnects with other pipeline systems, this production may be transported to the vast refining centers of the Gulf

> Coast Region.  Enbridge investigated a number of alternatives before
> determining that the Alberta Clipper Project provided the most economical,
> integrated transportation solutions available to the industry while ensuring
> flexible and scaleable incremental capacity out of the WCSB.
> . . .
>
> Once integrated with the Enbridge Mainline System, the Alberta Clipper
> Project provides the additional capacity needed to satisfy its shippers'
> requirements, while also providing increased flexibility to meet supply
> forecasts and accommodate changing crude oil slates over time.

(*Id.* at 29201-202.)  Plaintiffs do not cite to record evidence to demonstrate that meeting

shipper interest is not a valid purpose, but instead asks the Court to take judicial notice of

and consider a recent filing with the Federal Energy Regulatory Commission ("FERC")

by a Canadian oil sands producer, Suncor (the "Suncor Petition").  The Suncor Petition,

however, is an adversarial document that is not part of the administrative record on the

permitting of the AC Pipeline.  Indeed, the Suncor petition was filed in January 2010,

months after the close of the relevant administrative record.  Plaintiffs have not

demonstrated the existence of any circumstances that might warrant supplementation of

the record to include the Suncor Petition.  *See Newton County Wildlife Assoc. v. Rogers*,

141 F.3d 803, 807 (8th Cir. 1998) ("APA review of an agency action is normally

confined to the agency's administrative record.").  *See also Voyageurs Nat'l Park Ass'n

v. Norton*, 381 F.3d 759, 766 (8th Cir. 2004) (explaining that the administrative record

may be supplemented only under "extraordinary circumstances").  Accordingly,

Plaintiffs' request for judicial notice is denied and the Court declines to consider the Suncor Petition.[7]

Based on the information in the FEIS, the Court concludes that Defendants took a "hard look" at the factors relevant to the stated purpose for the AC Pipeline project. The FEIS is well supported by evidence that demonstrates the need for the AC Pipeline to transport heavy crude oil from Western Canada to refineries in the Midwest, to secure a reliable and stable source of heavy crude oil for the United States, and to meet shipper interest in increased pipeline capacity. Defendants, therefore, did not act arbitrarily or capriciously in defining the stated purpose and need for the AC Pipeline project.

---

[7]    Plaintiffs also filed a Motion for Leave to File Supplementary Material asking the Court to consider a July 16, 2010 EPA Comment Letter on the Keystone XL Draft EIS, wherein an EPA Assistant Administrator states that additional information and analysis is needed on certain topics related to the Keystone XL project. Plaintiffs contend that the EPA letter is relevant even though it relates to a different pipeline project because that project is similar in purpose and function to, and part of a larger expansion program involving, the AC Pipeline. Specifically, Plaintiffs contend that the EPA letter expresses concern about deficiencies in the Keystone XL Draft EIS that are similar to the alleged deficiencies in the AC Pipeline FEIS. The Court denies Plaintiffs' request, as the EPA letter was not part of the administrative record that was before the Defendants when they made their decisions with respect to the AC Pipeline FEIS. For the same reasons, the Court declines to consider the Declaration of Julia May (Doc. No. 104) and certain Congressional letters attached to the July 14, 2010 Declaration of Sarah H. Burt. (Doc. No. 243.)

### B.   Consideration of Alternatives

Plaintiffs argue that as a result of the inaccurate statement of purpose, the FEIS fails to consider and evaluate other reasonable alternatives.  Plaintiffs contend that the Defendants' misunderstanding of U.S. demand forecasts for Canadian crude oil compromised the evaluation of alternatives, and in particular, the "no action" alternative. In addition, Plaintiffs contend that the FEIS contains no discussion or analysis of renewable fuels and conservation as an alternative to the AC Pipeline project.

In an EIS, an agency must "[r]igorously explore and objectively evaluate all reasonable alternatives."  40 C.F.R. §1502.14(a).  For alternatives that were eliminated from a detailed study, the agency must only "briefly discuss the reasons for their having been eliminated."  *Id*.  *See also City of Bridgeton*, 212 F.3d at 455.  The court reviews an agency's choice of the alternatives to discuss and the extent to which the EIS must discuss them under the 'rule of reason.'"  *Friends of the Boundary Waters v. Dombeck*, 164 F.3d 1115, 1128 (8th Cir. 1999) (citation omitted).

First, as explained above, Plaintiffs have not demonstrated that the State Department acted arbitrarily or capriciously in defining the need for the AC Pipeline--to transport heavy crude oil from Western Canada to refineries in the Midwest, to secure a reliable and stable source of heavy crude oil for the United States, and to meet shipper interest in increased pipeline capacity.  Thus, the State Department appropriately used that stated purpose and need when it evaluated reasonable alternatives to the AC Pipeline.

Section 3 of the FEIS discusses and analyzes alternatives to the AC Pipeline project.  The FEIS describes several alternatives, including no action (assuming the AC

19

Pipeline is not built), system alternatives (considering other methods for providing crude

oil supplies to the Midwest markets and beyond), major route alternatives (assessing the

feasibility of other pipeline routes for transporting crude oil from Neches, North Dakota,

to Superior, Wisconsin), route variations (evaluating relatively short alternative routes to

avoid or minimize impacts to specific features), aboveground facility alternatives

(considering other locations for siting pump stations), and Superior Terminal expansion

alternatives (describing alternative sites for expansion of the Superior Terminal).  (ACP

at 209-274.)

Plaintiffs assert that the State Department should have adopted a "no action"

alternative because there is no record to support the contention that future U.S. demand

requires additional imports of Canadian heavy crude.  As discussed above, the record

supports the stated purposes and need for the AC Pipeline.  With respect to the "no

action" alternative, the State Department explained:

> If the No Action Alternative is implemented, refiners would seek other
> means of obtaining the heavy Canadian crude oil, or attempt to obtain
> additional supplies from less stable and less reliable sources.  This could
> involve actions such as constructing other pipelines to transport crude oil
> from the Canadian oil sands into the United States or increasing overseas
> import of heavy crude oil by tanker, rail, or truck, which may also require
> new pipelines or expansion of existing pipeline systems.

(*Id*. at 211.)  The Court concludes that State Department had sufficient record

evidence to support its conclusion that adopting a "no action" alternative would

not meet the purpose and need for the AC Pipeline project.  (*Id*. at 210-11.)

As to the issue of whether the FEIS adequately discussed the alternative of

reliance on energy conservation and sources of renewable energy sources, the Court notes

again that the record supports the stated purpose and need for the AC Pipeline—which

was in part to meet increased demand for heavy crude by refiners in the United States.

With respect to energy conservation and renewable energy as possible alternatives, the

FEIS states:

> Energy conservation and renewable energy have been identified as
> potential alternatives to the proposed Project.  Energy conservation alone
> cannot reasonably offset the demand for oil or other forms of energy for
> end users that ultimately would be served the proposed Project.
> Consequently, it cannot negate the need for the Project.  Although energy
> conservation and efficiency measures are important elements in addressing
> future energy demands for the Midwest market, current and projected
> participation in energy conservation and efficiency measures will reduce
> the energy demands by a small fraction of the projected energy demand
> within the foreseeable future.  Renewable energy sources, including wind
> and solar power, will increasingly play an important role in power
> generation for the Midwest market, especially as it related to electrical
> demand.  However, these sources represent a small fraction of the
> projected energy demands for the market for the foreseeable future,
> especially related to providing refined petroleum products for the
> transportation sector.

(*Id*. at 211.)  Plaintiffs argue that this explanation is conclusory and does not meet

NEPA's requirements to rigorously explore all reasonable alternatives.  Plaintiffs also

argue that the Defendants did not take a "hard look" at whether future U.S. consumer

demand for liquid fuels could be met through the reliance on energy conservation and

sources of renewable energy sources.

The FEIS explains that energy conservation alone cannot offset the U.S. demand

for oil and that renewable sources of energy, while playing an increasing important role

in power generation in the Midwest, present a small fraction of projected energy demands

for the Midwest market.  This analysis is supported by the AEO Report 2009, which was

considered during the environmental review.  (*Id.* at 41487-88, 41593.)  Agencies are not

required to consider unreasonable alternatives, or alternatives that do not fulfill the

purpose of the project.  *See City of Richfield v. FAA*, 152 F.3d 905, 907 (8th Cir. 1998);

*Sierra Club North Star Chapter v. LaHood*, 693 F. Supp. 2d 958, 988 (D. Minn. 2010).

The record supports the determination that mere reliance on energy conservation and

renewable energy is not a reasonable alternative because it would not fulfill the purpose

of the AC Pipeline.

Based on the record, the Court concludes that Defendants' analysis is sufficient to

demonstrate that the agencies took a "hard look' at and discussed an appropriate range of

alternatives.

### C.    Impacts of the SLD Pipeline

Plaintiffs assert that the FEIS does not adequately analyze the potential

environmental impacts of the SLD Pipeline.  Plaintiffs contend that Defendants failed to

take a "hard look" at the impacts of diluent leaks and spills during the operation of the

SLD Pipeline, which will transport diluent to oil sands producers in Canada.  Plaintiffs

assert that diluent has different chemical and physical properties than heavy crude oil and

that the FEIS fails to identify how the chemicals in diluent will react if released into the

environment.  In addition, Plaintiffs argue that the Forest Service and the Corps each

permitted the SLD Pipeline directly and were required to do a full review of the impacts

of the SLD Pipeline.  Finally, Plaintiffs assert that the State Department improperly

segmented the AC and SLD Pipelines and improperly omitted the SLD Pipeline from the

scope of the AC Pipeline FEIS.

### 1.   Diluent Leaks and Spills

The FEIS addresses the impacts of spills associated with the operation of both the

AC Pipeline and the SLD Pipeline.  In particular, those impacts are addressed in the

Forest Service's EA attached to the FEIS at Appendix U (ACP at 2522-2693);

Enbridge's Spill Prevention, Containment, and Control Plan, attached as Appendix E (*id*.

at 1574-1591); and Enbridge's Pipeline Integrity and Emergency Response Measures),

attached as Appendix Q (*id*. at 1978-1985).  The FEIS also notes that the U.S.

Department of Transportation, Pipeline and Hazardous Materials Safety Administration

("PHMSA"), Office of Pipeline Safety ("OPS") is responsible for monitoring the

operation of liquid hydrocarbon pipeline systems in the United States.  (*Id*. at 130.)  In

addition, the FEIS explains that Enbridge has an Emergency Response Plan ("ERP") for

its pipeline system that was approved by PHMSA.  Enbridge has also submitted an ERP

for the AC Pipeline and SLD Pipeline that is subject to review and approval by OPS prior

to the pipelines becoming operational.  (*Id*. at 199, 622.)  The requirements of the ERP

are summarized in Appendix Q to the FEIS.  (*Id*. at 1978-1985.)

The FEIS addresses spills and leaks from both the AC and SLD Pipelines.  In

particular, the Enbridge Spill Prevention, Containment, and Control Plan for the Alberta

Clipper and Southern Lights Diluent Pipeline Projects "describes planning, prevention

and control measures to minimize impacts resulting from spills of fuels, petroleum

products, or other regulated substances as a result of construction."  (*Id*. at 1578.)  The

ERP contains requirements regarding spill prevention, storage and handling of fuels and

hazardous liquids, spill management, notification responsibilities, sill containment and

cleanup, and storage and disposal of contaminated materials.  The FEIS also includes

Enbridge's Petroleum-Contaminated Soil Management Plan and Pipeline Integrity and

Emergency Response Measures for the AC and SLD Pipelines.  (*Id*. at 1976-1807, 1980-

1985.)

The FEIS recognizes that transportation of oil, both crude and refined products,

involves some risk.  (*Id*. at 621.)  The FEIS addresses the reliability and safety of the AC

Pipeline and provides information on safety standards, spill history, potential spills, spill

impacts, and mitigation of spills.  With respect to spill impacts, the FEIS discusses

potential impacts of a spill involving *all* types of hydrocarbons (including diluent).  For

example, the FEIS discusses impacts to geological features, soils, water resources,

biological resources, wildlife, land-use, socioeconomics, cultural resources, and air.  (*Id*.

at 621-651.)  As to mitigation, the FEIS discusses both construction spills and operation

spills.  (*Id*. at 630, 647-648.)  As to operation leaks, the FEIS explains that Enbridge

would incorporate operation of the AC Pipeline to its existing operations monitoring

program, including Enbridge's existing Supervisory Control and Data Acquisition

("SCADA") system, its system for small leak detection, the Enbridge Control Center,

right-of-way inspections and monitoring, training, and public awareness.  The SCADA

system includes pipeline sensing devices, remote computers at each pump station, real-

time communications, and automated alarms.  (*Id*. at 198, 648-649.)  To detect smaller

releases, Enbridge operates a similar system to SCADA that can monitor smaller

deviations in flow.  (*Id*.)  The FEIS also discusses maintenance procedures designed to

avoid accidental releases.  (*Id*.)  The EA for the AC Pipeline and the SLD Pipeline,

specifically considers the impact of spills and leaks in connection with the AC Pipeline and the SLD Pipeline in the Leech Lake Reservation and the CNF.

The FEIS notes that the SLD Pipeline is collocated with the AC Pipeline. The FEIS discusses the impacts of spills and leaks along that corridor, and therefore a leak from either pipeline would impact the same natural resources. Plaintiffs have not identified any natural resources that would be impacted by the SLD Pipeline that would not have been considered in the FEIS.

Plaintiffs' primary argument is that the FEIS does not consider the operational impacts of transporting diluent in the SLD Pipeline. In particular, Plaintiffs assert that the FEIS fails to identify the chemicals in diluent and contains no evaluation of the consequences of a diluent leak. The FEIS notes that conventional oil and diluent "are both hydrocarbons" (*id*. at 1084) and Appendix U offers a description of diluent:

> Diluent is a generic term that encompasses mixture range of hydrocarbons used for [the purpose of diluting crude oil so it can be transported over long distances]. Diluent is also referred to as condensate, natural gas oil, or pentane plus. The most prevalent types are condensate and naphtha. Diluent is expected to have a similar composition and physical characteristics to gasoline. Therefore, if released into the environment, diluent will behave in a similar manner to gasoline.

(*Id*. at 2561.) As discussed above, the FEIS discusses potential impacts due to spills of refined products, such as gasoline and other petroleum-based products, during construction or operation. (*Id*. at 633.) Such refined products include diluent. In its spill analysis, the FEIS discusses potential spills of refined oil products, including gasoline, in addition to its discussion of crude oil spills. The FEIS recognizes that refined oil products (or products with more viscosity) behave differently in the environment:

> The impact of oil spills on soil is a function of several variables, including the type of oil, permeability of the soil, type and amount of vegetation and other surface cover, and the release point (such as on the surface, or below ground).  Crude oil, lubricating oil, and similar heavy oils would be less likely to penetrate through the surface soil layers than refined oil (such as gasoline and diesel), which could infiltrate through the vegetation, debris, and litter cover.
>
> Once the oil reaches the soil surface, the depth of penetration into the soil would depend on the volume released, the viscosity of the spilled oil, the porosity of the soil, and the extent to which the soil is frozen, or during warmer seasons, saturated by water.  Porous soils (such as sand, gravel, and moraines) are generally more permeable than clays and silts, especially if the latter are saturated.  Karst areas may be especially vulnerable to impacts from a spill.

(*Id*. at 639-40.)  The FEIS notes that "[c]rude or refined oils typically do not penetrate beyond the surface layer in sediments" and "[r]efined products also typically would not penetrate sediments because of their water content but may penetrate or be mixed further into the sediments under the same turbulent or cleanup actions as described for crude oil."  (*Id*. at 640.)  The FEIS also notes that refined products are more likely to percolate down toward the watertable and tend to be "more toxic" than crude oil, but that crude oil spills tend to cause more physical impacts.  (*Id*. at 640-42.)  The FEIS also addresses the impacts of oil spills, including crude and refined oil, on biological, cultural and other resources.  (*Id*. at 642 -648.)  The FEIS concludes that the impacts of spills would be addressed or mitigated.

Based on its review of the administrative record, the Court concludes that Defendants took a "hard look" at operational spills and leaks of both the AC and SLD Pipelines to the extent required by NEPA.

## 2. Connected or Cumulative Actions

Plaintiffs also assert that the State Department was required to analyze the SLD Pipeline and the AC Pipeline in one EIS because they are "connected" or "cumulative" actions. Plaintiffs contend that the State Department violated NEPA by segmenting the AC and SLD Pipelines and omitting the SLD Pipeline from the scope of the AC Pipeline FEIS. In addition, Plaintiffs argue that both the Forest Service and the Corps permitted the SLD Pipeline directly and are therefore required to fully review of the impacts of the SLD Pipeline. Specifically, Plaintiffs argue that the increased capacity to transport heavy crude oil created by the AC Pipeline makes it necessary to increase the supply of diluent, thus making the AC and SLD Pipelines interdependent. Plaintiffs argue that Enbridge treats the pipelines as one project, Enbridge plans to construct the AC Pipeline and SLD Pipeline simultaneously and in the same corridor, and Enbridge applied for related certificates and permits together.

Enbridge maintains that the AC Pipeline and SLD Pipelines are separate and have independent utility. Enbridge argues that even if the pipelines are connected actions, all relevant environmental impacts associated with the SLD Pipeline have been fully considered. Defendants assert Plaintiffs' argument is without merit because the SLD Pipeline has independent utility and therefore it was not required to be analyzed in the same EIS as the AC Pipeline. In addition, Defendants assert that the SLD Pipeline is part of the Southern Lights Project, a separate pipeline project from the AC Pipeline project. Defendants assert that the SLD Pipeline did not require approval from the State Department because it does not cross an international border and, in any event, the Corps

and the Forest Service included the SLD Pipeline within the scope of their NEPA analyses.

NEPA requires that an EIS consider "connected" and "cumulative" actions. 40 C.F.R. § 1508.25(a). Actions are connected if they "(i) [a]utomatically trigger other actions which may require environmental impact statements; (ii) [c]annot or will not proceed unless other actions are taken previously or simultaneously; or (iii) [a]re interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1)(i)-(iii). "Cumulative actions are those actions that when viewed together "have cumulatively significant impacts." 40 C.F.R. § 1508.25(a)(2). A "cumulative impact is an "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. Actions are "similar" if they have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography. 40 C.F.R. § 1508.25(a)(3).

The Court's Order on Plaintiffs' Motion for Preliminary Injunction discussed the issue of whether the AC Pipeline and SLD Pipeline projects are connected. The Court previously explained that in the FEIS, the State Department responded to comments on the scope of the FEIS and explained that the scope of the AC Pipeline project consists of the construction and operation of the AC Pipeline and the expansion of associated pump stations in the United States. The State Department also explains that the AC Pipeline

project does not include the SLD Pipeline as a connected action because it "would have

independent utility relative to the Alberta Clipper Project." (ACP at 135.)[8]  The FEIS

addresses in further detail the SLD pipeline, explaining the Southern Lights Project

consists of three projects, the SLD Pipeline project, the Reversal Pipeline project, and the

LSr project.  (*Id.* at 144.)  The FEIS indicates that neither the AC Pipeline nor the SLD

Pipeline depend upon the other to operate and that they are separate and distinct projects.

(*Id.* at 825.)  For example, the FEIS explains that the current diluent supplies for use in

---

[8]      The FEIS also explains that the SLD project is considered in the Cumulative
Impacts analysis.  (*Id.* at 136.)  With respect to the cumulative effects, the FEIS considers
both Enbridge and non-Enbridge pipeline projects and acknowledges that there are other
existing and proposed projects that could result in similar impacts as the AC Pipeline
project.  Specifically, the FEIS states that:

> . . . Existing large-scale pipelines in the [region of influence] include the
> pipelines within the existing Enbridge right-of-way, the Keystone oil
> pipeline, the MinnCan oil pipeline, and the Great Lakes Gas natural gas
> pipeline [].
>
> There are currently six pipelines in the right-of-way between Neches,
> North Dakota and Clearbrook, Minnesota, and four existing pipelines in
> the Enbridge right-of-way between Clearbrook, Minnesota, and Superior,
> Wisconsin.  These existing pipelines transport crude oil or petroleum
> products.  A fifth pipeline would be installed within the corridor south of
> Clearbrook (Diluent Project) at approximately the same time as the Alberta
> Clipper pipeline, and the associated acreage impacts of the Diluent Project
> pipeline have been incorporated into the environmental review described
> throughout Section 4.0 of this EIS. . . .

(*Id.* at 654.)  The FEIS describes each "large-scale" project and specifically discusses the
impacts of these projects, including potential effects on geology, soils and sediments,
water resources, wetlands, vegetation, wildlife, fisheries, threatened and endangered
species, land use, socioeconomics, cultural resources, and air quality, GHG, and climate
change.  (*Id.* at 654-664.)  The FEIS also describes additional expansion projects and
small-scale projects.

the Alberta, Canada, tar sands are insufficient to meet the demands for the dilution of heavy crude oil and that the SLD Pipeline project is designed to meet a *portion* of that demand.  (*Id.* at 146.)  Although the AC Pipeline will transport heavy crude oil that has been blended with diluent, the diluent will not necessarily be supplied by the SLD Pipeline.  Thus, the SLD Pipeline is not being constructed solely for the purpose of transporting oil through the AC Pipeline.  Instead, "[p]ortions of the Alberta heavy crude oil that will be diluted with the diluent from the [SLD] Project will be transported to other regions in North America via existing Enbridge pipelines and other existing, planned, and proposed pipelines."  (*Id.* at 146.)

Plaintiffs assert that the increase in heavy crude production is due in large part to increased transit capacity via the AC Pipeline and that diluent is a fungible product. Thus, Plaintiffs argue that it is unimportant whether diluent is dedicated to heavy crude that will be transported through the AC Pipeline or added to the general supply.  Plaintiffs contend that there is a "but for" relationship between the increased amount of heavy crude due to the addition of the AC Pipeline and the need for additional diluent.

The Court disagrees with Plaintiffs' above assertions and concludes that the record supports the conclusion that the AC and SLD Pipelines have independent utility and are not reliant upon each other for their operation.  Based on a review of the administrative record, the State Department was not required to include the SLD Pipeline in the scope of its NEPA analysis.

Plaintiffs also assert that the AC Pipeline and SLD Pipeline are similar actions.[9] Plaintiffs note that the pipelines are being constructed side by side in the same right of way at roughly the same time.  Plaintiffs argue that the resulting impacts of construction and operation and threat of operational leaks and spills will increase because of the similar nature of the projects.  The AC Pipeline and SLD Pipeline are similar in certain respects, but the regulations do not require analysis of these projects in a single EIS.  *See* 40 C.F.R. § 1508.25(a) (3) ("An agency *may* wish to analyze these actions in the same impact statement.") (emphasis added).  Here, even if the pipelines are similar, the State Department was not required to include the SLD Pipeline in its FEIS for the AC Pipeline.  In addition, the Corps and the Forest Service both analyzed the AC Pipeline and SLD pipeline in their NEPA analysis.  In issuing their permits, the Forest Service and the Corps relied on the AC Pipeline FEIS, as well as their own assessments of the pipelines.  The Forest Service prepared an EA that specifically considered the impacts of both the AC Pipeline and SLD Pipeline in the CNF.  The Corps also reviewed both pipelines in relation to wetland impacts and imposed additional mitigation measures.

Based on the above reasons, the Court concludes that there are no genuine issues of material fact as to whether Defendants properly evaluated the SLD Pipeline with

---

[9]   Plaintiffs cite to the May Declaration (Doc. No. 104) in support of their contention that cumulative impacts were not adequately considered.  As explained above, the Court does not consider the May Declaration because it was not part of the administrative record.

respect to the AC Pipeline project.  The Court finds that Defendants' analysis was thorough enough to meet NEPA's "hard look" requirement.

### D.   Direct, Indirect, and Cumulative Impacts

Plaintiffs argue that the FEIS fails to consider the reasonably foreseeable indirect and cumulative impacts of the AC Pipeline project.  Specifically, Plaintiffs assert that the FEIS fails to consider the trans-boundary impacts of increased tar sands extraction due to the AC Pipeline project and the effects of the project relative to alternative sources of energy.

NEPA requires that an EIS consider the potential direct, indirect, and cumulative impacts[10] of a proposed action.  40 C.F.R. § 1508.25(c).  "Direct impacts" "are caused by the action and occur at the same time and place."  40 C.F.R. § 1508.08(a).  "Indirect impacts" are those effects caused by the action that are reasonably foreseeable but later in time or farther removed in distance.  40 C.F.R. § 1508.8(b).  A "cumulative impact" is

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

C.F.R. § 1508.7.  A "but for" causal relationship is not enough to make an agency responsible for a particular effect under NEPA.  *U.S. Dep't of Transp. v. Public Citizen*,

---

[10]   "Effects" and "impacts" are used synonymously in the NEPA regulations. 40 C.F.R. § 1508.8(b).

541 U.S. 752, 767 (2004).  NEPA requires "a reasonably close causal relationship" between the effect and the alleged cause.  *Id.*

1.     **Trans-boundary Impacts of the Increased Exploitation of Canadian Tar Sands Extraction Due to AC Pipeline**

Plaintiffs assert that the FEIS fails to analyze the impacts in the United States caused by increased exploitation of Canadian tar sands, such as GHG emissions and impacts on migratory species.  Plaintiffs assert that tar sands extraction in Canada has significant environmental impacts in the United States.  For example, Plaintiffs assert that tar sands extraction will affect over 100,000 square kilometers of Canadian boreal forest that are home to many species which migrate across the U.S.-Canada border, will destroy peat bogs that capture and store carbon, will require toxic "tailing ponds" that will threaten wildlife and water, and will emit black carbon emissions.

Defendants argue that these indirect effects that affect the environment in Canada are transboundary impacts and that there is not a reasonably close causal relationship between the permitting of the AC Pipeline and the development of the Canadian tar sands.  Defendants further argue that the development of the oil sands is under the authority of the Canadian government.  Defendants contend that the Canadian government analyzed the development of the tar sands as part of its environmental review process and that the U.S. agencies here were under no obligation to duplicate that work.  Enbridge argues that NEPA does not impose an obligation on the State Department to address the impacts of oil sands development in Canada because the impacts are not sufficiently related to the AC Pipeline.

The FEIS contains Enbridge's responses to comments on the DEIS directed at the claim that the FEIS fails to consider the cumulative impacts of tar sands oil extraction. In those comments, Enbridge explained:

> NEPA does not require the consideration of the cumulative impacts of extraction of crude oil from the oil sands in Canada. The area of extraction is in Alberta, several hundred miles from the U.S. border. Given the distance between the area of extraction and the U.S. pipeline being considered in this EIS, it is extremely unlikely that there will be any cumulative impacts of the two projects and no credible cumulative impact has been demonstrated. Agencies are allowed to consider "practical considerations of feasibility" in their selection of a geographic scope for an EIS. . . . Further, the Department's NEPA regulations make clear that they apply "to decisions on all Departmental actions which may affect the quality of the environment *in the United States*." 22 CFR § 161.3 (emphasis added).
>
> We also disagree with the comment that the [AC] pipeline will "expand" oil sands development in Canada. The Canadian oil sands will be extracted and utilized regardless of the Alberta Clipper pipeline. The clearest evidence of this is that Alberta oil sands production has been increasing for years even though the Alberta Clipper pipeline has not been constructed. Production of oil from the oil sands is driven by global market demand for oil and the price of oil, not be whether one more or one less pipeline exists to transport that oil to the United States. Were the Alberta Clipper pipeline not built, the oil produced in Alberta would simply find another outlet through which to meet the global demand for that oil.
>
> . . . The extraction impacts need not be addressed in the EIS because there is neither evidence that those activities have an impact in the United States, or even if they did, that the impact is a consequence of, or connected to, the proposed construction of the pipelines. . . . Since the oil extraction has been occurring, and will continue to occur, regardless of whether the pipeline is built, the environmental implications of the oil sands projects is outside the scope of the Alberta Clipper EIS.

(ACP at 15774.)

The administrative record demonstrates that the Canadian tar sands are being developed independently from the AC Pipeline project. In the discussion of the U.S.

Crude Oil Market Demand, the FEIS explains that "[a]ccording to the Oil and Gas

Journal (Stowers 2006), Canada has 180 billion barrels of proven oil reserves, with

174 billion barrels of those reserves in oil sands located in the Western Canadian

Sedimentary Basin" and the "Energy Resources Conservation Board (ERCB 2008) also

estimated that 174 billion barrels of proven reserves are recoverable from Canada's oil

sands."  (*Id*. at 124.)  Further, the FEIS notes:

> Total production of crude bitumen and synthetic crude oil from the oil
> sands increased to 1.9 million bpd in 2007 (ERCB 2008).  The latest report
> on the oil sands from the CNEB stated that as of mid-2006, the number of
> major mining, upgrading, and thermal in-situ production projects grew to
> include over 46 existing and proposed projects, encompassing 135
> individual project expansion phases in various stages of execution (CNEB
> 2006).  The CNEB's projected base scenario, in which most but not all
> announced projects were assumed to go forward, anticipated that
> production capacity would increase each year to eventually reach about
> 3 million bpd by 2015.
> . . .
>
> The CNEB (2006) reported that it expects conventional crude oil
> production in the basin to decline; because of rapidly growing oil sands
> production, however, it expects that total production in the basin will rise to
> 3.9 million bpd by 2015.

(*Id*. at 124-125.)  Despite the oil sands anticipated supply of over 3 million bpd, the AC

Pipeline has the capacity to transport only 450,000 bpd.  (*Id*. at 119.)  The AC Pipeline,

however, is not the only means to transport oil from the tar sands.  The FEIS explains that

nearly all heavy and light crude oil imported from the WCSB in 2006 was transported

through the Enbridge, Kinder Morgan Express, and Kinder Morgan TransMountain

pipeline systems.  (*Id*. at 125.)  As the oil production in the Basin increases, capacity will

be met by the Keystone Pipeline Project and the AC Pipeline, as well as additional

pipeline construction and/or expansion projects.  (*Id.*)  This record suggests that oil from

the WCSB will be transported with or without the AC Pipeline.

Analysis of the tar sands oil production by CNEB further supports the lack of a

causal relationship.  In its 2006 Energy Market Assessment, the CNEB explains that the

"rapid pace of development" of Canada's oil sands are driven by higher oil prices,

concerns surrounding the global supply of oil, market potential in the United States and

Asia, and stable generic fiscal concerns for producers.  (*Id.* at 31569.)  The CNEB

forecasts " a fairly quick ramp-up in oil sands production" and notes issues that could

impede the pace of capacity development.  These issues include factors such as lower

crude oil prices, natural gas usage, and local infrastructure issues in Canada.  (*Id.* at

31585.)  The CNEB notably *does not* mention the availability of pipeline capacity or

diluent as factors either driving or potentially impeding development.  (*Id.*)  The CNEB

does, however, explain that pipeline infrastructure will need to be addressed to

accommodate increasing supply of tar sands oil.  (*Id.* at 31596.)  The CNEB and the

CAPP reports explain that there are several potential markets for increased oil sands

production, including Italy (which has received "spot shipments"), India, and Asia in the

"longer-term."  (*Id.* at 31592-93, 41448.)

Based on a review of the administrative record, the Court concludes that the

Defendants' decision not to assess the trans-boundary impacts associated with the oil

sands production is supported and consistent with their NEPA obligations.  In particular,

the administrative record supports Defendants' conclusion that there is not a sufficient

causal relationship between the AC Pipeline and the development of the oil sands.[11]

Moreover, the oil sands development is under the jurisdiction of Canada.  Because the

activities in Canada here are beyond the review of NEPA, the FEIS is not insufficient for

its failure to consider or attempt to mitigate transboundary impacts.

> **2.    Effects of the AC Pipeline Project Relative to Alternative Sources of Energy**

Plaintiffs assert that the FEIS fails to adequately address the effects of the

availability of tar sands crude oil on the development of alternative energy sources, such

as wind, solar, nuclear, or natural gas.  In support, Plaintiffs rely on *Mid-States Coalition*

*for Progress v. STB*, 345 F.3d 520 (8th Cir. 2003).  In *Mid-States*, the court reviewed the

approval by the Surface Transportation Board (the "Board") of a project proposed by the

Dakota, Minnesota & Eastern Railroad Corporation ("DM&E") to construct new and

---

[11]    Plaintiffs rely heavily on *Border Power Plant Working Group v. Dept. of Energy*, 260 F. Supp. 2d 997 (S.D. Cal. 2003), for the proposition that the Defendants were required to consider the trans-boundary impacts of tar sands development.  In *Border Power Plant*, the court determined that the Department of Energy was required to consider the environmental impacts *in the United States* of the operation of a turbine at a power plant in Mexico.  *Border Power Plant*, 260 F. Supp. 2d 997 at 1017.  The court reasoned that the emissions resulting from the operation of the turbine constituted an effect of the construction and operation of an electrical transmission line that connected the turbine to a substation in the United States.  *Id.* at 1006, 1017.  In so holding, that court explained that the cross-border power line into the United States was "the *only* current means" through which the turbine could transmit its power and found that the line was a "but-for cause" of the generation of power at the particular turbine.  *Id.*  Here, however, the AC Pipeline is *not* the only pipeline through which Canadian oil sands will be transported.  Accordingly, this case is distinguishable from *Border Power Plant* and the holding of that case does not apply.

upgrade existing railroad lines.  In *Mid-States*, the petitioners argued that the Board failed

to consider the effects on air quality that an increase in the supply of coal to power plants

via the rail lines would produce.  *Mid-States*, 345 F.3d at 548.  The court in *Mid-States*

noted that "[t]he increased availability of inexpensive coal will at the very least make

coal a more attractive option to future entrants into the utilities market when compared

with other potential fuel sources."  *Id*. at 549.  The court in *Mid-States* also noted,

however, that DM&E "does not adopt the Board's argument that the proposed project

will leave demand for coal unaffected" and instead acknowledged that the project would

increase coal generation.  *Id*.  The Court remanded the case to the government agency for

further review of the possible environmental impacts of the reasonably foreseeable

increase in coal consumption.  *Id*.

Here, however, there has been no showing that it is reasonably foreseeable that the

oil being transported through the AC Pipeline will increase overall oil consumption in the

United States.  Indeed, the FEIS notes that the volume of crude oil transported via the AC

Pipeline will total about 3% of crude oil processed in the United States.  The FEIS

concludes that this amount of crude oil is not expected to influence the ultimate types of

petroleum products refined or to significantly impact end-use price or demand.  (ACP at

674.)  Absent an effect on crude oil demand, there is no obligation on the part of the

Defendants to analyze the impact of the AC Pipeline on alternative sources of energy.

Based on the record, the Court concludes that Defendants' analysis of the

transboundary effects of the AC Pipeline and the effects on alternative sources of energy

are sufficient to demonstrate that the agencies took a "hard look' at those effects.  The analysis of those effects is not arbitrary and capricious.

### E.      Abandonment--Evaluation of Spills and Leaks and Abandonment

Finally, Plaintiffs assert that the FEIS fails to evaluate the end-of-life impacts or mitigation measures that should be required to ensure the safe closure of the pipelines and restoration of the land upon abandonment of the pipelines.  The AC Pipeline is expected to operate for fifty years or more.  (*Id*. at 203.)  Plaintiffs assert that abandonment of the pipeline is inevitable and certain to occur and that the impacts of abandonment must be considered in order to comply with NEPA.

The FEIS notes that Enbridge has not submitted plans for abandonment of pipeline facilities at the end of its operational life.  (*Id*. at 203.)  The FEIS also indicates that "[a]bandonment plans would be submitted to the appropriate agencies for review and approval prior to abandonment of the pipelines . . . and would be responsive to regulations that are in place at the time."  (*Id*.)  The FEIS also notes that "[c]urrent regulations require that oil pipelines be emptied and cleaned prior to abandonment," and that "agencies with jurisdiction may also require that a pipeline be filled with sand or that it be removed and the corridor be restored to conditions acceptable to the applicable resource agencies."  (*Id*. at 55, 855.)  Further, PHMSA requires pipeline operators to complete and file a report upon abandonment and to certify that the facility has been abandoned in accordance with all applicable laws.  49 C.F.R. 195.59.

The FEIS considered abandonment relevant to current regulations.  This discussion was reasonable in light of the fact that the AC Pipeline will operate for fifty

years or more and there is no way of knowing what particular regulations will govern

abandonment at that time.  Based on the record, the Court concludes that Defendants'

analysis is sufficient to demonstrate that the agencies took a "hard look' at the

abandonment of the AC Pipeline and that their treatment of the abandonment of the

pipeline was not arbitrary and capricious.

## CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons set forth

above, **IT IS ORDERED** that:

1.      Plaintiffs' Motion for Summary Judgment (Doc. No. [214]) is **DENIED**.

2.      Defendants' Motion for Summary Judgment (Doc. No. [226] is

**GRANTED**.

3.      Enbridge's Motion for Summary Judgment (Doc. No. [232]) is

**GRANTED**.

4.      Plaintiffs' Request for Judicial Notice (Doc. No. [218]) is **DENIED**.

5.      Plaintiffs' Motion for Leave to File Supplementary Material (Doc. No.

[241]) is **DENIED**.

6.      Defendants' Motion to Strike Extra-Record Evidence (Doc. No [223]) is

**GRANTED**.

7.      Plaintiffs' First Amended Complaint (Doc. No. [57]) is **DISMISSED**

**WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  October 19, 2010                    s/Donovan W. Frank
                                            DONOVAN W. FRANK
                                            United States District Judge